MATT O'MALLEY (SBN 272802)
PATRICK MCDONOUGH (SBN 288285)
San Diego Coastkeeper
2825 Dewey Rd # 207
San Diego, CA 92106
Ph: 619-758-7743
Email: matt@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlawgroup.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation,

Plaintiffs,

v.

REPUBLIC SERVICES, INC., a Delaware corporation; TAYMAN INDUSTRIES, INC., a California corporation; and ALLIED WASTE SYSTEMS, INC., a Delaware corporation,

Defendants.

Civil Case No. '19CV2219 BEN MSB

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

**(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)**

Complaint

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.   JURISDICTION AND VENUE

1.   This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). See 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.   Plaintiffs have issued three 60-day notice letters ("Notice Letters") to Defendant Republic Services, Inc., Tayman Industries, Inc, doing business as Republic Services of San Diego, and Allied Waste Systems, Inc., doing business as Republic Services of Chula Vista and Republic Services of San Diego Eastgate (collectively "Republic" or "Defendants"), Owners and Operators of three separate industrial facilities, regarding Defendants' violations of the Clean Water Act; California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*) ("General Industrial Permit"). The Notice Letters informed Republic of Plaintiffs' intention to file suit against Republic to enforce the Clean Water Act and General Industrial Permit.

3.   Plaintiffs issued Notice Letters to Republic's Facility located at 8364 Clairemont Mesa Blvd., San Diego, CA 92111 ("San Diego Hauling Facility"); Republic's Facility located at 881 Energy Way, Chula Vista, CA 91911 ("Chula Vista Hauling Facility"); and to Republic's Facility located at 5692 Eastgate Drive, San Diego, CA 92121 ("Eastgate Hauling Facility") on August 27, 2019. True and correct copies of the three Notice Letters, and all included enclosures, are attached hereto as Exhibit 1 and incorporated herein.

4.      Plaintiffs also sent the Notice Letters to the registered agents for Defendants, the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Board as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

5.      More than sixty (60) days have passed since the Notice Letters were served on Defendants and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letters and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

6.      Venue is proper in the Southern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## II.      **<u>INTRODUCTION</u>**

7.      Plaintiffs seek relief for Defendants' substantive and procedural violations of the General Industrial Permit and the Clean Water Act resulting from Defendants' activities at its San Diego, Chula Vista, and Eastgate Hauling Facilities (collectively "Republic Facilities").

8.      Specifically, Defendants have discharged and/or continue to discharge polluted storm water from the San Diego Hauling Facility to San Clemente Canyon Creek, Rose Creek, Mission Bay, and the Pacific Ocean; from the Chula Vista Hauling Facility to Otay River, San Diego Bay, and the Pacific Ocean; and from the Eastgate Hauling Facility to Carroll Canyon, Soledad Canyon, Los Peñasquitos Lagoon, and the Pacific Ocean in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

9.      Defendants have also violated and continue to violate the filing, monitoring,

reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Industrial Permit.

10.    This complaint further seeks relief to prevent discharges in violation of the General Industrial Permit as amended by *Order No. 2014-0057-DWQ* ("2015 Permit"). These are ongoing and continuous violations of the Clean Water Act and the General Industrial Permit.

11.    With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations conducted at the Republic Facilities, flow into storm drain systems, local tributaries, San Clemente Canyon Creek, Rose Creek, Carroll Canyon, Soledad Canyon, Otay River, Los Peñasquitos Lagoon, Mission Bay, San Diego Bay, and the Pacific Ocean (collectively "Receiving Waters").

12.    Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of bird, and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

13.    This discharge of pollutants in storm water from industrial activities at the Republic Facilities contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

14.    Storm water and non-storm water contaminated with sediment, heavy metals, pathogens, nutrients, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

15.    The polluted discharges from the Republic Facilities also harm the special aesthetic and recreational significance of Receiving Waters for people in the surrounding communities, including Coastkeeper's and CERF's members. The public's use of the Receiving Waters for water contact recreation exposes people to bacteria, toxic metals, and other contaminants resulting from storm water and non-storm water discharges. Non-

contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to these waters.

16. Plaintiffs seek a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendants' repeated and ongoing violations of the Clean Water Act and the General Industrial Permit.

**III.    PARTIES**

**A.    Plaintiffs.**

17. Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 2825 Dewey Road, Suite 207, San Diego, California 92106.

18. San Diego Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's inland waterways, marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation. Coastkeeper implements this mission through outreach and education programs that work to prevent water pollution, as well as community activism, participation in governmental hearings, and prosecuting litigation to ensure that San Diego's beaches, bays, coastal waters, and tributary streams and rivers meet all substantive water quality standards guaranteed by Federal, State and local statutes and regulations. When necessary, Coastkeeper directly initiates enforcement actions on behalf of itself and its members.

19. Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located at 1140 South Coast Highway 101, Encinitas California, 92024.

20. CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to aggressively advocate, including through litigation, for the protection and enhancement of coastal

natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

21.     Plaintiffs have thousands of members who live and/or recreate in and around the Receiving Waters.  Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies, among other activities.

22.     Defendants' failure to comply with the procedural and substantive requirements of the General Industrial Permit, and the Clean Water Act results in discharges of polluted storm water to the Receiving Waters. Defendants' polluted discharges degrade water quality and harm aquatic life in the Receiving Waters, and thus impair Plaintiffs' members' use and enjoyment of those waters.

23.     The violations of the General Industrial Permit and Clean Water Act at the Republic Facilities are ongoing and continuous. Thus, the interests of Plaintiffs' members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the General Industrial Permit and the Clean Water Act.

24.     The relief sought herein will redress the harms to Plaintiffs' members caused by Defendants' activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

**B.     The Owners and/or Operators of the Republic Facilities.**

25.      Plaintiffs are informed, believe, and thereon allege that Republic Services, Inc. is a Delaware corporation and its registered agent is CT Corporation System, 818 West Seventh Street, Suite 930, Los Angeles, California 90017.

26.     The Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") for the San Diego Hauling Facility states that the Owner and/or Operator of the Facility is "Republic Services of San Diego."

27.     The NOI for the Chula Vista Hauling Facility states that the Owner and/or

Operator of the Facility is "Republic Services of Chula Vista."

28.    The NOI for the Eastgate Hauling Facility states that the Owner and/or Operator of the Facility is "Republic Services of San Diego Eastgate."

29.    Plaintiffs are informed, believe, and thereon allege that Tayman Industries, Inc., doing business as Republic Services of San Diego, is the legal Owner and/or Operator of the San Diego Eastgate Hauling Facility.

30.    Plaintiffs are informed, believe, and thereon allege that Allied Waste Systems, Inc doing business as Republic Services of San Diego and Republic Services of Chula Vista is the legal Owner and/or Operator of the San Diego Hauling and Chula Vista Hauling Facilities respectively.

31.    Plaintiffs are informed, believe, and thereon allege that Tayman Industries, Inc. and Allied Waste Systems, Inc. are wholly-owned subsidiaries of Republic Services, Inc.

32.    Section 1.1 of the Storm Water Pollution Prevention Plans ("SWPPPs") for each of the Republic Facilities states that each property is "owned" and is "being operated" by Republic Services, Inc.

33.    Each of the SWPPPs and numerous other official documents related to the Republic Facilities' compliance with the General Industrial Permit and CWA indicates that such documents were "prepared for" Republic Services.

34.    Plaintiffs refer to the San Diego Hauling Facility Owner and/or Operator, Chula Vista Hauling Facility Owner and/or Operator, and the Eastgate Hauling Facility Owner and/or Operator, collectively as the "Republic Owners and/or Operators."

## IV.    LEGAL BACKGROUND

### A.    The Clean Water Act.

35.    The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by a NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

36.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the

Complaint                                6

discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated Sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

37. "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

38. The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see also* 40 C.F.R. § 122.2.

39. The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce.

40. The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

41. A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999–1000.

42. A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000–1001.

43.     Section 301(b) requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable (BAT) for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology (BCT) for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)–(iii).

44.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. §§ 1365(a)(1) and 1365(f).

45.     A corporate entity is a "person" within the meaning of Section 502(5) of the Clean Water Act. 33 U.S.C. § 1362(5).

46.     An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. 33 U.S.C. § 1365(a).

47.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring between January 28, 2009 and November 2, 2015, and $54,833 for violations occurring after November 2, 2015. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

48.     Section 505(d) of the Clean Water Act permits prevailing, or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees. 33 U.S.C. § 1365(d).

**B.      California's General Industrial Permit.**

49.     Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

50.     Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. 33 U.S.C. § 1342(b). States with approved

Complaint                                                8

NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *Id.*

51.     California is a state authorized by the EPA to issue NPDES permits.

52.     In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

53.     The General Industrial Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA that regulates the discharge of pollutants from industrial sites. 33 U.S.C. § 1342.

54.     Between 1997 and June 30, 2015, the General Industrial Permit in effect was Order No. 97-03-DWQ ("1997 Permit").

55.     On July 1, 2015, pursuant to Order No. 2014-0057-DWQ ("2015 Permit"), the reissued General Industrial Permit took effect.

56.     The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit.

57.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the General Industrial Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 1997 Permit, Finding 2; 2015 Permit § I.A.12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the General Industrial Permit by submitting an NOI to the State Board. 1997 Permit, Finding 3; 2015 Permit § I.A.17.

58.     Violations of the General Industrial Permit are violations of the Clean Water Act. 1997 Permit § C.1; 2015 Permit § XXI.A.

**C.      The General Industrial Permit Discharge Prohibitions.**

59.     The General Industrial Permit contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as

Complaint                                    9

specifically authorized by this General Permit or another NPDES permit." 2015 Permit § III.A.

60.     The Discharge Prohibitions provisions prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by a NPDES permit, to the waters of the United States. 1997 Permit § A.1; 2015 Permit § III.B.

61.     These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. 1997 Permit § A.2; 2015 Permit § III.C.

62.     The General Industrial Permit prohibits "[d]ischarges that violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans (Basin Plans), or statewide water quality control plans and policies." 2015 Permit § III.D.

63.     The Water Quality Control Plan for the San Diego Basin, California Regional Water Quality Control Board, San Diego Region ("Basin Plan") further establishes certain Waste Discharge Prohibitions. Basin Plan at 4-19.

64.     Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited. Allowances for dilution may be made at the discretion of the Regional Board." *Id*. at 4-20.

65.     Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the San Diego Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 Permit.

66.     Each and every time a Facility Owner and/or Operator discharges unauthorized non-storm water from the Facility is a violation of the General Industrial Permit and Clean Water Act. 33 U.S.C. § 1311(a); 1997 Permit § A.1; 2015 Permit § III.B.

67.     Each and every time a Facility Owner and/or Operator discharges storm water or authorized non-storm water which causes or threatens to cause pollution, contamination, or nuisance is a violation of the General Industrial Permit and Clean Water Act. 33 U.S.C. § 1311(a); 1997 Permit § A.2; 2015 Permit § III.C.

68.     Each and every time a Facility Owner and/or Operator discharges storm water or authorized non-storm water that violates any discharge prohibitions contained in applicable Basin Plans or statewide water quality control plans and policies is a violation of the General Industrial Permit and Clean Water Act. 33 U.S.C. § 1311(a); 2015 Permit § III.D.

### D.     The General Industrial Permit Effluent Limitations.

69.     The General Industrial Permit Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT for toxic or non-conventional pollutants, and BCT for conventional pollutants. 1997 Permit § B.3; 2015 Permit § V.A.

70.     Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), hydrogen ion concentration ("pH"), nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

71.     Pursuant to the CWA and the General Industrial Permit, dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 Permit § V.A.

72.     The EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

73.     The EPA Benchmarks provide a relevant and objective standard for

Complaint                                11

evaluating whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. See MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); MSGP, 65 Fed. Reg. 64,746, 64,766–67 (Oct. 30, 2000); *see also* 2015 MSGP Fact Sheet, p. 50; EPA 2008 MSGP Fact Sheet, p. 106.

74. Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Id.*

75. The EPA Benchmark for TSS is 100 mg/L. 2015 MSGP Fact Sheet at 55–56.

76. The EPA Benchmark for total zinc in freshwater is 0.12 mg/L. *Id.*

77. The EPA Benchmark for total copper in freshwater is 0.014 mg/L. *Id.*

78. The EPA Benchmark for oil and grease is 15 mg/L. *Id.*

79. The EPA Benchmark for total iron in freshwater is 1.0 mg/L. *Id.*

80. The EPA Benchmark for total aluminum is 0.75 mg/L. *Id.*

81. The EPA Benchmark for nitrate + nitrite nitrogen (N+N) is 0.68 mg/L. *Id.*

82. The EPA Benchmark for total phosphorus in freshwater is 2.0 mg/L. *Id.*

83. The EPA Benchmark for pH is 6.0–9.0 s.u. *Id.*

84. The EPA Benchmark for total lead in freshwater is 0.082 mg/L. *Id.*

85. The EPA Benchmark for total copper in saltwater is 0.0048 mg/L. *Id.*

86. The EPA Benchmark for total zinc in saltwater is 0.09 mg/L. *Id.*

87. The EPA Benchmark for total lead in saltwater is 0.21 mg/L. *Id.*

88. Failure to develop and/or implement BMPs that constitute BAT and BCT is a violation of the General Industrial Permit. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 Permit § V.A.

89. Each time a Facility Owner and/or Operator discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of

the 2015 Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

**E.     The General Industrial Permit Receiving Water Limitations.**

90.     The General Industrial Permit Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater from adversely impacting human health or the environment. 1997 Permit § C.1; 2015 Permit § VI.B.

91.     Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the General Industrial Permit's Receiving Water Limitations. *Id.*

92.     The General Industrial Permit Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. 1997 Permit § C.2; 2015 Permit § VI.A.

93.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the Beneficial Uses of the waters that receive polluted discharges.

94.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan that contains WQSs for water bodies within its geographical area.

95.     WQSs applicable to dischargers covered by the General Industrial Permit include, but are not limited to, those set out in the San Diego Basin Plan, and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

96.     The Basin Plan identifies "Beneficial Uses" for water bodies in the San Diego region.

97.     Beneficial Uses for surface waters are designated under the Clean Water Act section 303 in accordance with regulations contained in 40 C.F.R. § 131. The State is

Complaint                                        13

required to specify appropriate water Beneficial Uses to be achieved and protected. Basin Plan, at 2-2.

98.    The Beneficial Use designation of surface waters of the state must take into consideration the use and value of water for public water supplies, protection and propagation of fish, shellfish and wildlife, recreation in and on the water, agricultural, industrial and other purposes including navigation. *Id.*

99.    The existing and potential Beneficial Uses for San Clemente Canyon Creek include: Contact Water Recreation, Non-Contact Water Recreation, Warm Freshwater Habitat, Wildlife Habitat, Rare, Threatened, or Endangered Species, and Spawning, Reproduction, and/or Early Development. Basin Plan, Table 2-2.

100.    The existing and potential Beneficial Uses for Rose Creek include: Contact Water Recreation, Non-Contact Water Recreation, Warm Freshwater Habitat, Wildlife Habitat, and Industrial Service Supply. *Id.*

101.    The existing and potential Beneficial Uses for Mission Bay are: Water Contact Recreation, Non-Contact Water Recreation, Wildlife Habitat, Rare, Threatened, or Endangered Species, Migration of Aquatic Organisms, Marine Habitat, Estuarine Habitat, Spawning, Reproduction, and/or Early Development, Shellfish Harvesting, Commercial and Sport Fishing, and Industrial Service Supply. Basin Plan at Table 2-3.

102.    The Beneficial Uses for Carroll Canyon include: Contact Water Recreation, Non-Contact Water Recreation, Warm Freshwater Habitat, Cold Freshwater Habitat, Wildlife Habitat, Rare, Threatened, or Endangered Species, Industrial Service Supply, and Agricultural Supply. *Id.*

103.    The Beneficial Uses for Soledad Canyon include: Contact Water Recreation, Non-Contact Water Recreation, Warm Freshwater Habitat, Cold Freshwater Habitat, Wildlife Habitat, Industrial Service Supply, and Agricultural Supply. *Id.*

104.    The Beneficial Uses for Los Peñasquitos Lagoon include: Contact Recreation (Only Fishing from Boat or Shore), Non-Contact Water Recreation, Preservation of Biological Habitats of Special Significance, Estuarine Habitat, Wildlife

Habitat, Rare, Threatened, or Endangered Species, Marine Habitat, Migration of Aquatic Organisms, Spawning, Reproduction, and/or Early Development, and Shellfish Harvesting. *Id*. at Table 2-3.

105.   The Beneficial Uses for the Otay River include: Non-Contact Water Recreation, Warm Freshwater Habitat, Wildlife Habitat, Rare, Threatened, or Endangered Species, and the potential Beneficial Use of Contact Recreation. *Id*.

106.   The Beneficial Uses for the San Diego Bay include: Industrial Service Supply, Navigation, Contact Water Recreation, Non-Contact Water Recreation, Commercial and Sport Fishing, Wildlife Habitat, Estuarine Habitat, Preservation of Biological Habitats of Special Significance, Marine Habitat, Migration of Aquatic Organism, Spawning Reproduction, and/or Early Development, Shell Harvesting, and Rare, Threatened, or Endangered Species. *Id.* at Table 2-3.

107.   The Beneficial Uses for the Pacific Ocean include: Industrial Service Supply, Navigation, Contact Water Recreation, Non-Contact Water Recreation, Commercial and Sport Fishing, Wildlife Habitat, Preservation of Biological Habitats of Special Significance, Marine Habitat, Migration of Aquatic Organism, Spawning Reproduction, and/or Early Development, Shell Harvesting, Aqua Culture, and Rare, Threatened, or Endangered Species. *Id.*

108.   Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

109.   According to the 2016 303(d) List of Impaired Water Bodies,[1] Rose Creek is impaired for benthic community effects, selenium, toxicity.

110.   Coastkeeper monitoring data, publicly reported in the California

---

[1] 2014/16 Integrated Report – All Assessed Waters, *available at* https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2014_2016.shtml (last accessed on October 29, 2019).

Environmental Data Exchange Network ("CEDEN"), indicates that Rose Creek is also impaired for E. coli, enterococcus, total coliform, N+N, and phosphorus.[2]

111.   Coastkeeper monitoring data publicly reported in CEDEN indicates that San Clemente Creek is impaired for E. coli, enterococcus, and total coliform.

112.   According to the 2016 303(d) List of Impaired Water Bodies, Mission Bay at the mouth of Rose Creek is impaired for lead and for eutrophic conditions (nutrients).

113.   According to the 2016 303(d) List of Impaired Water Bodies, Mission Bay Shoreline at Campland by the Bay, which is immediately adjacent to the mouth of Rose Creek, is impaired for indicator bacteria such as enterococcus, fecal coliform, and total coliform.

114.   According to the 2016 303(d) List of Impaired Water Bodies, Mission Bay at large is impaired for mercury and polychlorinated biphenyls ("PCBs"). Other areas of Mission Bay are impaired for copper and toxicity.

115.   According to the 2016 303(d) List of Impaired Water Bodies, San Diego Bay is impaired for mercury, polycyclic aromatic hydrocarbons, and PCBs. Other parts of San Diego Bay are impaired for benthic community effects, sediment toxicity, copper, total coliform, enterococcus, fecal coliform, and chlordane.

116.   Coastkeeper monitoring data publicly reported in CEDEN indicates that the Otay River is impaired for E. Coli, enterococcus, N+N, and phosphorus.

117.   According to the 2016 303(d) List of Impaired Water Bodies, Carroll Canyon is impaired for benthic community effects and toxicity.

118.   According to the 2016 303(d) List of Impaired Water Bodies, Soledad Canyon is impaired for sediment toxicity and selenium.

119.   According to the 2016 303(d) List of Impaired Water Bodies, Los Peñasquitos Lagoon is impaired for sedimentation/siltation and toxicity.

_____

[2] This data and information is publicly available at https://ceden.waterboards.ca.gov/AdvancedQueryTool under the program titled "SDCK Monitoring Program."

120.   According to the 2016 303(d) List of Impaired Water Bodies, the Pacific Ocean shoreline on Torrey Pines State Beach, at the North Beach Entrance parking lot is impaired for trash.

121.   Polluted discharges from industrial facilities, such as the Republic Facilities, contribute to the degradation of these already impaired surface waters, as well as aquatic-dependent wildlife.

122.   The Basin Plan sets forth WQSs for surface waters and enclosed bay and estuaries for various pollutants

123.   The Basin Plan Objective for total iron is 0.3 mg/L for the San Clemente Canyon, Rose Creek, Carroll Canyon, Soledad Canyon, and the Otay River. Basin Plan, Table 3-2.

124.    The Basin Plan Objective for inland surface waters for total phosphorus is 0.1 mg/L. *Id.*

125.   The Basin Plan Objective for inland surface waters for total nitrogen is 1.0 mg/L. *Id.*

126.   The Basin Plan Objective for pH states that inland surface water "shall not be depressed below 6.5 or raised above 8.5." *Id.* at 3-26.

127.   From July 1, 2015, to March 21, 2019, the Basin Plan Water Quality Objective for inland surface waters for fecal coliform was 400 MPN/100 ml, and for enterococcus was 61 MPN/100 ml.

128.   Since March 22, 2019, the applicable Basin Plan Water Quality Objective for indicator bacteria states that the statistical threshold value may not exceed 320 cfu/100mL for E. coli in all waters where the salinity is equal to or less than 1 ppth 95 percent or more of the time. State Water Resources Control Board, Part 3 of the Water Quality Control Plan for Inland Surface Waters, Enclosed Bay, and Estuaries of California § III.E.2.

129.   Since March 22, 2019, the applicable Basin Plan Water Quality Objective for indicator bacteria states that the statistical threshold value may not exceed 110

cfu/100mL for enterococci in all waters where the salinity is greater than 1 ppth more than five percent of the time. *Id*.

130.   From July 1, 2015, to March 21, 2019, the Water Quality Control Plan for Ocean Waters of California ("Ocean Plan") set the single sample maximum for fecal coliform density at 400 per 100mL, and single sample maximum for enterococcus density at 104 per 100 mL. Ocean Plan § II.B.1.(1).

131.   Since March 22, 2019, the applicable Water Quality Objective for indicator bacteria in Ocean Waters is 110 cfu/100mL for enterococci. State Water Resources Control Board, Amendment to the Water Quality Control Plan for Ocean Waters of California § II.B.1.(1).

132.   The CTR includes numeric criteria set to protect human health and the environment in the State of California. *See* Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), *available at* http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

133.   The CTR sets forth maximum concentration levels of several toxic pollutants such that California can achieve health and environmental protection goals.

134.   The CTR sets forth the maximum concentrations for freshwater inland surface waters, based on 100mg/L hardness. For example, lead is 0.065 mg/L; zinc is 0.12 mg/L; and copper is 0.013 mg/L. 40 C.F.R. § 131.38.

135.   The CTR sets forth the maximum concentrations for saltwater bays and estuaries. For example, lead is 0.21 mg/L; zinc is 0.09 mg/L; and copper is 0.0048 mg/L. 40 C.F.R. § 131.38.

136.   Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

137.   In adopting the CTR, the EPA expressly directed that "[a]ll waters (including lakes, estuaries and marine waters) … are subject to the Criteria promulgated today. Such criteria will need to be attained at the end of the discharge pipe, unless the

State authorizes a mixing zone."  65 F.R. §§ 31682-01, 31701.

138.   Similarly, the Basin Plan provides that absent any "allowance for dilution," waste discharges are prohibited unless "the quality of the discharge" meets its Criteria. Basin Plan at 4-19.

139.   Because the General Industrial Permit Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the General Industrial Permit. *See* 1997 Permit § C.2; 2015 Permit § VI.A; *see also Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 926 (C.D. Cal. 2009).

140.   "'Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for [an] enforcement action.'" *Natural Resources Defense Council, Inc. v. County of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013) (quoting 40 C.F.R. § 122.41(a)).

141.   The General Industrial Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facility. Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS, it is a separate and distinct violation of Receiving Water Limitation C.2 of the 1997 Permit, Receiving Water Limitation VI.A of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

142.   Each time discharges of storm water from the Facility adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation C.1 of the 1997 Permit, Receiving Water Limitation VI.B of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

**F.     The General Industrial Permit Storm Water Pollution Prevention Plan Requirements.**

143.   Section A.1.a and Provision E.2 of the 1997 Permit require dischargers to

have developed and implemented a SWPPP by October 1, 1992, or prior to beginning industrial activities, that meets all the requirements of the Industrial Permit. Sections X.A–B of the 2015 Permit require development and implementation of site-specific SWPPPs by July 1, 2015, or upon commencement of industrial activity.

144.   The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit § A.2; 2015 Permit § X.

145.   The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. 1997 Permit § A.2; 2015 Permit § X.G.

146.   The SWPPP must identify site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. 1997 Permit § A.2; 2015 Permit § X.H.

147.   The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT, and as necessary to comply with the General Industrial Permit. 1997 Permit § A.2; 2015 Permit §§ I.D.32, X.C.

148.   The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the

Complaint                                    20

frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan, also referred to as a Monitoring and Reporting Plan. 1997 Permit §§ A.1–10; 2015 Permit §§ X.A–I.

149.   The General Industrial Permit requires the discharger to evaluate the SWPPP at least annually and revise it as necessary to ensure compliance with the General Industrial Permit. 1997 Permit §§ A.9–10; 2015 Permit §§ X.A.9, X.B.1. The 2015 Permit requires dischargers to "certify and submit via SMARTS their SWPPP within 30 days whenever the SWPPP contains significant revision(s)." 2015 Permit § X.B.2.

150.   The General Industrial Permit requires dischargers to conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit §§ A.9.a–c; 2015 Permit § XV.

151.   Section A.9.d of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the General Industrial Permit. 1997 Permit §§ A.9.d.i–vi. If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the General Industrial Permit. *Id.* § A.9.d. The evaluation report shall be submitted as part of the Annual Report specified in § B.14 of the General Industrial Permit. *Id.*

152.   The SWPPP and site maps must be assessed and revised as necessary to ensure accuracy and effectiveness. 1997 Permit §§ A.1, B.3–4; 2015 Permit §§ I.J.55,

X.B.1.

## G. The General Industrial Permit Monitoring and Reporting Requirements.

153.    The General Industrial Permit requires permittees to develop and implement a monitoring and reporting program ("M&RP"). 1997 Permit §§ B.1–2, E.3; 2015 Permit, §§ X.I, XI.3.

154.    The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the General Industrial Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit §§ B.2.a–b; 2015 Permit §§ X.I, XI.

155.    The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 1997 Permit §§ B.2.a, B.2.d; 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43.

156.    The M&RP must ensure that storm water discharges are in compliance with the General Industrial Permit Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit § B.2; 2015 Permit §§ I.J.55–56, XI.

157.    The M&RP shall be revised as necessary to ensure compliance with the General Industrial Permit. 1997 Permit § B.2.d; 2015 Permit § XI.A.4.

158.    The General Industrial Permit requires dischargers conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 1997 Permit § B.4.a (monthly observations of each discharge location required); 2015 Permit § XI.A.1 (monthly observations of each drainage area required).

159.    Section B.4.c of the 1997 Permit and Section XI.A.2 of the 2015 Permit

---

[3] The 2015 Permit refers to the M&RP as a Monitoring Implementation Plan or "MIP."

Complaint                                         22

require dischargers to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges, and to eliminate unauthorized non-storm water discharges. 1997 Permit § B.4.c; 2015 Permit § XI.A.3.

160.    The General Industrial Permit requires dischargers to revise the M&RP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit § B.4.c; 2015 Permit § X.B.1.

161.    The General Industrial Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. 1997 Permit §§ B.5, B.7; 2015 Permit § XI.B.4.

162.    The 1997 Permit defines Wet Season as October 1 through May 30. 1997 Permit, Section B.4.a.

163.    Section B.5.a of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. *Id.* Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled. *Id.*

164.    Section B.5.b of the 1997 Permit required sampling to occur during scheduled facility operating hours that were preceded by at least three (3) working days without storm water discharge.

165.    Section B.15 of the 1997 Permit required dischargers participating in a group monitoring plan to collect at least two (2) samples from each discharge point at the Facility over a five (5) year period. *See* 1997 Permit §§ B.5, B.7, B.15.

166.   Section XI.B.1 of the 2015 Permit requires sampling from a qualifying storm event ("QSE"), which is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area.

167.   The 2015 Permit defines Reporting Year as July 1 through June 30. 2015 Permit § I.M.62.b.

168.   Section XI.B.2 of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30).

169.   Section XI.B.11 of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via California's Storm Water Multiple Application & Report Tracking System ("SMARTS") database within thirty (30) days of obtaining the results for each sampling event.

170.   Section B.5.c.i of the 1997 Permit required dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and total organic carbon ("TOC"). A discharger may substitute analysis for O&G instead of TOC.

171.   Section B.5.c.ii of the 1997 Permit further required dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

172.   Section XI.B.6.a–b of the 2015 Permit requires dischargers to analyze samples for TSS, O&G, and pH.

173.   Section XI.B.6.c of the 2015 Permit requires dischargers to analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants on a facility-specific basis.

174.   Section XI.B.6 of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters

with 303(d) listed impairments, or approved Total Maximum Daily Loads.

175.   Section B.14 of the 1997 Permit required that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include (1) a summary of visual observations and sampling results, (2) an evaluation of the visual observations and sampling and analysis results, (3) laboratory reports, (4) the annual comprehensive site compliance evaluation report specified in Section A(9), (5) an explanation of why a facility did not implement any activities required, and (6) the records specified in Section B.13.i. *Id.*

176.   Section C.11.d of the 1997 Permit requires facility operators to report any incidence of noncompliance with the Industrial Permit at the time monitoring reports are submitted. Reports of noncompliance must contain (1) a description of noncompliance and its cause, (2) the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (3) steps taken or planned to reduce and prevent recurrence of the noncompliance. 1997 Permit § C.11.d.

177.   Section XVI of the 2015 requires dischargers to submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year, as indicated in the Compliance Checklist, (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation. *Id.*

178.   The General Industrial Permit requires that all reports, certifications, or other information required by the Permit or requested by a regional board to have been signed by an authorized representative of the facility's operators. 1997 Permit § C.9; 2015 Permit § XX.K.

179.   The General Industrial Permit requires that signatories under Sections C.9-

10 of the 1997 Permit, and Sections XX.K–L of the 2015 Permit, to make the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to ensure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

**H.      The 2015 Permit Exceedance Response Actions Requirements.**

180.    The 2015 Permit includes Numeric Action Levels ("NALs") that are based on EPA Benchmarks. Like Benchmarks, the NALs indicate "the overall pollutant control performance at any given facility." 2015 Permit § I.M.61; see also *Id.* § I.M.62 and Table 2.

181.    When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." 2015 Permit § XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *Id.* § XII.C.

182.    Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred. *See id.* § XII.C. By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of General Industrial Permit ("Level 1 Evaluation"). *Id.* §§ XII.C.1.a–c.

183.    Although the Level 1 Evaluation may focus on the drainage area(s) where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *Id.* § XII.C.1.c.

184.    Based upon the Level 1 Evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the Level 1 Evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the summary of the Level 1 ERA Evaluation, and a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL. *Id.* §§ XII.C.2.a.i–ii.

185.    The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *Id.* § XII.C.2.a.iii.

186.    A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *Id.* § XII.C.2.b.

187.    A discharger's Level 1 status for any given parameter changes to Level 2 status if sampling results indicate a NAL exceedance for that same parameter while the discharger is in Level 1. Level 2 status commences on July 1 following the Reporting Year during which the NAL exceedance(s) occurred. *Id.* § XII.D.

188.    Dischargers with Level 2 status shall certify and submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the Reporting Year during which the NAL exceedance(s) occurred. For each new Level 2 NAL exceedance, the Level 2 Action Plan must identify which of the demonstrations in subsection D.2.a through c the Discharger has selected to perform. A new Level 2 NAL exceedance is any Level 2 NAL exceedance for 1) a new parameter in any drainage area, or 2) the same parameter that is being addressed in an existing Level 2 ERA Action Plan in a different drainage area. *Id.*

Complaint                                    27

§ XII.D.1.a.

189.   The Discharger shall certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) if this information has changed since previous certifications. *Id.* § XII.D.1.b.

190.   The Level 2 ERA Action Plan shall at a minimum address the drainage areas with corresponding Level 2 NAL exceedances. *Id.* § XII.D.1.c.

191.   All elements of the Level 2 ERA Action Plan shall be implemented as soon as practicable and completed no later than 1 year after submitting the Level 2 ERA Action Plan. *Id.* § XII.D.1.d.

192.   The Level 2 ERA Action Plan shall include a schedule and a detailed description of the tasks required to complete the discharger's selected demonstration(s) as described in subsections D.2.a through c of the 2015 Permit. *Id.* § XII.D.1.e.

193.   On January 1 of the Reporting Year following the submittal of the Level 2 ERA Action Plan, a discharger with Level 2 status shall certify and submit a Level 2 ERA Technical Report prepared by a QISP that includes one or more of the following demonstrations: (a) Industrial Activity BMPs Demonstration, (b) Non-Industrial Pollutant Source Demonstration, or (c) Natural Background Pollutant Source Demonstration. *Id.* §§ XII.D.2.a–c.

194.   NAL exceedances as defined in the General Industrial Permit are not, in and of themselves, violations of the General Industrial Permit. However, NAL exceedances indicate that a facility is performing poorly and failing to implement BMPs that achieve BAT and BCT.

195.   A "[d]ischarger that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is in violation of this General Permit." *Id.* § I.M.63.

## V.   FACTUAL BACKGROUND

### A.   Facility Information.

/ / /

### 1.  The San Diego Hauling Facility.

196.   Plaintiffs are informed, believe, and thereon allege Republic enrolled as a discharger subject to the 1997 Permit on December 22, 1998, for the San Diego Hauling Facility.

197.   Plaintiffs are informed, believe, and thereon allege Republic submitted a Notice of Intent ("NOI") to the State Water Resources Control Board to obtain General Industrial Permit coverage enrolled as a discharger under the 2015 Permit for the San Diego Hauling Facility on March 16, 2018 ("2018 NOI").

198.   The 2018 NOI lists the Facility Waste Discharge Identification ("WDID") number as 9 37I014866, and identifies both the Facility site name and Facility operator as "Republic Services of San Diego."

199.   The Facility's SWPPPs dated June 2015 ("2015 SWPPP") and November 2016 ("2016 SWPPP") both state that the "property is owned by Republic Services and is being operated by Republic Services."

200.   The Level 2 ERA Action Plan dated December 2017 ("2017 Level 2 ERA Action Plan"), and the Level 2 ERA Technical Report dated December 2018 ("2018 Level 2 ERA Technical Report") were both "prepared for Republic Services, Inc.," and both state that the "property is owned and operated by Republic Services, Inc." As such, Plaintiffs are informed, believe, and thereon allege that Republic Services, Inc. is the owner and/or operator of the Facility.

201.   The 2018 NOI states that the Facility is four acres, all of which are exposed to storm water, but does not indicate what percent of the site is impervious.

202.   The 2016 SWPPP states that the operating portion of Facility is approximately 3.6 acres, and lists the site as greater than 90 percent impervious.

203.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility is currently an active industrial facility covered under the General Industrial Permit.

204.   The 2018 NOI and the 2016 SWPPP list the Standard Industrial

Classification ("SIC") code for the San Diego Hauling Facility as 4212. The 2018 NOI describes this SIC code as local trucking without storage, while the 2016 SWPPP states it is "Motor Freight Transportation and Warehousing."

205.   Plaintiffs are informed, believe, and thereon allege that SIC code 4231 (terminal and joint terminal maintenance facilities for motor freight transportation), and SIC code 4953 (refuse systems) also apply to the San Diego Hauling Facility.

206.   Plaintiffs are informed, believe, and thereon allege storm water is or has been discharged from multiple discharge points at the San Diego Hauling Facility into Receiving Waters or tributaries of Receiving Waters.

207.   Plaintiffs are informed, believe, and thereon allege that each of the surface waters into which the San Diego Hauling Facility discharges polluted storm water are tributaries to traditional navigable waters, such as San Clemente Creek, Rose Creek, Mission Bay, and the Pacific Ocean.

### 2.  The Chula Vista Hauling Facility.

208.   Plaintiffs are informed, believe, and thereon allege Republic enrolled as a discharger subject to the 1997 Permit on July 6, 1998, for the Chula Vista Hauling Facility.

209.   Plaintiffs are informed, believe, and thereon allege Republic submitted an NOI to the State Water Resources Control Board to obtain General Industrial Permit coverage enrolled as a discharger under the 2015 Permit for the Chula Vista Hauling Facility on March 6, 2018 ("2018 NOI").

210.   The 2018 NOI lists the Facility WDID number as 9 37I014355, and identifies both the Facility site name and Facility operator as "Republic Services of Chula Vista."

211.   The Facility's SWPPPs dated June 2015 ("2015 SWPPP") and November 2016 ("2016 SWPPP") both state that the property is owned and operated by "Republic Services."

212.   The Level 2 ERA Action Plan dated December 2017 ("2017 Level 2 ERA

Action Plan"), and the Level 2 ERA Technical Report dated December 2018 ("2018 Level 2 ERA Technical Report") were both "prepared for Republic Services, Inc." As such, Plaintiffs are informed, believe, and thereon allege that Republic Services, Inc. is the owner and/or operator of the Facility.

213.   The 2018 NOI states that the Facility is 202,204 square feet, all of which is industrial area exposed to storm water, but does not indicate what percent of the site is impervious.

214.   The 2016 SWPPP states that the operating portion of Facility is approximately 4.64 acres, which is approximately equivalent to 202,204 square feet, but also fails to state what percentage of the site is impervious.

215.   Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility is currently an active industrial facility covered under the General Industrial Permit.

216.   The 2018 NOI and the 2016 SWPPP list the SIC code for the Chula Vista Hauling Facility as 4212. The 2018 NOI describes this SIC code as local trucking without storage, while the 2016 SWPPP states it is "Motor Freight Transportation and Warehousing."

217.   Plaintiffs are informed, believe, and thereon allege that SIC code 4231 (terminal and joint terminal maintenance facilities for motor freight transportation) also applies to the Chula Vista Hauling Facility.

218.   Plaintiffs are informed, believe, and thereon allege storm water is or has been discharged from multiple discharge points at the Chula Vista Hauling Facility into Receiving Waters or tributaries of Receiving Waters.

219.   Plaintiffs are informed, believe, and thereon allege that each of the surface waters into which the Chula Vista Hauling Facility discharges polluted storm water are tributaries to traditional navigable waters, such as the Otay River, San Diego Bay, and the Pacific Ocean.

/ / /

Complaint                                         31

### 3.  The Eastgate Hauling Facility.

220.   Plaintiffs are informed, believe, and thereon allege Republic enrolled as a discharger subject to the General Industrial Permit on November 14, 2017, for the Eastgate Hauling Facility.

221.   Plaintiffs are informed, believe, and thereon allege Republic most recently submitted an NOI to the State Water Resources Control Board to obtain General Industrial Permit coverage enrolled as a discharger under the 2015 Permit for the Eastgate Hauling Facility on March 6, 2018 ("2018 NOI").

222.   The 2018 NOI lists the Facility WDID number as 9 37I027471, and identifies both the Facility site name and Facility operator as "Republic Services of San Diego - Eastgate."

223.   The 2018 NOI identifies both the Facility site name and Facility operator as "Republic Services of San Diego Eastgate."

224.   The Facility's SWPPP dated October 2017 ("2017 SWPPP") states that the property is owned and operated by "Republic Services."

225.   Plaintiffs are informed, believe, and thereon allege that Republic Services, Inc. purchased the Eastgate Hauling Facility from Tayman Industries, Inc. ("Tayman") in 2017. 2017 SWPPP § 1.1.

226.   Plaintiffs are informed, believe, and thereon allege that Tayman owned and operated the Facility located at 5692 Eastgate Drive for some time without first obtaining coverage under the 1997 Permit.

227.   On June 23, 2011, a Regional Board inspector and a City of San Diego Storm Water inspector visited the Facility and confirmed that such coverage was required.

228.   On July 8, 2011, the California Regional Water Quality Control Board, San Diego Region, ("Regional Board") issued a notice informing Tayman that the Facility was required to enroll under the 1997 Permit, Order No. 97-03-DWQ.

229.   Tayman obtained coverage under the 1997 Permit for the Facility at some

point thereafter.

230. Tayman submitted an NOI for coverage under the 2015 Permit on June 19, 2015.

231. The 2015 Tayman NOI lists the Facility WDID as 9 37I023241, and identifies both the Facility site name and Facility operator as "Tayman Industries Inc."

232. The Tayman 2015 NOI lists the SIC code as 4212, local trucking without storage.

233. Plaintiffs are informed, believe, and thereon allege that the Tayman Facility SWPPPs describes vehicle and equipment maintenance and storage at the Facility, indicating that SIC code 4231, terminal and joint terminal maintenance facilities for motor freight transportation, also applied to Tayman's Operations.

234. Plaintiffs are informed, believe, and thereon allege that Republic has assumed the assets and liabilities of its predecessor, Tayman.

235. A purchasing entity assumes the seller's liabilities when "(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Ray v. Alad Corp.*, 19 Cal. 3d 22, 28 (1977).

236. Republic's annual report to the U.S. Securities and Exchange Commission for the fiscal year ending December 31, 2017 ("2017 Form 10-K") states that Tayman Industries, Inc. is a subsidiary or affiliate under the Republic corporate umbrella.

237. The URL "http://www.taymaninc.com/" indicates that Tayman "is now a part of" Republic, and the website is marked with Republic Services branding stating "We'll handle it from here.™" The website also contains the following message: "It is our pleasure to announce after proudly serving customers in San Diego, CA and the surrounding area for the past 23 years; Tayman Industries Inc is merging operations with another capable and customer-focused solid waste and recycling company, Republic

1   Services of San Diego."

2      238.   Plaintiffs are informed, believe, and thereon allege that Republic's purchase

3 of Tayman is a consolidation of the two corporations, and operations at the Eastgate

4 Hauling Facility are a mere continuation of Tayman's prior operations. Therefore,

5 Republic is liable for all prior Clean Water Act and General Industrial Permit violations

6 of its predecessor, Tayman Industries, Inc.

7      239.   The 2018 NOI states that the Facility is 2.11 acres, all of which is industrial

8 area exposed to storm water, but does not indicate what percent of the site is impervious.

9      240.   The 2017 SWPPP, the latest SWPPP which currently covers the Facility,

10 states that the operating portion of Facility is approximately 2.1, and lists the site as

11 greater than 90 percent impervious.

12      241.   Plaintiffs are informed, believe, and thereon allege that the Eastgate Hauling

13 Facility is currently an active industrial facility covered under the General Industrial

14 Permit.

15      242.   The 2018 NOI and the 2016 SWPPP list the SIC code for the Eastgate

16 Hauling Facility as 4212. The 2018 NOI describes this SIC code as local trucking without

17 storage, while the 2016 SWPPP states it is "Motor Freight Transportation and

18 Warehousing."

19      243.   The Eastgate Hauling Facility Owner and/or Operator published and

20 uploaded to the SMARTS database a revised SWPPP on October 26, 2019 ("2019

21 SWPPP"), 58 days after Plaintiffs mailed the Notice Letters to Defendants.

22      244.   Plaintiffs are informed, believe, and thereon allege that SIC code 4231

23 (terminal and joint terminal maintenance facilities for motor freight transportation) also

24 has applied to the Eastgate Hauling Facility since it first obtained coverage under the

25 General Industrial Permit. The 2019 SWPPP acknowledges that SIC code 4231 applies to

26 the Facility.

27      245.   Plaintiffs are informed, believe, and thereon allege storm water is or has

28 been discharged from multiple discharge points at the Eastgate Hauling Facility into

Receiving Waters or tributaries of Receiving Waters.

246.   Plaintiffs are informed, believe, and thereon allege that each of the surface waters into which the Eastgate Hauling Facility discharges polluted storm water are tributaries to traditional navigable waters, such as the Carroll Canyon, Soledad Canyon, Los Peñasquitos Lagoon, and the Pacific Ocean.

247.   Plaintiffs are informed, believe, and thereon allege that activities at each of the Republic Facilities generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the facilities. During rain events, this pollution is washed off those surfaces and into storm water discharge points, which flow to Receiving Waters.

248.   Plaintiffs are informed, believe, and thereon allege the Republic Facilities' polluted discharges have caused and threaten to cause, and/or contribute to the impairment of water quality in Receiving Waters in violation of the General Industrial Permit.

**B.     Industrial Activities and Associated Pollutant Sources at the Republic Facilities.**

249.   Plaintiffs are informed and believe, and thereon allege, that the industrial activities and areas of industrial activity at each of the Republic Facilities are pollutant sources.

250.   Plaintiffs are informed, believe, and thereon allege that industrial operations at each of the Republic Facilities occur throughout the site, outdoors, exposed to rainfall, without adequate cover to prevent storm water exposure to pollutant sources.

251.   Plaintiffs are informed and believe, and thereon allege, that industrial activities throughout each of the Republic Facilities occur outdoors without adequate containment or treatment measures to prevent polluted storm water from discharging from the Facilities.

**1.  The San Diego Hauling Facility.**

252.   The Owners and/or Operators of the San Diego Hauling Facility describe the

Facility as "a hauling, storage, and maintenance Facility for waste bins, equipment, and vehicles." 2016 SWPPP § 2.1.2.

253.   The 2016 SWPPP explains that "[t]he Facility primarily maintains waste containers and hauling vehicles. Waste containers and trash bins are brought on-site for maintenance, including painting, welding, and washing. Hauling vehicles also receive mechanical maintenance and washing at the Facility. A wash bay, paint booth, and a welding bay are also on-site." *Id.*

254.   Section 2.3.1 of the 2016 SWPPP notes that the Facility conducts vehicle fueling, as well as "waste transfer operations." The 2017 Level 2 ERA Action Plan and 2018 Level 2 ERA Technical Report further indicate that the San Diego Hauling Facility engages in waste transfer operations. *See* 2017 Level 2 ERA Action Plan; 2018 Level 2 ERA Technical Report.

255.   Plaintiffs are informed and believe, and thereon allege, that industrial activities at the Facility include but are not limited to: waste hauling vehicle and container washing, repair, fueling, and other maintenance; receiving, unloading, and handling of solid waste, green waste, and recyclables materials; depositing and/or loading municipal solid waste into trucks or containers; disposal of residue from solid waste, green waste, and recyclables materials from hauling trucks and containers; hazardous materials handling and storage; mechanical parts handling and storage; welding; painting; outdoor storage of waste hauling vehicles and containers; outdoor storage of various materials and chemicals; storage of fuel and other flammable materials; natural gas compression and storage; paint storage; and parking.

256.   Plaintiffs are informed and believe, and thereon allege, that industrial materials associated with operations at the San Diego Hauling Facility include natural gas and CNG; other compressed gasses; diesel and other fuels; new and used oils and other lubricants; new and used antifreeze; welding metals; acetylene, oxygen, and carbon dioxide for welding; wash water; and refinishing debris. Information available to Coastkeeper and CERF indicates that the Facility also handles significant quantities of

municipal solid waste, green waste, and recyclables.

257.   Plaintiffs are informed, believe, and thereon allege that the areas of industrial activity at the Facility include the paint booth; wash rack; welding bay; CNG dryer, compressor, and compressed fuel tank area; trash can and bin storage area; two oil/water separator areas; the storage area for bin parts, scrap metal, and bin parts to be repaired; the vehicle and bin maintenance shop; additional parts storage areas; tire storage area; fueling stations; and a transfer bay.

258.   According Section 2.3.1. of the 2016 San Diego Hauling Facility SWPPP, the only pollutants "that can potentially enter stormwater run-off and other discharges draining from the Facility include: Sediment (including vehicle traffic), Oil and Grease (waste oil and leaks from equipment), and pH."

259.   Table 2.1.b of the 2016 SWPPP indicates that pollutants associated with industrial activities at the Facility include: oil and grease, hydrocarbons, CNG, diesel fuel, "gross pollutants," and "trace metals," undermining the claims of Section 2.3.1 that only pollutants potentially present in the Facility's storm water discharges are sediment, O&G, and pH affecting substances.

260.   Table 2.1.a of the 2016 SWPPP states that indicator bacteria, enterococcus, fecal coliform, total coliform, copper and zinc are present at the Facility.

261.   The San Diego Hauling Facility Owner and/or Operator analyzed its storm water discharges for zinc on December 2, 2014 and December 12, 2014, and all six samples collected exceeded the EPA Benchmark and CTR standard for zinc of 0.12 mg/L. Yet, the Facility Owner and/or Operator ceased sampling for zinc after December 12, 2014 without providing explanation or implementing any BMPs to reduce and/or prevent discharges of zinc in the Facility's storm water.

262.   Plaintiffs are informed, believe, and thereon allege that the pollutants associated with industrial activities and operations at the San Diego Hauling Facility include, but are not limited to: pathogens such as enterococcus, E. coli, and fecal coliform; excessive nutrients such as ammonia as nitrogen, N+N, total nitrogen and

phosphorus; metals such as aluminum, lead, zinc, manganese, selenium, copper, and iron; dissolved oxygen; gasoline and diesel fuels; fuel additives; coolants; antifreeze; transmission fluid; hydraulic fluid; waste oil; compressed natural gas; oil and grease; TSS; and pH affecting substances.

263.   Plaintiffs are informed, believe, and thereon allege many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and/or developmental or reproductive harm.[4]

264.   Plaintiffs are informed, believe, and thereon allege that these pollutants are present in storm water discharged from the San Diego Hauling Facility to the Receiving Waters.

265.   Plaintiffs are informed, believe, and thereon allege that discharges of polluted storm water from the San Diego Hauling Facility pose carcinogenic and reproductive toxicity threats to the public and adversely affect the aquatic environment and surrounding ecosystems.

### 2.  The Chula Vista Hauling Facility.

266.   According to the 2016 Facility SWPPP, the Chula Vista Hauling Facility primarily maintains and stores waste hauling vehicles, waste containers, and trash bins. 2016 SWPPP §§ 2.1.1–2. This maintenance includes washing, welding, fueling, and oil refills. *Id*. The 2016 SWPPP also acknowledges outdoor material storage and vehicle parking occur outdoors. *Id*. § 2.1.2.

267.   Plaintiffs are informed and believe, and thereon allege, that industrial activities at the Chula Vista Hauling Facility include but are not limited to: waste hauling vehicle and container washing, repair, fueling, and other maintenance; disposal of residue from solid waste, green waste, and recyclables materials from hauling trucks and containers; hazardous materials handling and storage; mechanical parts handling and storage; welding; painting; outdoor storage of waste hauling vehicles and containers;

---

[4] Health & Saf. Code §§ 25249.1–5.

outdoor storage of various materials and chemicals; outdoor storage of metals and tires; storage of fuel and other flammable materials; natural gas compression and storage; paint storage; and parking.

268.   Plaintiffs are informed and believe, and thereon allege that industrial materials associated with operations at the Chula Vista Hauling Facility include natural gas and CNG; other compressed gasses; diesel and other fuels; new and used oils and other lubricants; new and used antifreeze; welding metals; acetylene, oxygen, and carbon dioxide for welding; wash water; and refinishing debris.

269.   Plaintiffs are informed and believe, and thereon allege that the hauling vehicles maintained at the Facility have accumulated waste residue, trash, and other filth on their exterior and underside from handling municipal solid waste, green waste, and/or recyclables, which is tracked onto and throughout the Facility during the normal course of operations.

270.   Plaintiffs are informed, believe, and thereon allege that the areas of industrial activity at the Facility include the maintenance shop, wash bay, welding bay, truck storage area, waste container and trash bins storage areas, the truck parking and CNG fueling area, battery storage, flammables cabinet, the hazardous waste material storage area, metals storage bin, tire storage area, CNG dryer, compressor, and compressed fuel tank area, and fueling island.  2016 SWPPP § 2.1.4.

271.   According to Section 2.3.1 of the 2016 Facility SWPPP, pollutants which can potentially enter the Chula Vista Hauling Facility's storm water include "Sediment (including erodible soils and aggregates), Oil and Grease (waste oil and leaks from equipment), Hydrocarbons (petroleum products, hydraulic fluid, and fuel), Gross Pollutants (litter, debris, and floatables), Organics (cleaners, solvents, and herbicides), [and] Trace Metals."

272.   Table 2.1.a of the 2016 SWPPP indicates that pollutants associated with industrial activities at the Facility include oil and grease, hydrocarbons, diesel fuel, gross pollutants, and trace metals.

273.   The Chula Vista Hauling Facility Owner and/or Operator analyzed its storm water discharges for zinc on December 2, 2014, and December 12, 2014, and each sample collected exceeded the EPA Benchmark and CTR standard for zinc of 0.12 mg/L. Yet, the Facility Owner and/or Operator ceased sampling for zinc after December 12, 2014 without providing explanation or implementing any BMPs to reduce and/or prevent discharges of zinc in the Facility's storm water.

274.   Plaintiffs are informed, believe, and thereon allege that hauling trucks and containers regularly enter and exit the Facility. These trucks and containers are used to transport and store municipal solid waste, green waste, and recyclables, and as such, Plaintiffs are informed, believe, and thereon allege that these trucks frequently track all pollutants associated with waste hauling throughout the Chula Vista Hauling Facility.

275.   Plaintiffs are informed, believe, and thereon allege that the pollutants associated with industrial activities and operations at the Chula Vista Hauling Facility include, but are not limited to: pathogens such as enterococcus, E. coli, and fecal coliform; excessive nutrients such as ammonia as nitrogen, N+N, total nitrogen and phosphorus; metals such as aluminum, lead, zinc, manganese, selenium, copper, and iron; dissolved oxygen; gasoline and diesel fuels; fuel additives; coolants; antifreeze; transmission fluid; hydraulic fluid; waste oil; compressed natural gas; oil and grease; TSS; and pH affecting substances.

276.   Plaintiffs are informed, believe, and thereon allege many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and/or developmental or reproductive harm.[5]

277.   Plaintiffs are informed, believe, and thereon allege that these pollutants are present in storm water discharged from the Chula Vista Hauling Facility to the Receiving Waters.

278.   Plaintiffs are informed, believe, and thereon allege that discharges of

---

[5] Health & Saf. Code §§ 25249.1−5.

polluted storm water from the Chula Vista Hauling Facility pose carcinogenic and reproductive toxicity threats to the public and adversely affect the aquatic environment and surrounding ecosystems.

### 3.  The Eastgate Hauling Facility.

279.   According to the 2017 Facility SWPPP, the Eastgate Hauling Facility primarily maintains waste hauling vehicles, including mechanical maintenance and washing, and that washing activities are conducted by a third party vendor. The 2017 SWPPP also acknowledges that various materials are handled and stored outdoors.

280.   The Tayman SWPPPs state that the Facility stored vehicles and equipment, conducted vehicle maintenance such as changing oil and tires, and lubricating parts. The Tayman SWPPPs also note that their hauling vehicles were washed on site by a third party.

281.   Plaintiffs are informed and believe, and thereon allege that the Facility is also used to store waste bins, containers, and various other materials outdoors, exposed to precipitation.

282.   Plaintiffs are informed and believe, and thereon allege, that industrial activities at the Eastgate Hauling Facility include but are not limited to: waste hauling vehicle and container washing, repair, and other maintenance; disposal of residue from solid waste, green waste, and recyclables materials from hauling trucks and containers; hazardous materials handling and storage; mechanical parts handling and storage; painting; outdoor storage of waste hauling vehicles and containers; outdoor storage of various materials and chemicals; storage of fuel and other flammable materials; compressed gas storage; paint storage; and parking.

283.   Plaintiffs are informed, believe, and thereon allege that industrial materials associated with operations at the Eastgate Hauling Facility include new and used antifreeze, acetylene, oxygen, carbon dioxide, water-based paint, power steering fluid, propane, diesel, gasoline, hydraulic oil, used motor oil, transmission oil, diesel exhaust fluid, grease, and used oil filters.

284.   The Tayman SWPPPs identify motor oil, hydraulic oil, and basic solvents as industrial materials and possible pollutants.

285.   Plaintiffs are informed, believe, and thereon allege that the areas of industrial activity at the Facility include the areas of industrial activity at the Facility include two truck maintenance areas, one in Drainage Area 1 ("DA-1) and one in Drainage Area 2 ("DA-2"); a waste hauling truck parking and storage area; and multiple materials storage areas.

286.   According to the 2017 SWPPP, the only pollutants "that can potentially enter stormwater run-off and other discharges draining from the Facility include: Sediment (including vehicle traffic from both the Eastgate Facility and Neighboring Facilities), Oil and Grease (waste oil and leaks from equipment), and pH."

287.   According to Table 2.1.b of the same SWPPP, pollutants associated with industrial activities at the Facility include: oil and grease, hydrocarbons, "gross pollutants," and "trace metals." Table 2.1.b further states that these pollutants may come from leaks, spills, "debris from vehicles," or other maintenance activities.

288.   Table 2.1.a of the 2017 SWPPP acknowledges that "decaying organic material" is a potential pollutant source.

289.   Plaintiffs are informed, believe, and thereon allege that hauling trucks and containers regularly enter and exit the Facility. These trucks and containers are used to transport and store municipal solid waste, green waste, and recyclables, and as such, Plaintiffs are informed, believe, and thereon allege that these trucks frequently track all pollutants associated with waste hauling throughout the Eastgate Hauling Facility.

290.   The 2015, 2016, and 2017 Tayman SWPPPs state only that "[s]ources of possible pollutants are motor oil hydraulic oil and basic solvents."

291.   Plaintiffs are informed, believe, and thereon allege that the pollutants associated with industrial activities and operations at the Eastgate Hauling Facility include, but are not limited to: pathogens such as enterococcus, E. coli, and fecal coliform; excessive nutrients such as ammonia as nitrogen, N+N, total nitrogen and

phosphorus; metals such as aluminum, lead, zinc, manganese, selenium, copper, and iron; dissolved oxygen; gasoline and diesel fuels; fuel additives; coolants; antifreeze; transmission fluid; hydraulic fluid; waste oil; compressed natural gas; oil and grease; TSS; and pH affecting substances.

292.   Plaintiffs are informed, believe, and thereon allege many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and/or developmental or reproductive harm.

293.   Plaintiffs are informed, believe, and thereon allege that these pollutants are present in storm water discharged from the Eastgate Hauling Facility to the Receiving Waters.

294.   Plaintiffs are informed, believe, and thereon allege that discharges of polluted storm water from the Eastgate Hauling Facility pose carcinogenic and reproductive toxicity threats to the public and adversely affect the aquatic environment and surrounding ecosystems.

295.   Plaintiffs are informed, believe, and thereon allege that pollutants associated with each Republic Facility's industrial activities have been and continue to be tracked and dispersed throughout each site.

296.   Plaintiffs are informed, believe, and thereon allege that many of the industrial activities conducted at each Republic Facility occur outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from each facility.

297.   Plaintiffs are informed, believe, and thereon allege that many pollutants associated with industrial activities occurring indoors or under partial shelter at each Republic Facility regularly escape via wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout each Facility.

298.   Plaintiffs are informed, believe, and thereon allege that the pollutants associated with industrial activities at each Republic Facility have been and continue to

be tracked by vehicles and dispersed via wind throughout each site, and on and off each Facility through ingress and egress. This results in trucks and vehicles tracking trash, pathogens, nutrient pollutants, sediment, dirt, O&G, metal particles, and other pollutants throughout each site, and off-site.

299.   Plaintiffs are informed, believe, and thereon allege that one or more of the regulated industrial activities is conducted at locations throughout each Facility, and thus the entire site at each Republic Facility requires General Industrial Permit coverage.

300.   Plaintiffs are informed, believe, and thereon allege that even if regulated industrial activities are not conducted at all locations throughout each facility, no adequate BMPs or other controls exist to separate storm water flows from portions of each Facility where non-regulated activities may occur from storm water flows where regulated industrial activities are conducted.

301.   Plaintiffs are informed, believe, and thereon allege that storm water from areas of each Republic Facility where industrial activities are conducted commingle with storm water from other areas of each Facility, and thus all storm water discharges from each Republic Facility are regulated under the General Industrial Permit.

302.   Plaintiffs are informed, believe, and thereon allege that industrial activities at each Republic Facility generate significant quantities of numerous pollutants. During rain events, these pollutants are washed off surfaces throughout each facility and into storm water discharge points, which flow to Receiving Waters.

303.   Plaintiffs are informed, believe, and thereon allege that the Republic Facility Owners and/or Operators have discharged and continue to discharge polluted storm water and non-storm water from each Republic Facility in violation of the General Industrial Permit.

304.   Plaintiffs are informed, believe, and thereon allege that the polluted discharges from each Republic Facility have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the General Industrial Permit.

305.   Plaintiffs are informed, believe, and thereon allege that elevated levels of metals, pathogens, nutrients, sedimentation, and other pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

306.   Plaintiffs are informed, believe, and thereon allege that the illegal discharges of polluted storm water and non-storm water from each of the Republic Facilities impact Coastkeeper and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health, aquatic life, and the surrounding ecosystems.

**C.      Facility Drainage Areas, Storm Water Flow, and Discharge Locations.**

        **1.  The San Diego Hauling Facility.**

307.   According to the 2016 SWPPP, the San Diego Hauling Facility consists of five drainage areas which ultimately discharge storm water from the Facility into the City of San Diego Municipal Separate Storm Sewer System ("MS4"), "which directs the flows north towards San Clemente Canyon and into Rose Canyon Creek, which discharges into Mission Bay." 2016 SWPPP § 2.1.1.

308.   According to the 2016 SWPPP, Drainage Area 1 ("DA1") includes the employee parking area; a portion under the sloped roof of a building which houses a paint booth, wash rack, offices, and welding bay; and the CNG dryer, compressor, and compressed fuel tank. 2016 SWPPP § 2.1.4. The Facility site map indicates that storm water within DA1 discharges via three driveways to the surface street bordering the Facility to the West.

309.   The Facility Owner and/or Operator classifies DA1 as non-industrial reasoning that "[a]ll of the industrial activities are conducted under weatherproof covers, or are stored in sealed, well maintained tanks." *Id*.

310.   Plaintiffs are informed, believe, and thereon allege that San Diego Hauling Facility Owner and/or Operator's self-classification of DA1 as non-industrial is erroneous.

311.   The 2016 SWPPP itself indicates that various pollutants and pollutant

1  sources associated with container maintenance affect DA1. 2016 SWPPP, Table 3.5.

2  312.  DA1 includes the driveway through which waste hauling trucks and

3  containers regularly enter and exit the Facility. These trucks and containers are used to

4  transport and store municipal solid waste, green waste, and recyclables, and as such,

5  Plaintiffs are informed, believe, and thereon allege that these trucks frequently track all

6  pollutants associated with waste hauling through DA1.

7  313.  Plaintiffs are informed, believe, and thereon allege that pollutants associated

8  with the Facility's industrial operations have been and continue to be tracked throughout

9  the entire site, including the ingress/egress driveways.

10  314.  Plaintiffs are informed, believe, and thereon allege that during rainfall

11  events, storm water carrying pollutants commingles with other storm water from DA1.

12  315.  According to the 2016 SWPPP, Drainage Area 2 ("DA2") contains scrap

13  metal bins and trash can and bin storage, and that surface flows in this drainage area are

14  directed towards the storm drain inlet at SD-1.

15  316.  According to the Facility's 2018 Level 2 ERA Technical Report, a Kraken

16  grate media filter was installed at SD-1. Flows in this subsurface drainage pipe are

17  directed to the City of San Diego MS4. 2016 SWPPP § 2.1.4.

18  317.  Plaintiffs are informed, believe, and thereon allege that paint booths,

19  welding bays, wash racks, and transfer bays are located within DA2 or bordering DA2.

20  All entrances and exits to the Facility buildings which house paint booths, welding bays,

21  wash racks, and transfer bays are located within DA2, and thus any escape or track-out of

22  pollutants associated with any of these industrial activities will end up in DA2.

23  318.  According to the 2016 SWPPP, Drainage Area 3 ("DA3") "contains some of

24  the CNG fueling area, the Diesel [sic] fueling island, truck parking area, and the office

25  supply storage bin." Storm water from DA3 flows to an unnamed drain inlet fitted with a

26  filter, and thereafter runs West, connecting to the drainage system beneath SD-1, and

27  ultimately to the City of San Diego MS4. 2016 SWPPP § 2.1.4.

28  319.  Plaintiffs are informed, believe, and thereon allege that DA3 is also used for

trash can, bin, and waste hauling vehicle storage, and such equipment is stored outdoors, exposed to precipitation.

320.    According to the 2016 SWPPP, Drainage Area 4 ("DA4") includes parts storage for the vehicle maintenance shop, the used oil AST, tire storage, the diesel exhaust fluid tanks, a wash bay, and a welding bay. 2016 SWPPP §§ 2.1.4; 2.3.1.

321.    According to the 2016 SWPPP, surface flows are directed towards the drain inlet located on the south side of this drainage area, which is fitted with a Filtrexx with Metaloxx storm drain filter insert. Flows in this subsurface drainage pipe are directed northwest, joined by flows from DA3, connect to the drainage system beneath SD-1, and are thus ultimately routed to the City of San Diego MS4. 2016 SWPPP § 2.1.4.

322.    Plaintiffs are informed, believe, and thereon allege that DA4 is also used for trash can, bin, and waste hauling vehicle storage, and such equipment is stored outdoors, exposed to precipitation.

323.    According to the 2016 SWPPP, Drainage Area 5 ("DA5") includes the visitor and employee parking area; the offices and parts storage; and the vehicle maintenance shop. Surface flows in DA5 are directed towards the Industrial Park Driveway.

324.    Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility Owners and/or Operators erroneously identify DA5 as non-industrial, reasoning that the "industrial activities are conducted under weatherproof covers, or are stored in sealed, well maintained tanks." DA5 is immediately adjacent to the Facility's primary ingress/egress driveway, through which waste hauling vehicles and containers frequently travel.

325.    Plaintiffs are informed, believe, and thereon allege that there are no BMPs to prevent pollutants from these vehicles and containers from settling on DA5.

326.    Plaintiffs are informed, believe, and thereon allege that during rainfall events, storm water from this ingress/egress driveway in DA1 comingles with storm water from DA5, as there are insufficient BMPs in place to prevent such comingling.

## 2.  The Chula Vista Hauling Facility.

327.    According to Facility SWPPPs and site map, the Chula Vista Hauling Facility consists of two drainage areas.

328.    According to the 2016 SWPPP, Drainage Area 1 ("DA1") includes the vehicle entry/exit roadway, the truck parking, Diesel and CNG fueling stations, portions of the covered vehicle maintenance shop, wash rack, and work area. 2016 SWPPP § 2.1.4.

329.    According to the 2019 SWPPP, surface flows from industrial areas are directed southwest as sheet flow and along the curb where stormwater then flows towards the storm drain inlet and vault at PL-1. Surface flows from this slope are directed to the west with a masonry wall.

330.    According to the 2019 SWPPP, the curb inlet at PL-1 contains a Filtrexx with Metaloxx, and the vault is fitted with a BioClean Kraken filter insert to remove additional pollutants before stormwater discharges.

331.    Plaintiffs are informed, believe, and thereon allege that DA1 also includes a large hauling vehicle storage area, ingress/egress points to the vehicle maintenance shop and wash rack, and underground storage tanks for oil and hydraulic fluids.

332.    According to the 2019 SWPPP, Drainage Area 2 ("DA-2") includes the trash bin and lift storage area, covered battery storage, flammables cabinet, the hazardous waste material storage area, employee parking area, a maintenance shop, and an access road that leads directly to the Otay landfill, which is also operated by Republic. 2016 SWPPP § 2.1.4. "Surface flows are directed southwest towards the berm, curb, and drains towards the flow through planter and discharges at RD-1." *Id*.

333.    Plaintiffs are informed, believe, and thereon allege that DA-2 also includes the welding shop, tire storage area, ingress/egress points to the vehicle maintenance shop and wash rack, and the entry/exit driveway into and out of the Facility. Waste hauling trucks, bins, and containers, all of which have been recently exposed to a variety of trash and waste, frequently enter and exit the Facility via the driveway located within DA-2, as

well as frequently traverse DA-1.

### 3. The Eastgate Hauling Facility.

334.   According to the Facility SWPPPs, the Eastgate Hauling Facility consists of two drainage areas, each with one discharge point.

335.   The SWPPPs and site maps indicate that the vast majority of the Facility is situated in DA-1, and that DA-1 includes a truck maintenance area, truck parking area, most of the material storage areas, an employee parking area, and a covered building. Surface flows in DA-1 are directed towards the employee parking area, and flow via sheet flow toward the southeast corner of Facility to a small concrete curbed channel, labeled DP-1, which directs flows to a City of San Diego MS4 drainage inlet. 2017 SWPPP § 2.1.4.

336.   Plaintiffs are informed, believe, and thereon allege that during rain events storm water exposed to industrial materials and activities comingles with storm water from the employee parking area due to the layout and flow pattern of the Facility.

337.   Plaintiffs are informed, believe, and thereon allege that not all water from DA-1 is successfully routed to the curbed channel at the Facility's most eastern point. Some storm water flows and/or is tracked outside of the Facility boundary, onto the access road shared by the Eastgate Hauling Facility and the neighboring Robertson's Ready Mix Facility, and onto Eastgate Drive.

338.   The 2017 Facility SWPPP and site map indicate that DA-2 is a much smaller drainage area located in the northern-most corner of the Facility. According to the 2017 SWPPP, the "area contains a second truck maintenance area, materials storage container and an oil containment trench. *Id*.

339.   The 2017 SWPPP states that storm water flows in DA-2 are directed towards the Facility's fence line in the northeast corner of the Facility, and is thereafter discharged via DP-2 "directly offsite into open space." *Id*. The SWPPP further states that DA-2 "only discharges during larger rainfall events and in cases where the trench might overflow," but fails to quantify the containment capacity of the trench.

340.   The 2019 SWPPP claims that all surface flows from the trench are pumped into an above-ground storage tank, and thereafter disposed by a waste hauler so no discharge occurs from DA-2.

341.   Plaintiffs are informed, believe, and thereon allege that the trench only maintains a limited capacity of storm water such that discharges will occur in DA-2 under certain conditions.

**D.   The Republic Facilities Violate General Industrial Permit Discharge Prohibitions.**

342.   Plaintiffs are informed, believe, and thereon allege that each of the Republic Facilities have discharged and continue to discharge storm water and non-storm water in violation of various absolute prohibitions enumerated in the General Industrial Permit.

**1.   The San Diego Hauling Facility Has Violated and Continues to Violate General Industrial Permit Discharge Prohibitions.**

343.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility Owners and/or Operators have discharged and continue to discharge non-storm water discharges, which are not otherwise authorized by the General Industrial Permit in violation of Section A.1 of the 1997 Permit, and Section III.B 2015 Permit. For example, one of the Facility's primary industrial activities is vehicle and container washing, and Table 3.5 of the 2016 SWPPP indicates that "wash water" associated with container maintenance is common in DA1 and DA2. *See also* 2016 SWPPP § 2.1.2.

344.   Plaintiffs are informed, believe, and thereon allege that the Facility SWPPPs fail to identify any BMPs would prevent wash water from being tracked out of wash bays, commingling, and discharging from the Facility.

345.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section A.2 of the 1997 Permit, and Section III.C of the 2015 Permit. For example, the San Diego Hauling Facility's own monitoring

data shows that on numerous occasions during the past five years, the Facility has discharged zinc, pH affecting substances, TSS, and O&G in excess of various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters.

346.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility has discharged and continues to discharge pollutants in excess of water quality objectives listed in the San Diego Basin Plan in violation of Section III.D of the 2015 Permit. For example, the Basin Plan Objective for pH for inland surface waters states that "the pH shall not be depressed below 6.5 nor raised above 8.5 S.U.," and multiple storm water samples collected from the Facility on December 12, 2014 reflected a pH of 6, which is outside the acceptable level of the Basin Plan water quality objective.

347.   Plaintiffs are informed, believe, and thereon allege that no express allowance for dilution has been granted by the Regional Board applicable to the San Diego Hauling Facility's discharges, or to the downstream Receiving Waters. Accordingly, the "quality of the discharge" does not meet water quality objectives, and therefore such discharges violate Discharge Prohibition III.D of the 2015 Permit.

348.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to analyze the Facility's storm water discharges for numerous pollutants required by the General Industrial Permit, indicating that the Facility has discharged and continues to discharge numerous pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D, and which cause or threaten to cause pollution, contamination, or nuisance in violation of Discharge Prohibition III.C.

### 2. The Chula Vista Hauling Facility Has Violated and Continues to Violate General Industrial Permit Discharge Prohibitions.

349.   Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility Owners and/or Operators have discharged and continue to discharge non-storm water discharges, which are not otherwise authorized by the General Industrial

Complaint                                    51

Permit in violation of Section A.1 of the 1997 Permit, and Section III.B 2015 Permit. For example, one of the Facility's primary industrial activities is vehicle and container washing.

350.   Plaintiffs are informed, believe, and thereon allege that the Facility SWPPPs fail to identify any BMPs would prevent wash water from being tracked out of wash bays, commingling, and discharging from the Facility.

351.   NSWDs resulting from washing and cleaning are not from sources that are listed among the authorized NSWDs in the special conditions section of the General Industrial Permit, and are thus always prohibited.

352.   Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section A.2 of the 1997 Permit, and Section III.C of the 2015 Permit. For example, the Chula Vista Hauling Facility's own monitoring data shows that on numerous occasions during the past five years, the Facility has discharged TSS, pH, and zinc in excess of various water quality objectives, benchmarks and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters.

353.   Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility has discharged and continues to discharge pollutants in excess of water quality objectives listed in the San Diego Basin Plan in violation of Section III.D of the 2015 Permit. For example, the Basin Plan Objective for pH for inland surface waters states that "the pH shall not be depressed below 6.5 nor raised above 8.5 S.U.," and storm water samples collect from the Facility on December 16, 2016 at PL-1 and RD-1, December 5, 2016 at RD-1, December 12, 2014 at RD-1, and December 2, 2014 at PL-1 reflected a pH below 6.5.

354.   Plaintiffs are informed, believe, and thereon allege that no express allowance for dilution has been granted by the Regional Board applicable to the Chula Vista

Hauling Facility's discharges, or to the downstream Receiving Waters. Accordingly, the "quality of the discharge" does not meet water quality objectives, and therefore such discharges violate Discharge Prohibition III.D of the 2015 Permit.

355. Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility Owner and/or Operator has failed and continues to fail to analyze the Facility's storm water discharges for numerous pollutants required by the General Industrial Permit, indicating that the Facility has discharged and continues to discharge numerous pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D, and which cause or threaten to cause pollution, contamination, or nuisance in violation of Discharge Prohibition III.C.

### 3. The Eastgate Hauling Facility Has Violated and Continues to Violate General Industrial Permit Discharge Prohibitions.

356. Plaintiffs are informed, believe, and thereon allege that the Eastgate Hauling Facility Owners and/or Operators have discharged and continue to discharge non-storm water discharges, which are not otherwise authorized by the General Industrial Permit in violation of Section A.1 of the 1997 Permit, and Section III.B 2015 Permit. For example, one of the Facility's primary industrial activities is vehicle and container washing.

357. Section 2.1.2 of the 2017 SWPPP states that vehicle washing is one of the outdoor operations at the Facility which could affect ambient storm water quality, and the Facility SWPPP fails to identify any BMPs would prevent wash water from being tracked out of washing areas, commingling, and discharging from the Facility.

358. NSWDs resulting from washing and cleaning are not from sources that are listed among the authorized NSWDs in the special conditions section of the General Industrial Permit, and are thus always prohibited.

359. Plaintiffs are informed, believe, and thereon allege that the Eastgate Hauling Facility has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section A.2 of the 1997 Permit, and Section III.C of the

2015 Permit. For example, the Facility's own monitoring data shows that on numerous occasions during the past five years, the Facility has discharged pollutants in excess of various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters.

360.   Plaintiffs are informed, believe, and thereon allege that the Eastgate Facility has discharged and continues to discharge pollutants in excess of water quality objectives listed in the San Diego Basin Plan in violation of Section III.D of the 2015 Permit. For example, the San Diego Basin Plan sets forth a narrative standard for TSS mandating that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Yet, the Facility's own storm water monitoring data shows numerous instances of extremely high TSS concentrations, which have the potential to adversely affect the beneficial uses of Receiving Waters. Ex. 1.

361.   Plaintiffs are informed, believe, and thereon allege that no express allowance for dilution has been granted by the Regional Board applicable to the Eastgate Hauling Facility's discharges, or to the downstream Receiving Waters. Accordingly, the "quality of the discharge" does not meet water quality objectives, and therefore such discharges violate Discharge Prohibition III.D of the 2015 Permit.

362.   Plaintiffs are informed, believe, and thereon allege that the Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to analyze the Facility's storm water discharges for numerous pollutants required by the General Industrial Permit, indicating that the Facility has discharged and continues to discharge numerous pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D, and which cause or threaten to cause pollution, contamination, or nuisance in violation of Discharge Prohibition III.C.

363.   Plaintiffs are informed, believe, and thereon allege that the aforementioned Discharge Prohibitions provisions are violated each time storm water or unauthorized non-storm water discharges from any of the Republic Facilities.

364.   Each time any of the Republic Facility Owners and/or Operators discharge polluted storm water or unauthorized non-storm water in violation of the Discharge Prohibitions provisions of the General Industrial Permit is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

365.   Plaintiffs are informed, believe, and thereon allege that each Republic Facility has been in violation of these Discharge Prohibitions since at least August 27, 2014.

**E.     The Republic Facilities Violate General Industrial Permit Effluent Limitations.**

366.   Plaintiffs are informed, believe, and thereon allege that each of the Republic Facilities have violated and continue to violate General Industrial Permit Effluent Limitations during every significant rain event.

**1.   The San Diego Hauling Facility Has Violated and Continues to Violate General Industrial Permit Effluent Limitations.**

367.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility has discharged and continues to discharge storm water containing pollutant concentration levels above EPA Benchmarks without implementing BMPs that achieve BAT/BCT in violation of Sections B.3 of the 1997 Permit, and V.A of the 2015 Permit.

368.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the San Diego Hauling Facility has exceeded the EPA Benchmark value for numerous pollutants. For example, the EPA Benchmark for TSS is 100 mg/L, and a storm water sample collected from the Facility on January 9, 2018 reflected a TSS concentration of 175 mg/L. *See* Ex. 1. The Facility's monitoring data also indicates that on storm water samples collected on December 2, 2014 and December 12, 2014 exceeded

the EPA Benchmark for zinc of 0.12 mg/L. *Id.*

369.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to analyze storm water discharged from the Facility for numerous pollutants that result from the Facility's industrial operations. As such, Plaintiffs allege that in addition to TSS and zinc, the San Diego Hauling Facility discharges numerous pollutants in concentrations exceeding EPA benchmarks.

370.   EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards.

371.   Plaintiffs are informed, believe, and thereon allege, from visual observations, sample results, and investigations available to Plaintiffs, that the San Diego Hauling Facility has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the San Diego Hauling Facility. *See* 1997 Permit § B.3; 2015 Permit § V.A.

372.   Plaintiffs are informed, believe, and thereon allege the San Diego Hauling Facility's repeated exceedances of EPA Benchmarks over the past five years for numerous pollutants indicate that the San Diego Hauling Facility has failed and continues to fail to develop and/or implement BMPs that meet BAT/BCT.

## 2.   The Chula Vista Hauling Facility Has Violated and Continues to Violate General Industrial Permit Effluent Limitations.

373.   Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility has discharged and continues to discharge storm water containing pollutant concentration levels above EPA Benchmarks without implementing BMPs that achieve BAT/BCT in violation of Sections B.3 of the 1997 Permit, and V.A of the 2015 Permit.

374.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Chula Vista Hauling Facility has exceeded the EPA Benchmark value for numerous pollutants. For example, the Facility's monitoring data reflects that

multiple storm water samples have exceeded the EPA Benchmark for TSS of 100 mg/L. *See* Ex. 1. The Facility's monitoring data also indicates that each storm water sample collected on December 2, 2014 and December 12, 2014 exceeded the EPA Benchmark for zinc of 0.12 mg/L. *Id.*

375.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to analyze storm water discharged from the Facility for numerous pollutants that result from the Facility's industrial operations. As such, Plaintiffs allege that in addition to TSS and zinc, the Chula Vista Hauling Facility discharges numerous pollutants in concentrations exceeding EPA benchmarks.

376.   EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards.

377.   Plaintiffs are informed, believe, and thereon allege, from visual observations, sample results, and investigations available to Plaintiffs, that the Chula Vista Hauling Facility has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the Facility. *See* 1997 Permit § B.3; 2015 Permit § V.A.

378.   Plaintiffs are informed, believe, and thereon allege the Chula Vista Hauling Facility's repeated exceedances of EPA Benchmarks over the past five years for numerous pollutants indicate that the Chula Vista Hauling Facility has failed and continues to fail to develop and/or implement BMPs that meet BAT/BCT.

### 3. The Eastgate Hauling Facility Has Violated and Continues to Violate General Industrial Permit Effluent Limitations.

379.   Plaintiffs are informed, believe, and thereon allege that the Eastgate Hauling Facility has discharged and continues to discharge storm water containing pollutant concentration levels above EPA Benchmarks without implementing BMPs that achieve BAT/BCT in violation of Sections B.3 of the 1997 Permit, and V.A of the 2015 Permit.

380.   Plaintiffs are informed, believe, and thereon allege that storm water

discharged from the Eastgate Hauling Facility has exceeded the EPA Benchmark value for numerous pollutants. For example, storm water samples collected from the Facility on December 5, 2018, January 12, 2019, and January 14, 2019 reflected TSS concentrations above the EPA Benchmark for TSS of 100 mg/L. Ex. 1.

381.   Plaintiffs are informed, believe, and thereon allege that the Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to analyze storm water discharged from the Facility for numerous pollutants that result from the Facility's industrial operations. As such, Plaintiffs allege that in addition to TSS, the Eastgate Hauling Facility discharges numerous pollutants in concentrations exceeding EPA benchmarks.

382.   EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards.

383.   Plaintiffs are informed, believe, and thereon allege, from visual observations, sample results, and investigations available to Plaintiffs, that the Eastgate Hauling Facility has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the Facility. *See* 1997 Permit § B.3; 2015 Permit § V.A.

384.   Plaintiffs are informed, believe, and thereon allege the Eastgate Hauling Facility's repeated exceedances of EPA Benchmarks over the past five years for numerous pollutants indicate that the Facility has failed and continues to fail to develop and/or implement BMPs that meet BAT/BCT.

## F.   The Republic Facilities Violate General Industrial Permit Receiving Water Limitations.

385.   Plaintiffs are informed, believe, and thereon allege that each of the Republic Facilities have violated and continue to violate General Industrial Permit Receiving Water Limitations during every significant rain event.

/ / /

/ / /

### 1. The San Diego Hauling Facility Has Violated and Continues to Violate General Industrial Permit Receiving Water Limitations.

386.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility has violated and continues to violate General Industrial Permit Receiving Water Limitations during every significant rain event. For example, the Facility's own storm water monitoring data shows numerous instances of high TSS concentrations.

387.   The San Diego Basin Plan sets forth a narrative standard for TSS mandating that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses."

388.   The Basin Plan explains that "[s]uspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." Basin Plan at 3-31.

389.   According to the 2016 303(d) List of Impaired Water Bodies, Rose Creek is impaired for benthic community effects and is thus unable to support its designated Beneficial Uses.

390.   Plaintiffs are informed, believe, and thereon allege that the Facility's storm water discharges containing elevated concentrations of TSS in excess of the Basin Plan Water Quality Objective cause and/or contribute to the benthic community effects impairment of Rose Creek.

391.   Plaintiffs are informed, believe, and thereon allege that the Facility has discharged and continues to discharge elevated concentrations of zinc. For example, each of the six storm water samples analyzed for zinc on December 2, 2014 and December 12, 2014 exceeded the CTR standard of 0.12 mg/L.

392.   Zinc is considered a toxic pollutant, and limitations on zinc are specifically enumerated in the California Toxics Rules. 40 C.F.R. § 131.38.

393.   According to the 2016 303(d) List of Impaired Water Bodies, Rose Creek is impaired for toxicity.

394.   Plaintiffs are informed, believe, and thereon allege the Facility has discharged, and continues to discharge zinc in excess of CTR standards, and that such discharges cause and/or contribute to the toxicity impairment of Receiving Waters.

395.   Plaintiffs are informed, believe, and thereon allege that the Facility has discharged, and continues to discharge elevated concentrations of indicator bacteria such as fecal coliform, E. coli, and enterococcus in excess of the Basin Plan Objectives. For example, Table 2.1.a of the 2016 Facility SWPPP acknowledges that E. coli, enterococcus, fecal coliform, and total coliform are present at the Facility as a result of the Facility's industrial activities. Furthermore, storm water discharges from facilities similarly situated, which handle municipal waste and/or waste handling equipment, typically contain extremely high levels of these indicator bacteria.

396.   According to the 2016 303(d) List of Impaired Water Bodies, Mission Bay Shoreline at Campland by the Bay, which is immediately adjacent to mouth Rose Creek, is impaired for indicator bacteria such as enterococcus, fecal coliform, and total coliform.

397.   Coastkeeper monitoring data, publicly reported in CEDEN indicates that both San Clemente Creek and Rose Creek are impaired for E. coli, enterococcus, and total coliform.

398.   Plaintiffs are informed, believe, and thereon allege that San Diego Hauling Facility's discharges of elevated levels of indicator bacteria cause and/or contribute to the E. coli, enterococcus, and total coliform impairments of San Clemente Creek and Rose Creek, and to the enterococcus, fecal coliform, and total coliform impairments of Mission Bay Shoreline at Campland by the Bay.

399.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to analyze storm water discharged from the Facility for numerous pollutants that result from the Facility's industrial operations. As such, Plaintiffs allege that in addition to TSS, zinc, and bacteria,

the San Diego Hauling Facility discharges numerous pollutants in concentrations exceeding Receiving Water Limitations.

400.   Because the CTR and Basin Plan are applicable WQSs under the General Industrial Permit, Plaintiffs are informed, believe, and thereon allege that discharges from the San Diego Hauling Facility contain concentrations of pollutants that cause or contribute to violations of multiple applicable WQSs, and thus violate Receiving Water Limitation C.2 of the 1997 Permit and/or Receiving Water Limitation VI.A of the 2015 Permit. *See Kramer Metals*, 619 F. Supp. 2d at 927 ("A permittee violates Receiving Water Limitation C(2) when it 'causes or contributes to an exceedance of' [a water quality standard], including the CTR").

401.   Plaintiffs are informed, believe, and thereon allege that discharges of elevated concentrations of pollutants in the storm water from the San Diego Hauling Facility also adversely impact human health, thus violating the Permit Receiving Water Limitation C.1 of the 1997 Permit, and VI.B of the 2015 Permit.

### 2.   The Chula Vista Hauling Facility Has Violated and Continues to Violate General Industrial Permit Receiving Water Limitations.

402.   Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility has violated and continues to violate General Industrial Permit Receiving Water Limitations during every significant rain event.

403.   Plaintiffs are informed, believe, and thereon allege that Facility Owner and/or Operator has failed and continues to fail to sample and analyze storm water discharges for all parameters required by the General Industrial Permit. For example, pollutants commonly present in storm water discharged from facilities similar to the Chula Vista Hauling Facility include pathogens such as enterococcus, E. coli, and fecal coliform, and excessive nutrients such as nitrogen and other nitrogen-based compounds like nitrite and nitrate. As such, the Facility likely discharges pollutants such as indicator bacteria, N+N, and phosphorus in exceedance of applicable WQSs.

404.   Plaintiffs are informed, believe, and thereon allege that Receiving Waters

are impaired, and thus unable to support the designated Beneficial Uses, for some of the same pollutants discharged by the Facility.

405.   Coastkeeper's Ambient Monitoring Program data, publicly available via the CEDEN database, evidences that the Otay River is impaired for total coliform, E. coli, enterococcus, N+N, and phosphorus.

406.   Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility's discharges of elevated levels of indicator bacteria, N+N, and P cause and/or contribute to the bacteria and nutrient impairments of the Otay River.

407.   Because the CTR and Basin Plan are applicable WQSs under the General Industrial Permit, Plaintiffs are informed, believe, and thereon allege that discharges from the Chula Vista Hauling Facility contain concentrations of pollutants that cause or contribute to violations of multiple applicable WQSs, and thus violate Receiving Water Limitation C.2 of the 1997 Permit and/or Receiving Water Limitation VI.A of the 2015 Permit. *See Kramer Metals*, 619 F. Supp. 2d at 927 ("A permittee violates Receiving Water Limitation C(2) when it 'causes or contributes to an exceedance of' [a water quality standard], including the CTR").

408.   Plaintiffs are informed, believe, and thereon allege that discharges of elevated concentrations of pollutants in the storm water from the Chula Vista Hauling Facility also adversely impact human health, thus violating the Permit Receiving Water Limitation C.1 of the 1997 Permit, and VI.B of the 2015 Permit.

### 3.   The Eastgate Hauling Facility Has Violated and Continues to Violate General Industrial Permit Receiving Water Limitations.

409.   Plaintiffs are informed, believe, and thereon allege that the Eastgate Hauling Facility has violated and continues to violate General Industrial Permit Receiving Water Limitations during every significant rain event. For example, the Facility's own storm water monitoring data shows numerous instances of high TSS concentrations.

410.   The San Diego Basin Plan sets forth a narrative standard for TSS mandating that "[w]aters shall not contain suspended and settleable solids in concentrations of solids

that cause nuisance or adversely affect beneficial uses."

411.   The Basin Plan explains that "[s]uspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." Basin Plan at 3-31.

412.   "Suspended sediment in surface waters can cause harm to aquatic organisms by abrasion of surface membranes, interference with respiration, and sensory perception in aquatic fauna. Suspended sediment can reduce photosynthesis in and survival of aquatic flora by limiting the transmittance of light." *Id*.

413.   Plaintiffs are informed, believe, and thereon allege that Receiving Waters are impaired, and thus unable to support the designated Beneficial Uses, for some of the same pollutants discharged by the Facility.

414.   According to the 2016 303(d) List of Impaired Water Bodies, Carroll Canyon is impaired for benthic community effects.

415.   According to the 2016 303(d) List of Impaired Water Bodies, Los Peñasquitos Lagoon is impaired for sedimentation and siltation.

416.   Plaintiffs are informed, believe, and thereon allege that the Facility's storm water discharges containing elevated concentrations of TSS in excess of the Basin Plan Water Quality Objective cause and/or contribute to the benthic community effects impairment of Carroll Canyon, and the sedimentation and siltation impairments of Los Peñasquitos Lagoon.

417.   Plaintiffs are informed, believe, and thereon allege that Facility Owner and/or Operator has failed and continues to fail to sample and analyze storm water discharges for all parameters required by the General Industrial Permit. For example, storm water discharges from facilities similarly situated to the Eastgate Facility typically contain extremely high levels of toxic metals, such as zinc and copper, in excess of the Basin Plan Objectives.

Complaint                                    63

418.   According to the 2016 303(d) List of Impaired Water Bodies, Carroll Canyon and Los Peñasquitos Lagoon are impaired for toxicity, and Soledad Canyon is impaired for sediment toxicity.

419.   Plaintiffs are informed, believe, and thereon allege discharges from the Eastgate Hauling Facility exceeding the CTR will cause and/or contribute to the toxicity and sediment toxicity impairments of Receiving Waters.

420.   Because the CTR and Basin Plan are applicable WQSs under the General Industrial Permit, Plaintiffs are informed, believe, and thereon allege that discharges from the Eastgate Hauling Facility contain concentrations of pollutants that cause or contribute to violations of multiple applicable WQSs, and thus violate Receiving Water Limitation C.2 of the 1997 Permit and/or Receiving Water Limitation VI.A of the 2015 Permit. *See Kramer Metals*, 619 F. Supp. 2d at 927 ("A permittee violates Receiving Water Limitation C(2) when it 'causes or contributes to an exceedance of' [a water quality standard], including the CTR").

421.   Plaintiffs are informed, believe, and thereon allege that discharges of elevated concentrations of pollutants in the storm water from the Eastgate Hauling Facility also adversely impact human health, thus violating the Permit Receiving Water Limitation C.1 of the 1997 Permit, and VI.B of the 2015 Permit.

422.   Each time each Republic Facility discharges polluted storm water in violation of the General Industrial Permit's Receiving Water Limitations is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

423.   Plaintiffs are informed, believe, and thereon allege that the Republic Facilities' discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the General Industrial Permit's Receiving Water Limitations.

424.   Plaintiffs are informed, believe, and thereon allege that the Republic Facilities have been in violation since at least August 27, 2014, and Plaintiffs will update

the dates of violation when additional information and data becomes available. Defendants are subject to civil penalties for all violations of the Clean Water Act occurring since August 27, 2014.

### G. The Republic Facilities' SWPPPs Fail to Comply with the General Industrial Permit Requirements.

#### 1. The San Diego Hauling Facility Owner and/or Operator Has Violated and Continues to Violate Permit SWPPP Requirements.

425.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility Owner and/or Operator has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

426.   Plaintiffs are informed, believe, and thereon allege that the 2016 SWPPP fails to accurately identify all of the correct SIC codes applicable to the Facility. For example, the Facility SWPPP's own description of the industrial activities conducted at the Facility indicates that SIC code 4231 (terminal and joint terminal maintenance facilities for motor freight transportation), and SIC code 4953 (refuse systems) apply to the Facility, though the SWPPP fails to identify these SICs codes in violation of the General Industrial Permit.

427.   Plaintiffs are informed, believe, and thereon allege that the Facility SWPPPs and site maps have failed to accurately label and describe the location of all industrial activities, industrial materials, and potential pollutant sources in each drainage area in violation of the General Industrial Permit. *See* 2015 Permit, §§ X.E.3.f, X.G. For example, the Facility Owner and/or Operator's self-classification of DA1 as non-industrial is erroneous. Table 3.5 of the 2016 SWPPP indicates that various pollutants and pollutant sources associated with container maintenance are located within DA1, and the site map and SWPPPs fail to acknowledge that waste hauling trucks, bins, and containers frequently enter and exit the Facility via the driveway located within DA1. Thus, there are numerous industrial activities occurring within DA1, and the Facility's attempt to classify DA1 as non-industrial is erroneous, inaccurate, and violates the

Complaint                                    65

General Industrial Permit's SWPPP requirements.

428.   Plaintiffs are informed, believe, and thereon allege that the Facility site map and SWPPPs fail to acknowledge that the paint booths, welding bays, and wash racks are located either within DA2 or bordering DA2, in violation of the General Industrial Permit.

429.   Plaintiffs are informed, believe, and thereon allege that, although the 2016 SWPPP, 2017 Level 2 ERA Action Plan, and 2018 Level 2 ERA Technical Report acknowledge that the Facility engages in transfer operations, the site map and SWPPPs fail to provide any information about the Facility's transfer operations or where such activities take place on the Facility in violation of the General Industrial Permit.

430.   Plaintiffs are informed, believe, and thereon allege that the site map and SWPPPs fail to acknowledge that DA3 and DA4 are both used extensively for can, bin, and waste hauling vehicle storage, and such equipment is stored outdoors, exposed to precipitation.

431.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate description of potential pollutant sources.

432.   Section X.G.1.a of the 2015 Permit requires dischargers to "ensure the SWPPP *describes* each industrial process including: manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to the process." (emphasis added). However, the 2015 and 2016 Facility SWPPPs fail to adequately describe any of the industrial activities at the Facility, instead providing only cursory lists of the activities conducted at the Facility.

433.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate pollutant source assessment.

434.   Section X.G.2 of the 2015 Permit requires dischargers to "ensure that the SWPPP includes a *narrative* assessment of all areas of industrial activity with potential

industrial pollutant sources." (emphasis added). This assessment shall include "pollutants likely to be present in industrial storm water discharges and authorized NSWDs," (§ X.G.2.a.ii), "[t]he degree to which the pollutants associated with those materials may be exposed to, and mobilized by contact with, storm water," (§ X.G.2.a.iv), "[t]he direct and indirect pathways by which pollutants may be exposed to storm water or authorized NSWDs," (§ X.G.2.a.v), and "[t]he effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs," (§ X.G.2.a.vii), among other requirements.

435.   Plaintiffs are informed, believe, and thereon allege that the 2015 and 2016 Facility SWPPPs fail to comply with any of the aforementioned requirements of Section X.G.2. For example, the only narrative assessment provided in the 2016 SWPPP cursorily lists out the industrial activities conducted at the Facility, and summarily states "[p]ollutants that can potentially enter stormwater run-off and other discharges draining from the Facility include: Sediment (including vehicle traffic), Oil & Grease (waste oil and leaks from equipment); and pH." 2016 SWPPP § 2.3.1.

436.   The only pollutants identified in Table 2.1.b of the 2016 SWPPP are oil and grease, hydrocarbons, gross pollutants, trace metals, CNG, and diesel fuel, without any further description or analysis. The pollutants identified in this table to internally inconsistent with Section 2.3.1 of the same SWPPP which claims that the only potential pollutants are sediment, O&G, and pH.

437.   Plaintiffs are informed, believe, and thereon allege that San Diego Hauling Facility Owner and/or Operator has failed and continues to fail accurately identify the pollutants present at the Facility as a result of industrial activities. For example, Table 2.1.a of the 2016 SWPPP specifically acknowledges that indicator bacteria, enterococcus, fecal coliform, total coliform, copper, and zinc are present at the Facility, yet the SWPPP fails to identify or describe any BMPs that would eliminate such pollutants from its storm water and non-storm water discharges. Thus, Table 2.1.a further undermines the SWPPP's claim that only sediment, O&G, and pH could be present in the Facility's storm

1  water discharges in violation of the General Industrial Permit.

2  438.  The San Diego Hauling Facility Owner and/or Operator published and
3  uploaded a revised SWPPP to the SMARTS database on October 26, 2019 ("2019
4  SWPPP"), approximately 58 days after the Notice Letters were mailed to Defendants.

5  439.  The 2019 SWPPP acknowledges that copper and zinc are present at the
6  Facility as a result of the Facility's industrial activities, and that these pollutants may be
7  present in the Facility's discharges. However, the 2019 SWPPP continues to fail to
8  acknowledge the presence of indicator bacteria, nutrients, and other pollutants at the
9  Facility.

10  440.  Given the activities, operations, and materials present at this Facility as
11  described *supra*, Plaintiffs are informed, believe, and thereon allege that the San Diego
12  Hauling Facility Owner and/or Operator has failed and continues to fail to accurately
13  identify all pollutants present at the Facility as a result of industrial activities.

14  441.  Plaintiffs are informed, believe, and thereon allege that, as the pollutants
15  identified in the pollutant source assessment are used to determine the parameters for
16  which a Facility samples and analyzes its storm water, the San Diego Hauling Facility
17  Owner and/or Operator's identification of only these minimum pollutants evidences an
18  intent to circumvent requirements of the General Industrial Permit, and thus avoid
19  analyzing its storm water for required additional parameters.

20  442.  Plaintiffs are informed, believe, and thereon allege that the San Diego
21  Hauling SWPPP has failed and continues to fail to require the analysis of storm water
22  discharges from the Facility for all parameters required by the Permit. *See* 2015 Permit,
23  Section B.5.c.

24  443.  Plaintiffs are informed, believe, and thereon allege that, due in part to the
25  San Diego Hauling Facility SWPPP's failure to adequately assess all pollutants and
26  pollutants sources at the Facility, the San Diego Hauling Facility storm water discharges
27  have contained and will continue to contain pollutants in exceedance of EPA Benchmark
28  values, CTR limits, and/or Basin Plan objectives.

Complaint                              68

444.    Plaintiffs are informed, believe, and thereon allege that San Diego Hauling Facility Owner and/or Operator has also failed to adequately revise the Facility's SWPPP to ensure compliance with the General Industrial Permit.

**2.  The Chula Vista Hauling Facility Owner and/or Operator Has Violated and Continues to Violate Permit SWPPP Requirements.**

445.    Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility Owner and/or Operator has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

446.    Plaintiffs are informed, believe, and thereon allege that the Facility SWPPPs fail to accurately identify all of the correct SIC codes applicable to the Facility. For example, the Facility SWPPPs' own description of the industrial activities conducted at the Facility indicates that SIC code 4231 (terminal and joint terminal maintenance facilities for motor freight transportation) also applies to the Facility, though the SWPPPs fail to identify this SIC code in violation of the General Industrial Permit.

447.    Plaintiffs are informed, believe, and thereon allege that the Facility SWPPPs and site maps have failed to accurately label and describe the location of all industrial activities, industrial materials, and potential pollutant sources in each drainage area in violation of the General Industrial Permit. *See* 2015 Permit, §§ X.E.3.f, X.G. For example, all of the Facility SWPPPs and site maps fail to acknowledge that waste hauling trucks, bins, and containers, all of which have been recently exposed to a variety of trash and waste, frequently enter and exit the Facility via the driveway located within DA-2, as well as frequently traverse DA-1. Furthermore, the 2015 site map and 2015 and 2016 SWPPPs fail to acknowledge the ingress/egress point through which waste hauling vehicles, bins, and containers enter the Facility directly from the Otay Landfill via a dirt road on the eastern side of the Facility.

448.    Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate description of potential pollutant sources.

449.   Section X.G.1.a of the 2015 Permit requires dischargers to "ensure the SWPPP describes each industrial process including: manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to the process."

450.   Plaintiffs are informed, believe, and thereon allege the Facility SWPPPs fail to adequately describe any of the industrial activities at the Facility, instead providing only cursory lists of the activities conducted at the Facility. For example, the 2016 SWPPP's list of "specific industrial activities" lacks any sort of specificity and consists of only "vehicle and equipment maintenance," "vehicle and equipment fueling," and "container maintenance."

451.   Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility SWPPPs fail to describe how vehicles and equipment are washed, whether and how any wash water is contained, how welding operations are conducted, what other maintenance is performed on vehicles and bins, and how the Facility compresses natural gas and provides this fuel to its vehicles, etc. As such, the SWPPPs fail to provide the required description of industrial activities in violation of the General Industrial Permit. *See* 2015 Permit § X.G.1.

452.   Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate pollutant source assessment.

453.   Section X.G.2 of the 2015 Permit requires dischargers to "ensure that the SWPPP includes a *narrative* assessment of all areas of industrial activity with potential industrial pollutant sources." (emphasis added). This assessment shall include "pollutants likely to be present in industrial storm water discharges and authorized NSWDs," (§ X.G.2.a.ii), "[t]he degree to which the pollutants associated with those materials may be exposed to, and mobilized by contact with, storm water," (§ X.G.2.a.iv), "[t]he direct and indirect pathways by which pollutants may be exposed to storm water or authorized NSWDs," (§ X.G.2.a.v), and "[t]he effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs," (§ X.G.2.a.vii),

1   among other requirements.

2   454.   Plaintiffs are informed, believe, and thereon allege that the Facility SWPPPs

3   fail to comply with any of the aforementioned requirements of Section X.G.2. For

4   example, the only narrative assessment provided in the Facility SWPPPs cursorily list out

5   the industrial activities conducted at the Facility, and summarily states "[p]ollutants that

6   can potentially enter storm water run-off and other discharges draining from the facility

7   include: Sediment (including erodibles and aggregates), Oil and Grease (waste oil and

8   leaks from equipment), Hydrocarbons (petroleum products, hydraulic fluid, and fuel),

9   Gross Pollutants (litter, debris, and floatables), Organics (cleaners, solvents, and

10  herbicides), [and] Trace Metals." 2016 SWPPP § 2.3.1.

11  455.   The Chula Vista Hauling Facility Owner and/or Operator published and

12  uploaded a revised SWPPP to the SMARTS database on October 26, 2019 ("2019

13  SWPPP"), approximately 58 days after the Notice Letters were mailed to Defendants.

14  456.   The 2019 SWPPP acknowledges that copper and zinc are present at the

15  Facility as a result of the Facility's industrial activities, and that these pollutants may be

16  present in the Facility's discharges. However, the 2019 SWPPP continues to fail to

17  acknowledge the presence of indicator bacteria, nutrients, and other pollutants at the

18  Facility.

19  457.   Given the activities, operations, and materials present at this Facility as

20  described *supra*, Plaintiffs are informed, believe, and thereon allege that the Chula Vista

21  Hauling Facility Owner and/or Operator has failed and continues to fail to accurately

22  identify all pollutants present at the Facility as a result of industrial activities.

23  458.   Plaintiffs are informed, believe, and thereon allege that the Chula Vista

24  Hauling Facility SWPPPs have failed and continue to fail to require the analysis of storm

25  water discharges from the Facility for all parameters required by the Permit. *See* 2015

26  Permit, Section B.5.c.

27  459.   Plaintiffs are informed, believe, and thereon allege that, due in part to the

28  Facility SWPPPs' failure to adequately assess all pollutants and pollutants sources at the

Complaint                           71

Facility, storm water discharged from the Chula Vista Hauling Facility has exceeded and continues to exceed EPA Benchmark values, CTR limits, and Basin Plan objectives in violation of the General Industrial Permit.

460. Plaintiffs are informed, believe, and thereon allege the Chula Vista Hauling Facility Owner and/or Operator has also failed to adequately revise the Facility's SWPPP to ensure compliance with the General Industrial Permit.

### 3. The Eastgate Hauling Facility Owner and/or Operator Has Violated and Continues to Violate Permit SWPPP Requirements.

461. Plaintiffs are informed, believe, and thereon allege that the Eastgate Hauling Facility Owner and/or Operator has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

462. Plaintiffs are informed, believe, and thereon allege that the Facility SWPPPs fail to accurately identify all of the correct SIC codes applicable to the Facility. For example, the Facility SWPPPs' own description of the industrial activities conducted at the Facility indicates that SIC code 4231 (terminal and joint terminal maintenance facilities for motor freight transportation) also applies to the Facility, though the SWPPPs fail to identify this SIC code in violation of the General Industrial Permit.

463. Plaintiffs are informed, believe, and thereon allege that the Facility SWPPPs and site maps have failed to accurately include all information required by the General Industrial Permit.

464. The Facility SWPPPs, in conjunction with the site maps, claim that all water from DA-1 is routed to DP-1, the concrete curbed channel in the southeast corner of the Facility.

465. Plaintiffs are informed, believe, and thereon allege that not all surface flows from DA-1 are successfully routed to DP-1. Information available to Coastkeeper and CERF indicates that some storm water flows and/or is tracked outside of the Facility boundary, onto the access road shared by the Eastgate Hauling Facility and the neighboring Robertson's Ready Mix Facility, and onto Eastgate Drive.

466.   Plaintiffs are informed, believe, and thereon allege this constitutes a separate discharge point from the Facility. The Facility SWPPPs and site map fails to identify it as such, and further fail to collect storm water samples from this discharge point, all of which are violations of the General Industrial Permit. *See, e.g.*, 2015 Permit § X.E.3.b.

467.   The Facility SWPPPs and site maps fail to identify the containment capacity of the oil trench in DA-2 in violation of the General Industrial Permit. *See* 2015 Permit § X.G.1.a.

468.   Plaintiffs are informed, believe, and thereon allege each of the Tayman SWPPPs and site maps are inaccurate, and lack adequate information regarding storm water flow, drainage areas and discharge points, and locations of all industrial materials and industrial activities in violation of the General Industrial Permit.

469.   Plaintiffs are informed, believe, and thereon allege that the Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate description of potential pollutant sources.

470.   Section X.G.1.a of the 2015 Permit requires dischargers to "ensure the SWPPP *describes* each industrial process including: manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to the process." (emphasis added). However, the Facility SWPPPs fail to adequately describe any of the industrial activities at the Facility, instead providing only cursory lists of the activities conducted at the Facility.

471.   Plaintiffs are informed, believe, and thereon allege the Facility SWPPPs fail to adequately describe any of the industrial activities at the Facility, instead providing only cursory lists of the activities conducted at the Facility. For example, the most detailed information provided by the SWPPP regarding the Facility's industrial operations, processes, and activities states: "The Facility primarily maintains hauling vehicles. Hauling vehicles also receive mechanical maintenance and washing at the Facility. Vehicle washing activities are conducted by a 3rd party vendor." 2017 SWPPP § 2.1.2 The SWPPP provides no additional information regarding how these activities are

conducted at the Facility.

472.   The Tayman Facility SWPPPs contain even less information regarding Tayman's industrial activities.

473.   As such, Plaintiffs allege the Eastgate Hauling Facility and Tayman SWPPPs have failed and continue to fail to provide the required *description* of industrial activities in violation of the General Industrial Permit. *See* 2015 Permit § X.G.1.

474.   Plaintiffs are informed, believe, and thereon allege that the Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate pollutant source assessment.

475.   Section X.G.2 of the 2015 Permit requires dischargers to "ensure that the SWPPP includes a *narrative* assessment of all areas of industrial activity with potential industrial pollutant sources." (emphasis added). This assessment shall include "pollutants likely to be present in industrial storm water discharges and authorized NSWDs," (§ X.G.2.a.ii), "[t]he degree to which the pollutants associated with those materials may be exposed to, and mobilized by contact with, storm water," (§ X.G.2.a.iv), "[t]he direct and indirect pathways by which pollutants may be exposed to storm water or authorized NSWDs," (§ X.G.2.a.v), and "[t]he effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs," (§ X.G.2.a.vii), among other requirements.

476.   Plaintiffs are informed, believe, and thereon allege that the Facility SWPPPs fail to comply with any of the aforementioned requirements of Section X.G.2. For example, the only narrative assessment provided in the 2017 SWPPP cursorily lists out the industrial activities conducted at the Facility, and summarily states "[p]ollutants that can potentially enter stormwater run-off and other discharges draining from the Facility include: Sediment (including vehicle traffic from both Eastgate Hauling and Neighboring Facilities), Oil & Grease (waste oil and leaks from equipment); and pH." 2017 SWPPP § 2.3.1.

477.   Table 2.1.b of the 2017 SWPPP identifies O&G, hydrocarbons, gross

pollutants, and trace metals as potential pollutants at the Facility without any further description or analysis. The pollutants identified in this table are internally inconsistent with Section 2.3.1 of the same SWPPP which claims that the only potential pollutants are sediment, O&G, and pH.

478.   Plaintiffs are informed, believe, and thereon allege that Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to accurately identify all pollutants present at the Facility as a result of industrial activities as required by the General Industrial permit. For example, Table 2.1.a states that one source of pollutants at the Facility is "decaying organic material," indicating that indicator bacteria and other pathogens are likely present at the Facility.

479.   Table 2.1.b includes "debris from vehicles" as a pathway for pollutants to enter storm water. The vehicles receiving maintenance and washing at the Facility are used to transport municipal solid waste, green waste, and/or recyclables, and as such, they frequently track all pollutants associated with waste hauling onto the Facility.

480.   Given the activities, operations, and materials present at this Facility as described *supra*, Plaintiffs are informed, believe, and thereon allege that there are numerous pollutants present at the Eastgate Hauling Facility which the Facility SWPPPs fail to acknowledge.

481.   Plaintiffs are informed, believe, and thereon allege the Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to accurately identify all pollutants present at the Facility as a result of industrial activities.

482.   Plaintiffs are informed, believe, and thereon allege that, as the pollutants identified in the pollutant source assessment are used to determine the parameters for which a Facility samples and analyzes its storm water, the Eastgate Hauling Facility Owner and/or Operator's identification of only these minimum pollutants evidences an intent to circumvent requirements of the General Industrial Permit, and thus avoid analyzing its storm water discharges for required additional parameters.

483.   Plaintiffs are informed, believe, and thereon allege that the Eastgate Hauling

SWPPP has failed and continues to fail to require the analysis of storm water discharges from the Facility for all parameters required by the Permit. *See* 2015 Permit, Section B.5.c.

484.   Plaintiffs are informed, believe, and thereon allege that, due in part to the Eastgate Hauling Facility SWPPPs' failure to adequately assess all pollutants and pollutant sources at the Facility, storm water discharged from the Facility has contained and will continue to contain pollutant concentrations in exceedance of EPA Benchmark values, CTR limits, and/or Basin Plan objectives.

485.   Plaintiffs are informed, believe, and thereon allege that Eastgate Hauling Facility Owner and/or Operator has also failed to adequately revise the Facility's SWPPP to ensure compliance with the General Industrial Permit.

### 4. The SWPPPs for Each Republic Facility Have Failed and Continue to Fail to Develop and/or Implement BMPs that Would Comply with the General Industrial Permit.

486.   Plaintiffs are informed, believe, and thereon allege that without properly identifying all industrial activities and industrial materials in the Facilities' SWPPPs, the Republic Owners and/or Operators cannot and have not developed and/or implemented all appropriate BMPs at each Facility.

487.   Plaintiffs are informed, believe, and thereon allege that the Republic Facilities' SWPPPs fail to assess the BMPs at each Facility with respect to each Facility's potential pollutant sources.

488.   As discussed *supra*, exceedances of the General Industrial Permit Effluent Limitations, such as EPA benchmarks, and applicable Receiving Water Limitations, such as the CTR and Basin Plan, are indicators that a facility has failed to develop and implement BMPs that satisfy BAT/BCT requirements.

489.   As discussed *supra*, Defendant's own sampling data demonstrates that each of the Republic Facilities have discharged and continue to discharge storm water with concentrations of pollutants in exceedance of EPA Benchmarks values, CTR limits,

1    and/or Basin Plan objectives.

2        490.   Because the each of the Republic Facilities has discharged numerous

3    pollutants in exceedance of Effluent Limitations, as well as Discharge Prohibitions and

4    Receiving Water Limitations, Plaintiffs are informed, believe, and thereon allege that the

5    Republic Owners and/or Operators have failed to develop and/or implement BMPs that:

6            i.   adequately minimize the exposure of pollutants to storm water at the

7                 Facilities;

8           ii.   adequately control and minimize polluted runoff from the Facilities;

9          iii.   adequately treat and remove pollutants in storm water prior to the

10                discharge;

11          iv.   adequately prevent or control contaminated storm water from being

12                discharged from the Facilities; and

13           v.   adequately prevent or control contaminated NSWDs from being

14                discharged from the Facilities.

15       491.   Plaintiffs are informed, believe, and thereon allege that the Republic Owners

16   and/or Operators have failed and continue to fail to develop and/or implement SWPPPs

17   for each Facility that contain BMPs that achieve BAT/BCT in violation of the General

18   Industrial Permit.

19       492.   Plaintiffs are informed, believe, and thereon allege that the Republic

20   Owners' and/or Operators' failure to develop and implement adequate BMPs at each

21   Facility is due in part to the SWPPPs' failure to include adequate site-specific

22   information regarding the BMPs developed and/or implemented at the Facility. For

23   example, each Republic Facility's SWPPP simply states "[a]ll minimum Best

24   Management Practices (BMPs) that are required by the IGP and necessary to meet the

25   Facility conditions will be implemented," followed by boilerplate language parroting the

26   2015 Permit language setting forth minimum BMP requirements, and the CASQA

27   Stormwater BMP Handbook Portal.

28       493.   Plaintiffs are informed, believe, and thereon allege that the Republic Owners

Complaint                              77

and/or Operators have also failed to properly operate and maintain the structures and systems put in place at each Facility to achieve compliance with the General Industrial Permit requirements.

494.   Plaintiffs are informed, believe, and thereon allege that each of the Republic Facilities' SWPPPs fail to adequately analyze the effectiveness of each Facility's existing BMPs.

495.   Plaintiffs are informed, believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail to evaluate and revise the SWPPPs of each Facility to ensure compliance with the General Industrial Permit, as required by Sections A.9–10 of the 1997 Permit, and Sections X.A.9 and X.B.1 of the 2015 Permit.

496.   Plaintiffs are informed, believe, and thereon allege that the inadequacy of the BMPs at the Republic Facilities is in part a result of the Republic Owners and/or Operators' failure to develop, implement, and revise adequate SWPPPs.

497.   Plaintiffs are informed, believe, and thereon allege that the Republic Owners and/or Operators' failure to revise each Facility's SWPPPs, and thus failure to improve each Facility's BMPs, despite the numerous and repeated exceedances of Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations identified in Defendants' own monitoring data, ensures that these exceedances will continue in violation of the General Industrial Permit.

498.   Every day the Republic Owners and/or Operators operate each Facility with an inadequately developed and/or implemented SWPPP, and/or without properly revising each SWPPP, is a separate and distinct violation of the General Industrial Permit, New Industrial Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

499.   Plaintiffs are informed, believe, and thereon allege that the Republic Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit SWPPP requirements since at least August 27, 2014. These violations are ongoing, and Plaintiffs will include additional violations when information becomes available.

**H.      Defendants Have Failed and Continue to Fail to Develop, Implement, and/or Revise Adequate Monitoring and Reporting Programs at Each Republic Facility.**

500.   The 1997 Permit requires storm water samples be analyzed for TSS, pH, SC, total organic carbon or O&G, and other pollutants that are likely to be present in the facility's discharges in significant quantities. 1997 Permit § B.5.c. The 2015 Permit requires discharges to analyze all collected samples for TSS, O&G, pH, and all pollutants associated with the Discharger's industrial activities. 2015 Permit § XI.B.6.a–d.

501.   Specifically, the 2015 Permit requires Facility Owners and/or Operators to sample and analyze parameters on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. *Id*. § XI.B.6.c.

502.   Section XI.B.6.e of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with a Clean Water Act Section 303(d) listed impairment(s), or approved Total Maximum Daily Loads.

503.   Plaintiffs are informed, believe, and thereon allege that each of the Republic Facility Owners and/or Operators has conducted and continues to conduct operations at each Facility with an inadequately developed, implemented, and/or revised M&RP. For example, each of the Facilities have failed and continue to fail to sample and analyze storm water discharges for all parameters required by the General Industrial Permit,

504.   Plaintiffs are informed, believe, and thereon allege that each of the Republic Facility Owners and/or Operators has failed and continues to fail to collect samples from all discharge locations during each QSE.

**1.  The San Diego Hauling Facility Fails to Comply with the General Industrial Permit's M&RP Requirements.**

505.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility has failed and continues to fail to sample for numerous constituents

present at the Facility as a result of the Facility's industrial activities in violation of General Industrial Permit.

506.    The Facility's own SWPPPs, ERA reports, and ERA action plans acknowledge that the Facility engages in storing, washing, welding, painting, and otherwise maintaining waste hauling trucks and containers, as well as waste transfer operations, indicating that dozens of additional pollutants are present at the Facility as a result of its industrial activities.

507.    The 2016 SWPPP acknowledges that zinc, copper, E. coli, enterococcus, fecal coliform, total coliform, and "trace metals" are present at the Facility as a result of the Facility's industrial activities. 2016 SWPPP, Tables 2.1.a–b.

508.    The San Diego Hauling Facility Owner and/or Operator analyzed its storm water discharges for zinc on December 2, 2014 and December 12, 2014, and all six samples collected exceeded the EPA Benchmark for zinc of 0.12 mg/L. Yet, the Facility Owner and/or Operator ceased sampling for zinc after December 12, 2014 without providing explanation or implementing any BMPs to reduce and/or prevent discharges of zinc in the Facility's storm water indicating that zinc has been and continues to be present in the Facility's storm water discharges.

509.    The San Diego Hauling Facility Owner and/or Operator analyzes storm water samples for only TSS, O&G, and pH.

510.    Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility Owner and/or Operator has therefore failed and continues to fail to sample for numerous "additional" parameters in violation of the General Industrial Permit. *See* 1997 Permit § B.5.c; 2015 Permit §§ XI.B.6.c; XI.B.6.e.

511.    Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a M&RP that requires the collection of storm water samples from all discharge locations at the Facility in violation of Section XI.B.4 of the 2015 Permit. For example, the Facility Owner and/or Operator currently collects samples from only DA2

(at SD-1), and has failed and continues to fail collect samples from DA1, DA3, DA4, and DA5.

512.   Plaintiffs are informed, believe, and thereon allege that the Facility Owner and/or Operator's self-classification of DA1 as non-industrial is erroneous.

513.   Table 3.5 of the 2016 SWPPP indicates that various pollutants and pollutant sources associated with container maintenance are located within DA1.

514.   Plaintiffs are informed, believe, and thereon allege the site map and SWPPPs fail to acknowledge that waste hauling trucks, bins, and containers frequently enter and exit the Facility via the driveway located within DA1.

515.   Facility has also failed to obtain a No Exposure Certification ("NEC") to exclude any individual drainage areas from the SWPPP and monitoring requirements of the General Industrial Permit.

516.   While Section B.7.d of the 1997 Permit and Section XI.C.4 of the 2015 Permit allow permittees to reduce the number of locations to be sampled, there is no indication that the Facility Owner and/or Operator has complied with the requirements of Section B.7.d of the 1997 Permit or Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility.

517.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility Owner and/or Operator also failed to collect the required number of storm water samples for each reporting period. For example, the Facility only collected one sample during the entire 2017–2018 reporting period.

518.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility Owner and/or Operator fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

## 2.  The Chula Vista Hauling Facility Fails to Comply with the General Industrial Permit's M&RP Requirements.

519.   Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility has failed and continues to fail to sample for numerous constituents

Complaint                                              81

present at the Facility as a result of the Facility's industrial activities in violation of General Industrial Permit.

520.   The Facility's own SWPPPs, ERA reports, and ERA action plans acknowledge that the Facility engages in storing, washing, welding, painting, and otherwise maintaining waste hauling trucks and containers, indicating that dozens of additional pollutants are present at the Facility as a result of its industrial activities.

521.   The Chula Vista Hauling Facility Owner and/or Operator analyzed its storm water discharges for zinc on December 2, 2014 and December 12, 2014, and each sample collected exceeded the EPA Benchmark for zinc of 0.12 mg/L. Yet, the Facility Owner and/or Operator ceased sampling for zinc after December 12, 2014, without providing explanation or implementing any BMPs to reduce and/or prevent discharges of zinc in the Facility's storm water indicating that zinc has been and continues to be present in the Facility's storm water discharges.

522.   The Chula Vista Hauling Facility Owner and/or Operator has analyzed its storm water samples for only TSS, O&G, and pH since December 12, 2014.

523.   Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility Owner and/or Operator has therefore failed and continues to fail to sample for numerous "additional" parameters in violation of the General Industrial Permit. *See* 1997 Permit § B.5.c; 2015 Permit §§ XI.B.6.c; XI.B.6.e.

524.   Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a M&RP that requires the collection of storm water samples from all discharge locations at the Facility in violation of Section XI.B.4 of the 2015 Permit. For example, the Facility Owner and/or Operator only collects samples from DA-1 sampling location PL-1, and from DA-2 at sampling location RD-1. However, the Facility Owner and/or Operator has failed to collect samples from the unnamed drainage area between DA-1 and the Facility boundary along the western and southern edges of the property.

525.   The Facility has also failed to obtain a NEC to exclude any individual

Complaint                                        82

drainage areas from the SWPPP and monitoring requirements of the General Industrial Permit.

526.   While Section B.7.d of the 1997 Permit and Section XI.C.4 of the 2015 Permit allow permittees to reduce the number of locations to be sampled, there is no indication that the Facility Owner and/or Operator has complied with the requirements of Section B.7.d of the 1997 Permit or Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility.

527.   Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility Owner and/or Operator also failed to collect the required number of storm water samples for each reporting period. For example, the Facility only collected one sample during the entire 2017–2018 reporting period.

528.   Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility Owner and/or Operator fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

### 3.   The Eastgate Hauling Facility Fails to Comply with the General Industrial Permit's M&RP Requirements.

529.   Plaintiffs are informed, believe, and thereon allege that the Eastgate Hauling Facility has failed and continues to fail to sample for numerous constituents present at the Facility as a result of the Facility's industrial activities in violation of General Industrial Permit. *See* 1997 Permit § B.5.c; 2015 Permit § XI.B.6.

530.   The Facility Owner and/or Operator analyzes storm water samples for only TSS, O&G, and pH.

531.   In light of the Facility's activities of storing, washing, and maintaining waste hauling trucks, as described *supra*, Plaintiffs are informed, believe, and thereon allege that dozens of pollutants are present at the Facility as a result of its industrial activities, in addition to TSS, O&G, and pH.

532.   Plaintiffs are informed, believe, and thereon allege that the Eastgate Hauling Facility Owner and/or Operator has therefore failed and continues to fail to sample for

numerous "additional" parameters in violation of the General Industrial Permit. *See* 1997 Permit § B.5.c; 2015 Permit §§ XI.B.6.c; XI.B.6.e.

533.    Plaintiffs are informed, believe, and thereon allege that the Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a M&RP that requires the collection of storm water samples from all discharge locations at the Facility in violation of Section XI.B.4 of the 2015 Permit. For example, both Republic and Tayman have only collected storm water samples from DP-1, accounting for storm water in DA-1. However, the 2017 SWPPP and site map indicate that the Facility consists of two drainage areas, DA-1 and DA-2. DA-2 discharges storm water and non-storm water at DP-2. However, both Tayman and Republic have failed to collect samples from DP-2.

534.    Plaintiffs are informed, believe, and thereon allege that the Facility also discharges storm water from the truck ingress/egress point of the Facility, which ultimately discharges to Eastgate Drive. The Facility Owner and/or Operator has failed to sample any storm water discharged from this ingress/egress point.

535.    The Facility has failed to obtain a NEC to exclude any individual drainage areas from the SWPPP and monitoring requirements of the General Industrial Permit.

536.    While Section B.7.d of the 1997 Permit and Section XI.C.4 of the 2015 Permit allow permittees to reduce the number of locations to be sampled, there is no indication that the Facility Owner and/or Operator has complied with the requirements of Section B.7.d of the 1997 Permit or Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility.

537.    Plaintiffs are informed, believe, and thereon allege that the Eastgate Hauling Facility Owner and/or Operator also failed to collect the required number of storm water samples for each reporting period. For example, the Facility only collected one sample during the entire 2017–2018 reporting period, and two samples from the 2016–17 reporting period.

538.    Plaintiffs are informed, believe, and thereon allege that the Eastgate Hauling

Facility Owner and/or Operator fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

539.   Plaintiffs are informed, believe, and thereon allege that every day each Republic Facility operates with an inadequately developed and/or implemented M&RP, or with an improperly revised M&RP, is a separate and distinct violation of the General Industrial Permit and the Clean Water Act.

540.   Plaintiffs are informed, believe, and thereon allege that each of the Republic Facilities have been in daily and continuous violation of the General Industrial Permit M&RP requirements since at least August 27, 2014.

541.   Plaintiffs are informed, believe, and thereon allege that these violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. Defendants are subject to civil penalties for all violations of the Clean Water Act occurring since August 27, 2014.

**I.     Defendants Have Failed and Continue to Fail to Comply with the General Industrial Permit's Reporting Requirements at Each Republic Facility.**

542.   Plaintiffs are informed, believe, and thereon allege that each of the Republic Facilities has failed and continues to fail to submit Annual Reports that comply with the General Industrial Permit reporting requirements.

**1.   The San Diego Hauling Facility Fails to Comply with the General Industrial Permit's Reporting Requirements.**

543.   Plaintiffs are informed, believe, and thereon allege the San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to submit accurate Annual Reports. For example, the Annual Reports for the 2015−16 and 2016−17 reporting periods state that zinc, copper, E. coli, enterococcus, fecal coliform, and total coliform are not present at the Facility. However, as noted *supra*, the 2016 SWPPP acknowledges that all of these pollutants are present at the Facility as a result of the Facility's industrial activities.

544.   The Facility Owner and/or Operator failed to upload an Annual Report to the SMARTS database for the reporting period of 2017–2018 in violation of the General Industrial Permit reporting requirements.

545.   In each Annual Report since the filing of the 2013–14 Annual Report, the Facility Owner and/or Operator certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the General Industrial Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the General Industrial Permit, or will otherwise be revised to achieve compliance.

546.   Plaintiffs are informed, believe, and thereon allege the San Diego Hauling Facility has failed and continues to fail to update the SWPPP's BMPs to address existing potential pollutant sources. For example, storm water samples collected from the Facility contain concentrations of pollutants above EPA Benchmarks, thus demonstrating that the Facility BMPs do not adequately address existing potential pollutant sources.

547.   Plaintiffs are informed, believe, and thereon allege the Facility's SWPPPs do not include many elements required by the General Industrial Permit, and thus it is erroneous to certify that the SWPPPs comply with the General Industrial Permit.

548.   Facility operators must report any noncompliance with the General Industrial Permit at the time that the Annual Report is submitted, including (1) a description of the noncompliance and its cause, (2) the period of noncompliance, (3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (4) steps taken or planned to reduce and prevent recurrence of the noncompliance. 1997 Permit, § C.11.d; 2015 Permit, § XVI.B.2.

549.   Plaintiffs are informed, believe, and thereon allege that the San Diego Hauling Facility Owner and/or Operator has failed to report numerous instances of non-compliance as required by the General Industrial Permit.

/ / /

/ / /

## 2. The Chula Vista Hauling Facility Fails to Comply with the General Industrial Permit's Reporting Requirements.

550. Plaintiffs are informed, believe, and thereon allege the Chula Vista Hauling Facility Owner and/or Operator has failed and continues to fail to submit accurate Annual Reports. For example, the Facility Owner and/or Operator simply failed to upload an Annual Report to the SMARTS database for the reporting period of 2017−2018.

551. The Chula Vista Hauling Facility Annual Reports for the 2015−16 and 2016−17 reporting periods state that ammonia, iron, manganese, and nitrogen are not present at the Facility, and certify that the Facility included these pollutants in the SWPPPs' pollutant source assessment. However, the 2015 and 2016 Facility SWPPPs fail to assess any of these pollutants, and, as discussed *supra*, information available to Coastkeeper and CERF indicates that all of these pollutants are present at the Chula Vista Hauling Facility.

552. In each Annual Report since the filing of the 2013−14 Annual Report, the Facility Owner and/or Operator certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the General Industrial Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the General Industrial Permit, or will otherwise be revised to achieve compliance.

553. Plaintiffs are informed, believe, and thereon allege the Chula Vista Hauling Facility has failed and continues to fail to update the SWPPP's BMPs to address existing potential pollutant sources. For example, storm water samples collected from the Facility contain concentrations of pollutants above EPA Benchmarks, thus demonstrating that the Facility BMPs do not adequately address existing potential pollutant sources.

554. Plaintiffs are informed, believe, and thereon allege the Facility's SWPPPs do not include many elements required by the General Industrial Permit, and thus it is erroneous to certify that the SWPPPs comply with the General Industrial Permit.

555. Facility operators must report any noncompliance with the General

Industrial Permit at the time that the Annual Report is submitted, including (1) a description of the noncompliance and its cause, (2) the period of noncompliance, (3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (4) steps taken or planned to reduce and prevent recurrence of the noncompliance. 1997 Permit, § C.11.d; 2015 Permit, § XVI.B.2.

556.   Plaintiffs are informed, believe, and thereon allege that the Chula Vista Hauling Facility Owner and/or Operator has failed to report numerous instances of non-compliance as required by the General Industrial Permit.

### 3. The Eastgate Hauling Facility Fails to Comply with the General Industrial Permit's Reporting Requirements.

557.   Plaintiffs are informed, believe, and thereon allege the Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to submit accurate Annual Reports. For example, the 2015–16 Annual Report inaccurately states that the Facility is not located within an impaired HUC 10 watershed, when Carroll Canyon, Soledad Canyon, and Los Peñasquitos Lagoon are impaired for various pollutants, as discussed *supra*.

558.   The 2016–17 Annual Report inaccurately attests that all pollutants identified in the impaired watershed were included in the SWPPP pollutant source assessment. For example, none of the pollutants identified in the 2016–17 Annual Report were acknowledged or assessed in Tayman's SWPPPs during that time period.

559.   The Facility Owner and/or Operator simply failed to upload an Annual Report to the SMARTS database for the reporting period of 2017–2018.

560.   In each Annual Report since the filing of the 2013–14 Annual Report, the Facility Owner and/or Operator certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the General Industrial Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the General Industrial Permit, or will otherwise be revised to achieve compliance.

561.   Plaintiffs are informed, believe, and thereon allege the Eastgate Hauling Facility has failed and continues to fail to update the SWPPP's BMPs to address existing potential pollutant sources. For example, storm water samples collected from the Facility contain concentrations of pollutants above EPA Benchmarks, thus demonstrating that the Facility BMPs do not adequately address existing potential pollutant sources.

562.   Plaintiffs are informed, believe, and thereon allege the Facility's SWPPPs do not include many elements required by the General Industrial Permit, and thus it is erroneous to certify that the SWPPPs comply with the General Industrial Permit.

563.   Plaintiffs are informed, believe, and thereon allege Eastgate Hauling Facility Owner and/or Operator has not accurately reported non-compliance, as required by the General Industrial Permit. *See* 1997 Permit § C.11.d; 2015 Permit § XVI.B.2.

564.   Plaintiffs are informed, believe, and thereon allege that every day the Defendants conduct operations at each Republic Facility without reporting as required by the General Industrial Permit is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

565.   Plaintiffs are informed, believe, and thereon allege that each of the Republic Facilities have been in daily and continuous violation of the General Industrial Permit reporting requirements since at least August 27, 2014.

566.   Plaintiffs are informed, believe, and thereon allege that these violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. Defendants are subject to civil penalties for all violations of the Clean Water Act occurring since August 27, 2014.

## J.   The Republic Owners and/or Operators Fail to Comply with Level 1 and Level 2 ERA Requirements.

### 1.   The San Diego Hauling Facility Violates the General Industrial Permit's ERA Requirements.

567.   The San Diego Hauling Facility entered Level 1 status for TSS following the 2015–16 reporting period with an average annual concentration of TSS of 160 mg/L,

exceeding the annual NAL of 100 mg/L.

568.   Following the 2016–17 reporting period, the Facility entered Level 2 status for TSS with an average annual concentration of TSS of 181.75 mg/L, and entered Level 1 status for O&G with an average annual amount of 16.925 mg/L, exceeding the annual NAL of 15.0 mg/L.

569.   Following the 2017–18 reporting period, during which the Facility Owner and/or Operator collected only one sample, the Facility remained in Level 1 status for O&G and Level 2 for TSS.

570.   Plaintiffs are informed, believe, and thereon allege that, due to the Facility's failure to collect samples from all drainage areas and all discharge points, as well as the failure to analyze storm water samples for all parameters required by the General Industrial Permit, the Facility's monitoring data fails to accurately portray the San Diego Hauling Facility's actual NAL exceedances and proper ERA levels.

571.   In September 2016, the Facility Owner and/or Operator submitted a consolidated ERA Level 1 Evaluation and Report for TSS ("2016 Level 1 ERA Report").

572.   Plaintiffs are informed, believe, and thereon allege that the 2016 Level 1 ERA Report failed to conduct an adequate Level 1 status evaluation to identify additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances at the Facility. For example, the Report's statement that one likely source of TSS is "industrial activity" is entirely void of specificity, thus violating Section XII.C.1.b of the 2015 Permit and undermining the intent of the ERA provisions of the General Industrial Permit.

573.   Plaintiffs are informed, believe, and thereon allege that, because the Facility has continued to discharge TSS in excess of NALs, the 2016 Level 1 ERA Report failed to adequately evaluate sources of TSS, or recommend BMPs that would successfully reduce TSS below the NAL standard. *See* 2015 Permit § XII.C.1.c.

574.   In September 2017, the Facility Owner and/or Operator submitted a consolidated ERA Level 1 Evaluation and Report for O&G ("2017 Level 1 ERA

Report").

575. Plaintiffs are informed, believe, and thereon allege that the 2017 Level 1 ERA Report failed to conduct an adequate Level 1 status evaluation to identify additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances at the Facility.

576. In December 2017, the San Diego Facility Owner and/or Operator published a Level 2 ERA Action Plan, which is publicly available on the SMARTS online database.

577. The 2015 Permit requires that a Level 2 ERA Action Plan shall at a minimum address the drainage areas with corresponding Level 2 NAL exceedances. 2015 Permit § XII.D.1.c.

578. As previously discussed, the Facility Owner and/or Operator has failed to collect samples from each drainage area and discharge point. For example, the Facility Owner and/or Operator only collects storm water from DA2 at SD-1 in violation of the General Industrial Permit. As such, Plaintiffs are informed, believe, and thereon allege that the 2017 ERA Level 2 Action Plan failed to adequately evaluate any other drainage areas, undermining the accuracy of the ERA action plan, as well as the effectiveness of the NAL iterative process.

579. In December 2018, the San Diego Facility Owner and/or Operator published a Level 2 ERA Technical Report.

580. Plaintiffs are informed, believe, and thereon allege that, similar to the 2017 ERA Level 2 Action Plan, the 2018 Technical Report is inaccurate and ineffective due to the Facility Owner and/or Operator's failure to collect samples from each drainage area. For example, for both DA3 and DA4, the 2018 Technical Report's exceedance and BMP implementation analysis stats that "there were no exceedances in this DA." However, there were no recorded exceedances in these drainage areas because the Facility Owner and/or Operator ceased collecting samples from DA3 and DA4 after December 12, 2014, without providing any explanation.

/ / /

### 2. The Chula Vista Hauling Facility Violates General Industrial Permit ERA Requirements.

581.   The Chula Vista Hauling Facility entered Level 1 status for TSS following the 2015–16 reporting period with an average annual concentration of TSS of 273 mg/L, exceeding the annual NAL of 100 mg/L.

582.   Following the 2016–17 reporting period, the Facility entered Level 2 status for TSS with an average annual concentration of TSS of 152.75 mg/L, and entered Level 1 status for O&G with an average annual amount of 16.925 mg/L, exceeding the annual NAL of 15.0 mg/L.

583.   Following the 2017–18 reporting period, during which the Facility Owner and/or Operator collected only one sample, the Facility remained in Level 2 status for TSS.

584.   The Facility's sampling data from the 2018–19 reporting currently reflects an average of 264 mg/L TSS, indicating that the Facility will again exceed NAL standards for the current reporting period.

585.   Plaintiffs are informed, believe, and thereon allege that, due to the Facility's failure to collect samples from all drainage areas and all discharge points, as well as the failure to analyze storm water samples for all parameters required by the General Industrial Permit, the Facility's monitoring data fails to accurately portray the Chula Vista Hauling Facility's actual NAL exceedances and proper ERA levels.

586.   In September 2016, the Facility Owner and/or Operator submitted a consolidated ERA Level 1 Evaluation and Report for TSS ("2016 Level 1 ERA Report").

587.   Plaintiffs are informed, believe, and thereon allege that the 2016 Level 1 ERA Report failed to conduct an adequate Level 1 status evaluation to identify additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances at the Facility. For example, the Report's statement that one likely source of TSS is "industrial activity" is entirely void of specificity, thus violating Section XII.C.1.b of the 2015 Permit and undermining the intent of the ERA provisions of the General Industrial

1   Permit.

2   588.   Plaintiffs are informed, believe, and thereon allege that, because the Facility

3   has continued to discharge TSS in excess of NALs, the 2016 Level 1 ERA Report failed

4   to adequately evaluate sources of TSS, or recommend BMPs that would successfully

5   reduce TSS below the NAL standard. *See* 2015 Permit § XII.C.1.c.

6   589.   In December 2017, the Chula Vista Facility Owner and/or Operator

7   published a Level 2 ERA Action Plan for TSS, which is publicly available on the

8   SMARTS online database.

9   590.   The 2015 Permit requires that a Level 2 ERA Action Plan shall at a

10  minimum address the drainage areas with corresponding Level 2 NAL exceedances. 2015

11  Permit § XII.D.1.c.

12  591.   As previously discussed, the Facility Owner and/or Operator has failed to

13  collect samples from each drainage area and discharge point. As such, Plaintiffs are

14  informed, believe, and thereon allege that the 2017 ERA Level 2 Action Plan failed to

15  adequately evaluate all drainage areas, undermining the accuracy of the ERA action plan,

16  as well as the effectiveness of the NAL iterative process.

17  592.   In December 2018, the Chula Vista Facility Owner and/or Operator

18  published a Level 2 ERA Technical Report for TSS.

19  593.   Plaintiffs are informed, believe, and thereon allege that, similar to the 2017

20  ERA Level 2 Action Plan, the 2018 Technical Report is inaccurate and ineffective due to

21  the Facility Owner and/or Operator's failure to collect samples from each drainage area.

22  594.   The 2018 Level 2 Technical Report admits "that future NAL exceedances

23  have not been eliminated." In fact, the average annual TSS concentration for the Facility

24  is higher than it has been at any point during the past three years. Therefore, Plaintiffs are

25  informed, believe, and thereon allege that the 2018 Level 2 Technical Report failed to

26  adequately evaluate sources of TSS, or recommend BMPs that would successfully reduce

27  TSS below the NAL standard in violation of the General Industrial Permit. *See* 2015

28  Permit § XII.C.1.c.

Complaint                                    93

595.   Plaintiffs are informed, believe, and thereon allege that every day the Defendants conduct operations at each Republic Facility without complying with the General Industrial Permit ERA requirements is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

596.   Plaintiffs are informed, believe, and thereon allege that each of the Republic Facilities have been in daily and continuous violation of the General Industrial Permit ERA requirements since at least August 27, 2014.

597.   Plaintiffs are informed, believe, and thereon allege that these violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. Defendants are subject to civil penalties for all violations of the Clean Water Act occurring since August 27, 2014.

**VI.   CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

**Discharges of Contaminated Storm Water in Violation of the General Industrial Permit's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

598.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

599.   Plaintiffs are informed and believe, and thereon allege that prohibited non-storm water discharges have discharged and continue to discharge from the each of the three Republic Facilities.

600.   The Republic Owners and/or Operators' failure to prevent unauthorized non-storm water discharges is a violation of the General Industrial Permit and the CWA. 1997 Permit § A.1; 2015 Permit § III.B; 33 U.S.C. § 1311(a).

601.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators violated and will continue to violate this General Industrial Permit Discharge Prohibition each and every time unauthorized non-storm water

Complaint                                    94

discharges from each of the three Republic Facilities.

602.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have discharged and continue to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section A.2 of the 1997 Permit, and Section III.C of the 2015 Permit.

603.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have discharged and continue to discharge numerous pollutants in excess of water quality objectives listed in the San Diego Basin Plan in violation of Section III.D of the 2015 Permit.

604.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have been in violation of the General Industrial Permit Discharge Prohibition at each of the three Republic Facilities every day from August 27, 2014 to the present.

605.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators' violations of the General Industrial Permit Discharges Prohibitions are ongoing and continuous.

606.   Each and every violation of the General Industrial Permit Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

607.   By committing the acts and omissions alleged above, the Republic Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 27, 2014, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

608.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

609.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the General Industrial Permit's Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

610.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

611.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators failed and continue to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at each of the three Republic Facilities.

612.   Plaintiffs are informed and believe, and thereon allege that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from each of the three Republic Facilities.

613.   The Republic Owners and/or Operators' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at each of the three Republic Facilities is a violation of the General Industrial Permit and the CWA. See 1997 Permit § B.3; 2015 Permit § I.D.32, V.A; see also 33 U.S.C. § 1311(b).

614.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators violated and continue to violate the General Industrial Permit Effluent Limitation each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from each of the three Republic Facilities.

615.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have been in violation of the General Industrial Permit Effluent Limitation at each of the three Republic Facilities every day from August 27, 2014, to the present.

616.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators' violations of the General Industrial Permit Effluent Limitation and the Clean Water Act are ongoing and continuous at each of the three Republic Facilities.

617.   The Republic Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to adequately develop and/or implement BMPs to achieve BAT/BCT at each of the three Republic Facilities.

618.   Each day that Defendants operate the San Diego Hauling Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

619.   Each day that Defendants operate the Chula Vista Hauling Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

620.   Each day that Defendants operate the Eastgate Hauling Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

621.   Each day that Defendants operate the San Diego Hauling Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

622.   Each day that Defendants operate the Chula Vista Hauling Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

623.   Each day that Defendants operate the Eastgate Hauling Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

624.   By committing the acts and omissions alleged above, the Republic Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 27, 2014 to the present, at each of the three Republic Facilities, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

625.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

626.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

## THIRD CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of General Industrial Permit Receiving Water Limitations and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

627.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

628.   Plaintiffs are informed and believe, and thereon allege that each of the three Republic Facilities discharge storm water containing levels of pollutants that adversely impact human health and/or the environment.

629.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators discharge storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from each of the three Republic Facilities.

630.   Plaintiffs are informed and believe, and thereon allege that discharges of

storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from each of the three Republic Facilities.

631.   Plaintiffs are informed and believe, and thereon allege that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from each of the three Republic Facilities.

632.   The Republic Facilities Owners' and/or Operators' discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the General Industrial Permit and the Clean Water Act. See 1997 Permit §§ C.1–2; 2015 Permit §§ VI.A–B; see also 33 U.S.C. § 1311(b).

633.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators violated and will continue to violate the General Industrial Permit Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, discharge from the three Republic Facilities.

634.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have been in violation of the General Industrial Permit Receiving Water Limitations at each of the three Republic Facilities every day from August 27, 2014, to the present.

635.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators' violations of the General Industrial Permit Receiving Water Limitations and the CWA are ongoing and continuous at each of the three Republic Facilities.

636.   The Republic Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs is discharged from the Republic

Facilities.

637.   Each day that Defendants have discharged and/or continue to discharge polluted storm water from the San Diego Hauling Facility in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

638.   Each day that Defendants have discharged and/or continue to discharge polluted storm water from the Chula Vista Hauling Facility in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

639.   Each day that Defendants have discharged and/or continue to discharge polluted storm water from the Eastgate Hauling Facility in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

640.   By committing the acts and omissions alleged above, the Republic Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 27, 2014, to the present, from each of the three Republic Facilities, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

641.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

642.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

/ / /

/ / /

/ / /

/ / /

## FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the General Industrial Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

643.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

644.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail to develop and/or implement an adequate SWPPP for the each of the three Republic Facilities.

645.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail to adequately revise the SWPPPs for the each of the three Republic Facilities.

646.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators conduct operations at the each of the three Republic Facilities each day without an adequately developed, implemented, and/or revised SWPPP.

647.   The Republic Owners and/or Operators' failure to adequately develop, implement, and/or revise a SWPPP for each of the three Republic Facilities is a violation of the General Industrial Permit and the Clean Water Act. See 1997 Permit § A; 2015 Permit § X; see also 33 U.S.C. § 1311(b).

648.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have been in violation of the General Industrial Permit SWPPP requirements at each of the three Republic Facilities every day from August 27, 2014, to the present.

649.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators' violations of the General Industrial Permit SWPPP requirements and the CWA at each of the three Republic Facilities are ongoing and continuous.

650.   The Republic Owners and/or Operators will continue to be in violation of

the General Industrial Permit and the CWA each and every day the they fail to adequately develop, implement, and/or revise the SWPPPs for each of the three Republic Facilities.

651.   Each day that Defendants operate the San Diego Hauling Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. § 1311(a).

652.   Each day that Defendants operate the Chula Vista Hauling Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. § 1311(a).

653.   Each day that Defendants operate the Eastgate Hauling Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. § 1311(a).

654.   By committing the acts and omissions alleged above, the Republic Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 27, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

655.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

656.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FIFTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and Revise a Monitoring and Reporting Plan in Violation of the General Industrial Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

657.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

658.   Plaintiffs are informed and believe, and thereon allege that the Republic

Owners and/or Operators have failed and continue to fail to develop and/or implement an adequate M&RP for each of the three Republic Facilities.

659.   Plaintiffs are informed and believe, and thereon allege that Republic Owners and/or Operators have failed and continue to fail to adequately revise the M&RPs for each of the three Republic Facilities.

660.   Plaintiffs are informed and believe, and thereon allege that Republic Owners and/or Operators conducts operations at each of the three Republic Facilities each day without an adequately developed, implemented, and/or revised M&RP.

661.   The Republic Owners and/or Operators' failure to adequately develop, implement, and/or revise a M&RP for each of the three Republic Facilities is a violation of the General Industrial Permit and the Clean Water Act. See 1997 Permit § B; 2015 Permit § XI; see also 33 U.S.C. § 1311(b).

662.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have been in violation of the General Industrial Permit M&RP requirements at each of the three Republic Facilities every day from August 27, 2014, to the present.

663.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators' violations of the General Industrial Permit M&RP requirements and the CWA at each of the three Republic Facilities are ongoing and continuous.

664.   The Republic Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to adequately develop, implement, and/or revise the M&RP for each of the three Republic Facilities.

665.   Each day that Defendants operate the San Diego Hauling Facility without developing, implementing, and/or revising an adequate M&RP for that facility is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

666.   Each day that Defendants operate the Chula Vista Hauling Facility without developing, implementing, and/or revising an adequate M&RP for that facility is a

separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

667.   Each day that Defendants operate the Eastgate Hauling Facility without developing, implementing, and/or revising an adequate M&RP for that facility is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

668.   By committing the acts and omissions alleged above, the Republic Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 27, 2014 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

669.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

670.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SIXTH CAUSE OF ACTION

**Failure to Report as Required in Violation of the General Industrial Permit and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

671.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

672.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail to submit accurate and/or complete Annual Reports for each of the three Republic Facilities.

673.   The Republic Owners and/or Operators' failure to submit complete and accurate Annual Reports is a violation of the General Industrial Permit and the Clean Water Act. *See* 1997 Permit §§ B.14, C.9–10; 2015 Permit § XVI; *see also* 33 U.S.C. § 1311(b).

674.   Plaintiffs are informed and believe, and thereon allege that the Republic

Owners and/or Operators conduct operations at each of the three Republic Facilities each day without reporting as required by the General Industrial Permit.

675.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have been in violation of the General Industrial Permit's reporting requirements every day since at least August 27, 2014.

676.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators' violations of the reporting requirements of the General Industrial Permit and the CWA are ongoing and continuous at each of the three Republic Facilities.

677.   The Republic Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to comply with the General Industrial Permit reporting requirements at each of the three Republic Facilities.

678.   Each and every violation of the General Industrial Permit reporting requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

679.   By committing the acts and omissions alleged above, the Republic Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 27, 2014 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

680.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

681.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

/ / /

/ / /

## SEVENTH CAUSE OF ACTION

**Failure to Properly Monitor in Violation of the General Industrial Permit**

682.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

683.    Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail to conduct the requisite visual observations of storm water discharges at each of the three Republic Facilities.

684.    The Republic Owners' and/or Operators' failure to conduct the requisite visual observations at each of the three Republic Facilities is a violation of the General Industrial Permit and the CWA. *See* 1997 Permit §§ B.3–4; 2015 Permit § XI.A; *see also* 33 U.S.C. § 1311(b).

685.    Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail to collect and analyze the required number of storm water samples at each of the three Republic Facilities.

686.    The Republic Owners and/or Operators' failure to collect and analyze the required number of storm water samples at each of the three Republic Facilities is a violation of the General Industrial Permit and the CWA. See 1997 Permit §§ B.5.a–b, 2015 Permit §§ XI.B.1–3; see also 33 U.S.C. § 1311(b).

687.    Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail collect samples from each discharge location at each of the three Republic Facilities.

688.    The Republic Owners and/or Operators' failure to collect samples from each discharge location at each of the three Republic Facilities is a violation of the General Industrial Permit and the CWA. *See* 1997 Permit § B.7; 2015 Permit §§ XI.B.4–5; *see also* 33 U.S.C. § 1311(b).

689.    Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail analyze all collected samples for all required parameters at each of the three Republic Facilities.

690.   The Republic Owners and/or Operators' failure to analyze all collected samples for all required parameters at each of the three Republic Facilities is a violation of the General Industrial Permit and the CWA. *See* 1997 Permit §§ B.5.c, B.6; 2015 Permit §§ XI.B.6, XI.D; *see also* 33 U.S.C. § 1311(b).

691.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed to comply with the General Industrial Permit's monitoring requirements at each of the three Republic Facilities since August 27, 2014.

692.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators' violations of the General Industrial Permit monitoring requirements and the Clean Water Act are ongoing and continuous at each of the three Republic Facilities.

693.   The Republic Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to comply with the General Industrial Permit's monitoring requirements at each of the three Republic Facilities.

694.   Each and every violation of the General Industrial Permit's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

695.   By committing the acts and omissions alleged above, the Republic Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 27, 2014, to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

696.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

697.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## **EIGHTH CAUSE OF ACTION**

### **Failure to Comply with ERA Requirements in Violation of the General Industrial Permit and the Clean Water Act.**

### **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

698.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

699.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail to conduct an adequate Level 1 status evaluation for the each of the three Republic Facilities.

700.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail to submit an adequate Level 1 ERA Report for each of the three Republic Facilities.

701.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators conduct operations at each of the three Republic Facilities each day without conducting an adequate Level 1 Evaluation and/or without submitting an adequate Level 1 ERA Report.

702.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators' failure to conduct an adequate Level 1 Evaluation and/or failure to file an adequate Level 1 ERA Report is a violation of the General Industrial Permit. 2015 Permit § XII(C).

703.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit Level 1 status Evaluation requirements every day since at least October 1, 2016 for each of the three Republic Facilities.

704.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit Level 1 status ERA reporting requirements every day since at least January 1, 2017.

705.   The Republic Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day the Republic Owners and/or Operators fails to comply with the Level 1 ERA requirements at each of the three Republic Facilities.

706.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators violations of the Level 1 ERA requirements of the General Industrial Permit and the CWA are ongoing and continuous.

707.   Every day the Republic Owners and/or Operators conduct operations at the San Diego Hauling Facility without conducting an adequate Level 1 status evaluation and/or a without submitting an adequate Level 1 ERA Report, is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

708.   By committing the acts and omissions alleged above, the Republic Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the Level 1 status Evaluation requirements occurring from October 1, 2016, to the present, and for each and every violation of the Level 1 ERA Report requirements occurring from January 1, 2017, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

709.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

710.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendants as set forth hereafter.

## VII.   <u>RELIEF REQUESTED</u>

711.   Plaintiffs respectfully request that this Court grant the following relief:

a.   A court order declaring the Defendants to have violated and to be in

violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Republic Facilities in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include BAT/BCT requirements, for failing to meet receiving water limitations, and for failing to comply with the substantive and procedural requirements of the General Industrial Permit;

b.     A court order enjoining Defendants from discharging pollutants without a NPDES permit;

c.     A court order requiring Defendants to implement affirmative injunctive measures designed to eliminate Defendants' violations of the substantive and procedural requirements of the General Industrial Permit and the Clean Water Act;

d.     A court order assessing civil monetary penalties for each violation of the CWA at $37,500.00 per day per violation for all CWA violations after January 12, 2009, and $54,833.00 per day per violation for violations that occurred after November 2, 2015, as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

e.     A court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

f.      Any other relief as this Court may deem appropriate.

Dated: November 20, 2019

Respectfully submitted,

COAST LAW GROUP LLP

By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorney for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com

SAN DIEGO COASTKEEPER

By: s/Matt O'Malley
MATT O'MALLEY
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: matt@sdcoastkeeper.org