# TABLE OF CONTENTS

Page

Exhibit 1 ......................................................................................................... 1

  

August 27, 2019

<u>VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED</u>

Republic Services, Inc.
ATTN: Managing Agent
5692 Eastgate Drive,
San Diego, CA 92121

Republic Services of San Diego Eastgate
ATTN: Managing Agent
5692 Eastgate Drive,
San Diego, CA 92121

Republic Services of San Diego Eastgate
ATTN: Managing Agent
18500 North Allied Way
Phoenix, AZ 85054

CT Corporation System
Registered agent for:
Republic Services, Inc.
818 West Seventh Street, Suite 930
Los Angeles, CA 90017

Republic Services, Inc.
ATTN: Managing Agent
18500 North Allied Way
Phoenix, AZ 85054

**Re:    Notice of Violation and Intent to File Suit Under the Clean Water Act**

To the Above-Listed Recipients:

Please accept this letter on behalf of San Diego Coastkeeper ("Coastkeeper") and Coastal Environmental Rights Foundation ("CERF") regarding violations of the Clean Water Act[1] and California's Storm Water Permit[2] occurring at the Republic Services of San Diego Eastgate Facility, located at 5692 Eastgate Drive, San Diego, California 92121 ("Eastgate Hauling Facility" or "Facility"). The purpose of this letter is to put Republic Services of San Diego Eastgate and/or Republic Services, Inc. ("Republic"), as the owner(s) and/or operator(s) of the Facility, on notice of the violations of the Storm Water Permit occurring at the Facility, including, but not limited to, discharges of polluted storm water from the Eastgate Hauling Facility into local surface waters. Violations of the Storm Water Permit are violations of the Clean Water Act. As explained below, Republic is liable for violations of the Storm Water Permit and the Clean Water Act.

Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen must give notice of his/her intention to file suit. Notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.
[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, Order No. 97-03-DWQ ("1997 Permit"), as amended by Order No. 2014-0057-DWQ ("2015 Permit").

Exhibit 1
Page 001

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Eastgate Hauling Facility*
August 27, 2019
Page 2

("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation. *See* 40 C.F.R. § 135.2(a)(1). This notice letter ("Notice Letter") is being sent to you as the responsible owner and/or operator of the Eastgate Hauling Facility, or as the registered agent for the owner and/or operator. This Notice Letter is issued pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act to inform Republic that Coastkeeper and CERF intend to file a federal enforcement action against Republic for violations of the Storm Water Permit and the Clean Water Act sixty (60) days from the date of this Notice Letter.

## 1.   BACKGROUND

### 1.1. <u>San Diego Coastkeeper and Coastal Environmental Rights Foundation.</u>

San Diego Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 2825 Dewey Road, Suite 207, San Diego, California 92106. Founded in 1995, San Diego Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of San Diego County watersheds. To further these goals, Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of themselves and their members.

CERF is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Encinitas, California. CERF is dedicated to the preservation, protection, and defense of the environment, the wildlife, and the natural resources of the California Coast. CERF's mailing address is 1140 S. Coast Highway 101, Encinitas, California 92024.

Members of Coastkeeper and CERF live in and around, recreate in and around, and enjoy the waters into which the Facility discharges, including Carroll Canyon, Soledad Canyon, Los Peñasquitos Lagoon, and the Pacific Ocean (collectively "Receiving Waters"). Members of Coastkeeper and CERF use the Receiving Waters to swim, boat, kayak, surf, bird watch, view wildlife, hike, bike, walk, run, and/or for general aesthetic enjoyment. Additionally, members of Coastkeeper and CERF use the Receiving Waters to engage in scientific study through pollution and habitat monitoring and restoration activities. The discharges of pollutants from the Facility impair each of these uses. Discharges of polluted storm water from the Facility are ongoing and continuous. Thus, the interests of Coastkeeper's and CERF's members have been, are being, and will continue to be adversely affected by the Eastgate Facility Owner and/or Operator's failure to comply with the Clean Water Act and the Storm Water Permit.

### 1.2. <u>The Owner and/or Operator of the Facility.</u>

Information available to Coastkeeper and CERF indicates that Republic Services, Inc. is the owner(s) and/or operator(s) of the Facility. *See* Facility Storm Water Pollution Prevention Plan dated November 2017 ("2017 SWPPP") ("The property is owned by Republic Services, Inc.

Exhibit 1
Page 002

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Eastgate Hauling Facility*
August 27, 2019
Page 3

(Republic Services) and is being operated by Republic Services."). Republic Services, Inc. is herein referred to as "Republic" or "Facility Owner and/or Operator." Information available to Coastkeeper and CERF indicates that Republic Services, Inc. is an active Delaware corporation and its registered agent is CT Corporation System, 818 West Seventh Street, Suite 930, Los Angeles, California 90017.

The Eastgate Hauling Facility Owner and/or Operator has violated and continues to violate the procedural and substantive terms of the Storm Water Permit including, but not limited to, the illegal discharge of pollutants from the Facility into local surface waters. As explained herein, the Facility Owner and/or Operator is liable for violations of the Storm Water Permit and the Clean Water Act.

### 1.3. <u>The Facility's Storm Water Permit Coverage</u>.

Certain classified facilities that discharge storm water associated with industrial activity are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent ("NOI") to the State Water Resources Control Board ("State Board") to obtain Storm Water Permit coverage. Information available to Coastkeeper and CERF indicates that the Eastgate Hauling Facility first obtained Storm Water Permit coverage on November 14, 2017. The Facility submitted its most recent NOI on March 16, 2018 ("2018 NOI"). Coastkeeper and CERF obtained the 2018 NOI from California's online Storm Water Multiple Application & Reporting Tracking System ("SMARTs") database. The 2018 NOI lists the Facility Waste Discharge Identification ("WDID") number as 9 37I027471. The NOI identifies both the Facility site name and Facility operator as "Republic Services of San Diego Eastgate." However, the Facility's 2017 SWPPP states that the property is owned and operated by "Republic Services." 2017 SWPPP § 1.1.

The 2018 NOI states that the Facility is 2.11 acres, all of which are exposed to storm water, but does not indicate what percent of the site is impervious. The 2017 SWPPP, the latest SWPPP which currently covers the Facility, states that the operating portion of Facility is approximately 2.1, and lists the site as greater than 90 percent impervious.

The 2018 NOI and the 2017 SWPPP list the Standard Industrial Classification ("SIC") code for the Eastgate Hauling Facility as 4212, described as local trucking without storage. Information available to Coastkeeper and CERF, including the Facility 2017 SWPPP describing vehicle and equipment maintenance and storage at the Facility, indicates that SIC code 4231 (terminal and joint terminal maintenance facilities for motor freight transportation) also applies to the Facility.

Republic Services Inc. purchased the Eastgate Hauling Facility from Tayman Industries, Inc. ("Tayman") in 2017. 2017 SWPPP § 1.1. Information available to Coastkeeper and CERF indicates that Tayman owned and operated the Facility located at 5692 Eastgate Drive for some time without first obtaining coverage under the 1997 Permit. On July 8, 2011, the California Regional Water Quality Control Board, San Diego Region, ("Regional Board") issued a notice informing Tayman that the Facility was required to enroll under the 1997 Permit, Order No. 97-

Exhibit 1
Page 003

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Eastgate Hauling Facility*
August 27, 2019
Page 4

03-DWQ. On June 23, 2011, a Regional Board inspector and a City of San Diego Storm Water inspector visited the Facility and confirmed that such coverage was required. Information available to Coastkeeper and CERF indicates that Tayman obtained coverage under the 1997 Permit for the Facility at some point thereafter. Tayman submitted an NOI for coverage under the 2015 Permit on June 19, 2015. The 2015 NOI lists the Facility WDID as 9 37I023241, and identifies both the Facility site name and Facility operator as "Tayman Industries Inc." The Tayman 2015 NOI lists the SIC code as 4212, local trucking without storage. However, all of the Tayman Facility SWPPPs describe vehicle and equipment maintenance and storage at the Facility, indicating that SIC code 4231, terminal and joint terminal maintenance facilities for motor freight transportation, also applied to Tayman's Operations.

Information available to Coastkeeper and CERF indicate that Republic has assumed the assets and liabilities of its predecessor. A purchasing entity assumes the seller's liabilities when "(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Tayman Industries, Inc. Ray v. Alad Corp.*, 19 Cal. 3d 22, 28 (1977). As previously noted, Republic Services Inc. purchased the Eastgate Hauling Facility from Tayman in 2017. Republic's annual report to the U.S. Securities and Exchange Commission for the fiscal year ending December 31, 2017 ("2017 Form 10-K") states that Tayman Industries, Inc. is a subsidiary or affiliate under the Republic corporate umbrella. Moreover, the URL "http://www.taymaninc.com/" indicates that Tayman "is now a part of" Republic, and the website is marked with Republic Services branding stating "We'll handle it from here.™" The website also contains the following message: "It is our pleasure to announce after proudly serving customers in San Diego, CA and the surrounding area for the past 23 years; Tayman Industries Inc is merging operations with another capable and customer-focused solid waste and recycling company, Republic Services of San Diego." Hence, Republic's purchase of Tayman is a consolidation of the two corporations, and operations at the Eastgate Hauling Facility are a mere continuation of Tayman's prior operations. Therefore, Republic is liable for all prior Clean Water Act and Storm Water Permit violations of its predecessor, Tayman Industries, Inc.

Coastkeeper and CERF put the Facility Owner and/or Operator on notice that industrial activities are conducted throughout the Facility, and thus the entire Facility requires Storm Water Permit coverage. In addition, even if the regulated industrial activities are not occurring throughout the entire Facility at all times, under the Storm Water Permit's definition of "storm water associated with industrial activities" and explanation of material handling activities, Coastkeeper and CERF puts the Facility Owner and/or Operator on notice that since insufficient best management practices ("BMPs") or other controls exist to separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities, storm water at the Facility commingles and thus all storm water discharges from the Facility are regulated under the Storm Water Permit.

Exhibit 1
Page 004

**1.4.** <u>**Storm Water Pollution and the Waters Receiving Facility's Discharges**</u>.

With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations around San Diego County, such as the Eastgate Hauling Facility, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

Information available to Coastkeeper and CERF indicate that polluted discharges from industrial facilities similarly situated to the Eastgate Hauling Facility often contain the following pollutants: heavy metals such as copper, iron, lead, aluminum, selenium, and zinc; pathogens and bacteria such as E. coli, enterococcus, and fecal coliform; excessive nutrients such as nitrogen and phosphorus; oil and grease ("O&G"), hydraulic fluids, antifreeze, aromatic hydrocarbons, and chlorinated hydrocarbons; solvents and detergents; and paints. Many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and/or developmental or reproductive harm.[3] Discharges of polluted storm water pose carcinogenic and reproductive toxicity threats to the public and adversely affect the aquatic environment.

The Receiving Waters into which the Eastgate Hauling Facility discharges polluted storm water are ecologically sensitive areas. The Los Peñasquitos Lagoon ("Lagoon") is a 574-acre coastal estuary that is part of the Torrey Pines State Natural Reserve, and is designated as a "Natural Preserve" by California State Parks.[4] One of the few remaining native saltmarsh lagoons in southern California, it serves as an important stopover and refuge for migratory birds using the Pacific Flyway, as well as an essential fish habitat which supports the nearby La Jolla and San Diego-Scripps State Marine Conservation Areas (ASBS #29 and #31) located just South of the Lagoon.[5] The Lagoon provides an extensive ecosystem that is home to numerous plant and animal species, including 49 species designated as sensitive by the International Union for Conservation of Nature. Pollutants discharged from the Facility are deleterious not only to the Lagoon's larger inhabitants such as mammals and birds, but also to invertebrates, insects, larval fish, and local vegetation which support life throughout the estuary. As such, these pollutant discharges strain the ecosystems on which numerous species depend for survival.

The polluted discharges from the Facility harm the special aesthetic and recreational significance of the Receiving Waters, adversely impacting the public's ability, as well as that of Coastkeeper's and CERF's members, to use and enjoy these unique waterbodies. Multiple parking lots, public access points, and several miles of trails and mixed use pathways provide

[3] Health & Saf. Code §§ 25249.5 - 25249.1.
[4] Regional Board, Sediment TMDL for Los Peñasquitos Lagoon, *available at* https://www.waterboards.ca.gov/sandiego/water_issues/programs/tmdls/docs/los_penasquitos_lagoon/updates071212/Staff_Report.pdf; http://www.lospenasquitos.org/visit-the-preserve/.
[5] Los Peñasquitos Lagoon Foundation website, http://www.lospenasquitos.org/visit-the-preserve/.

Exhibit 1
Page 005

public access to a variety of locations surrounding the Lagoon. This public access offers recreational opportunities to observe wildlife, and enjoy unique views of the Lagoon, coastline, and dramatic landscape of Torrey Pines State Natural Reserve. Pollutants discharged from the Eastgate Hauling Facility affects the health of the Receiving Waters, and thus the plant and animal life of the surrounding habitats. Sediment deposits in particular have directly and indirectly affected Lagoon functions and salt marsh characteristics, at times choking the Lagoon's proper tidal flow and drainage, which can lead to an increase in mosquito activity, some of which are known to carry West Nile Virus in the area. Damage to these natural habitats, and thus the flora and fauna within them, harms the ability of the public, including Coastkeeper's and CERF's members' ability to use and enjoy the unique recreational opportunities offered by the Receiving Waters. Furthermore, Coastkeeper's and CERF's members are less likely to recreate in and around waters known to be polluted with pathogens such as E. coli and fecal coliform, nutrients, and toxic metals such as lead, copper, and zinc. As such, polluted discharges from the Facility impedes Coastkeeper's and CERF's members' use and enjoyment of the parks, trails and open spaces surrounding Receiving Waters.

The Regional Board issued the *Water Quality Control Plan for the San Diego Basin* ("San Diego Basin Plan" or "Basin Plan"). The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for Carroll Canyon include: contact water recreation, non-contact water recreation, warm freshwater habitat, cold freshwater habitat wildlife habitat, rare, threatened, or endangered species, industrial service supply, and agricultural supply. Basin Plan, Table 2-2. The Beneficial Uses for Soledad Canyon include: contact water recreation, non-contact water recreation, warm freshwater habitat, cold freshwater habitat wildlife habitat, industrial service supply, and agricultural supply. *Id*. The Beneficial Uses for Los Peñasquitos Lagoon include: contact recreation (only fishing from boat or shore), non-contact water recreation, preservation of biological habitats of special significance, estuarine habitat, wildlife habitat, rare, threatened, or endangered species, marine habitat, migration of aquatic organisms, spawning, reproduction, and/or early development, and shellfish harvesting. *Id*. at Table 2-3.

According to the 2016 303(d) List of Impaired Water Bodies, Carroll Canyon is impaired for benthic community effects and toxicity; Soledad Canyon is impaired for sediment toxicity and selenium; Los Peñasquitos Lagoon is impaired for sedimentation/siltation and toxicity; and the Pacific Ocean shoreline on Torrey Pines State Beach, at the North Beach Entrance parking lot is impaired for trash.[6] Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

## 2.  THE EASTGATE HAULING FACILITY AND RELATED DISCHARGES OF POLLUTANTS

### 2.1. <u>The Facility Site Description and Industrial Activities</u>.

---

[6] 2016 Integrated Report – All Assessed Waters, *available at* http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2012.shtml (last accessed on May 3, 2017.)

Exhibit 1
Page 006

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Eastgate Hauling Facility*
August 27, 2019
Page 7

The Owners and/or Operators of the Eastgate Hauling Facility describe the Facility as "a hauling, storage, and maintenance Facility for hauling vehicles." 2017 SWPPP § 2.1.2. The 2017 SWPPP explains that the Facility primarily maintains waste hauling vehicles, including mechanical maintenance and washing, and that washing activities are conducted by a third party vendor. The 2017 SWPPP also acknowledges that various materials are handled and stored outdoors. The Tayman SWPPPs state that the Facility stored vehicles and equipment, conducted vehicle maintenance such as changing oil and tires, and lubricating parts. The Tayman SWPPPs also note that their hauling vehicles were washed on site by a third party. Information available to Coastkeeper and CERF indicate that the Facility has also been used to store waste bins, containers, and various other materials outdoors, exposed to precipitation.

The 2017 Facility SWPPP identifies numerous industrial materials associated with operations at the Eastgate Hauling Facility. Table 2.1.c provides the following list of significant industrial materials present at the Facility: new and used antifreeze, acetylene, oxygen, carbon dioxide, water-based paint, power steering fluid, propane, diesel, gasoline, hydraulic oil, used motor oil, transmission oil, diesel exhaust fluid, grease, and used oil filters. The Tayman SWPPPs identify motor oil, hydraulic oil, and basic solvents as industrial materials and possible pollutants.

According to the Facility SWPPP and site map, the areas of industrial activity at the Facility include two truck maintenance areas, one in Drainage Area 1 ("DA-1) and one in Drainage Area 2 ("DA-2"); a waste hauling truck parking and storage area; and multiple materials storage areas.

Information available to Coastkeeper and CERF indicates that these industrial activities occur at various locations throughout the Facility either outdoors, or without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility. Further, information available to Coastkeeper and CERF indicates that the pollutants associated with the Facility have been and continue to be tracked throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking trash, pathogens, nutrient pollutants, sediment, dirt, O&G, metal particles, and other pollutants off-site. The resulting illegal discharges of polluted storm water and non-storm water impact Coastkeeper's and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human wellbeing, aquatic life, and ecosystem health.

## 2.2. Pollutants and Pollutant Sources Related to the Facility's Industrial Activities.

Despite the activities and pollutant sources listed above, the 2017 Facility SWPPP states that the only pollutants "that can potentially enter stormwater run-off and other discharges draining from the Facility include: Sediment (including vehicle traffic from both the Eastgate Facility and Neighboring Facilities), Oil and Grease (waste oil and leaks from equipment), and pH." However, this claim is contradicted by Tables 2.1.a and 2.1.b of the very same SWPPP.

Exhibit 1
Page 007

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Eastgate Hauling Facility*
August 27, 2019
Page 8

Table 2.1.b indicates that pollutants associated with industrial activities at the Facility include: oil and grease, hydrocarbons, "gross pollutants," and "trace metals." Table 2.1.b further states that these pollutants may come from leaks, spills, "debris from vehicles," or other maintenance activities. While Table 2.1.a also states that the only pollutants present at the Facility as a result of industrial activities are O&G, total suspended solids ("TSS"), and pH, Table 2.1.a acknowledges that "decaying organic material" may be a pollutant source.

Information available to Coastkeeper and CERF indicates that the Facility discharges numerous pollutants not identified in the Facility SWPPP. Such information indicates that pollutants commonly present in storm water discharged from facilities similar to the Eastgate Hauling Facility include: pathogens such as enterococcus, E. coli, and fecal coliform; excessive nutrients such as ammonia as nitrogen, nitrite, nitrate, total nitrogen and phosphorus; metals such as aluminum, lead, zinc, manganese, selenium, copper, and iron; dissolved oxygen; as well as a host of other pollutants acknowledged in the Facility SWPPP such as gasoline and diesel fuels; fuel additives; coolants; antifreeze; transmission fluid; hydraulic fluid; waste oil; compressed natural gas; oil and grease; TSS; and pH affecting substances. The Facility SWPPP's acknowledgement of pollutants and pollutant sources such as gross pollutants, trace metals, debris from vehicles, and decaying organic material serves as additional evidence that the pollutants listed above are present at the Facility.

As further discussed Sections 3.5.3 and 3.6.3, *infra*, the Eastgate Hauling Facility SWPPP has failed and continues to fail to adequately assess potential pollutant and pollutant sources, and the Facility has failed and continues to fail to monitor for all pollutants required by the Permit.

### 2.3.   Eastgate Hauling Facility Storm Water Flow and Discharge Locations.

According to the Facility SWPPP, the Eastgate Hauling Facility Owner and/or Operator reports that the Facility consists of two drainage areas, each with one discharge point. The SWPPP and site map indicate that the vast majority of the Facility is situated in DA-1. The 2017 SWPPP states that DA-1 includes a truck maintenance area, truck parking area, most of the material storage areas, an employee parking area, and a covered building. According to the Facility SWPPP, surface flows in DA-1 are directed towards the employee parking area, and flow via sheet flow toward the southeast corner of Facility to a small concrete curbed channel, labeled DP-1, which directs flows to a City of San Diego Municipal Separate Storm Water Sewer System ("MS4") drainage inlet. 2017 SWPPP § 2.1.4. As such, the SWPPP and site map indicate that storm water from the primary industrial area of the Facility is directed to the employee parking area, which the SWPPP designates as a non-industrial area. Thus, during rain events storm water exposed to industrial materials and activities comingles with storm water from the employee parking area due to the layout and flow pattern of the Facility. Furthermore, information available to Coastkeeper and CERF indicates that not all water from DA-1 is successfully routed to the curbed channel at the Facility's most eastern point. Some storm water flows and/or is tracked outside of the Facility boundary, onto the access road shared by the Eastgate Hauling Facility and the neighboring Robertson's Ready Mix Facility, and onto Eastgate Drive.

Exhibit 1
Page 008

The Facility SWPPP and site map indicate that DA-2 is a much smaller drainage area located in the northern-most corner of the Facility. According to the SWPPP, the "area contains a second truck maintenance area, materials storage container and an oil containment trench. *Id*. The SWPPP states that storm water flows in DA-2 are directed towards the Facility's fence line in the northeast corner of the Facility, and is thereafter discharged via DP-2 "directly offsite into open space." *Id*. The SWPPP further states that DA-2 "only discharges during larger rainfall events and in cases where the trench might overflow," but fails to quantify the containment capacity of the trench.

## 3. VIOLATIONS OF THE CLEAN WATER ACT AND THE STORM WATER PERMIT

In California, any person who discharges storm water associated with certain industrial activity must comply with the terms of the Storm Water Permit in order to lawfully discharge pollutants. *See* 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1).

Between 1997 and June 30, 2015, the Storm Water Permit in effect was Order No. 97-03-DWQ, which Coastkeeper and CERF refer to as the "1997 Permit." On July 1, 2015, pursuant to Order No. 2014-0057-DWQ the Storm Water Permit was reissued, which Coastkeeper and CERF refer to as the "2015 Permit." As explained below, the 2015 Permit includes terms that are as stringent or more stringent than the 1997 Permit. Accordingly, the Eastgate Hauling Facility Owner and/or Operator is liable for violations of the 1997 Permit and ongoing violations of the 2015 Permit, and civil penalties and injunctive relief are available remedies. *See Illinois v. Outboard Marine, Inc.*, 680 F.2d 473, 480-81 (7th Cir. 1982) (relief granted for violations of an expired permit); *Sierra Club v. Aluminum Co. of Am.*, 585 F. Supp. 842, 853-54 (N.D.N.Y. 1984) (holding that the Clean Water Act's legislative intent and public policy favor allowing penalties for violations of an expired permit); *Pub. Interest Research Group of N.J. v. Carter-Wallace, Inc.*, 684 F. Supp. 115,121-22 (D.N.J. 1988) ("[l]imitations of an expired permit, when those limitations have been transferred unchanged to the newly issued permit, may be viewed as currently in effect").

### 3.1. <u>Unauthorized NSWDs from the Facility in Violation of Storm Water Permit Discharge Prohibition.</u>

Except as authorized by certain special conditions, the Storm Water Permit prohibits permittees from discharging materials other than storm water ("non-storm water discharges" or "NSWDs") either directly or indirectly to waters of the United States. 1997 Permit §§ A.1, D.1; 2015 Permit § III.B. Prohibited NSWDs must be either eliminated or permitted by a separate NPDES permit. 1997 Permit § A.1; 2015 Permit § III.B.

Information available to Coastkeeper and CERF indicates that unauthorized NSWDs occur at the Facility, and the Facility has failed to develop and/or implement adequate BMPs necessary to prevent these discharges. For example, one of the Facility's primary industrial activities is vehicle washing. Section 2.1.2 of the 2017 SWPPP states that vehicle washing is one of the outdoor operations at the Facility which could affect ambient storm water quality, and the

Exhibit 1
Page 009

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Eastgate Hauling Facility*
August 27, 2019
Page 10

Facility SWPPP fails to identify any BMPs would prevent wash water from being tracked out of washing areas, commingling, and discharging from the Facility. NSWDs resulting from washing and cleaning are not from sources that are listed among the authorized NSWDs in the special conditions section of the Storm Water Permit, and are thus always prohibited. Furthermore, the 2017 SWPPP concedes that no non-storm water discharges are authorized at Facility. 2017 SWPPP § 2.4. Therefore, the Facility Owner and/or Operator's assertion that "[t]here are no activities at this site that may result in unauthorized non-stormwater discharges" is erroneous, and in violation of the Storm Water Permit. *Id.*; *see also* 1997 Permit § A.1; 2015 Permit § III.B.

Coastkeeper and CERF put the Eastgate Hauling Facility Owner and/or Operator on notice that the Storm Water Discharge Prohibition is violated each time unauthorized non-storm water is discharged from the Facility. *See* 1997 Permit § D.1; *see also* 2015 Permit § III.B. These Discharge Prohibition violations are ongoing and will continue until the Facility Owner and/or Operator develops and implements BMPs that prevent prohibited unauthorized NSWDs, or obtains separate NPDES permit coverage. Each time the Facility Owner and/or Operator discharges prohibited non-storm water in violation of the Storm Water Permit's Discharge Prohibitions is a separate and distinct violation of the Storm Water Permit and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owner and/or Operator has been in violation since August 26, 2014, and Coastkeeper and CERF will update the number and dates of violations when additional information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

### 3.2. <u>Discharges of Polluted Storm Water from the Facility in Violation of Storm Water Permit Discharge Prohibitions.</u>

Section III of the 2015 Permit enumerates several Discharge Prohibitions. Section III.D of the 2015 Permit states that "[d]ischarges that violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans (Basin Plans), or statewide water quality control plans and policies are prohibited." The San Diego Basin Plan designates beneficial uses for water bodies in the San Diego region and establishes water quality objectives and implementation plans to protect those beneficial uses.[7] The San Diego Basin Plan further establishes certain Waste Discharge Prohibitions.[8] Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited. Allowances for dilution may be made at the discretion of the Regional Board."[9] "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water.[10] Accordingly, where the "quality of the discharge" does not meet water quality

---

[7] *See* https://www.waterboards.ca.gov/sandiego/water_issues/programs/basin_plan/ for updated Basin Plan.
[8] San Diego Basin Plan, Chapter 4, page 4-19.
[9] *Id.* at page 4-20 (Waste Discharge Prohibition 5).
[10] California Water Code, § 13050(d) (emphasis added).

Exhibit 1
Page 010

objectives, the discharge, absent an express "allowance for dilution" by the San Diego Regional Board is prohibited by Discharge Prohibition III.D of the 2015 Permit.

Information available to Coastkeeper and CERF, including its review of publicly available information and observations, indicates that no express allowance for dilution has been granted by the Regional Board applicable to the Eastgate Hauling Facility's discharges, or to the downstream Receiving Waters. As such, information available to Coastkeeper and CERF, including review of available information, direct observations, and the analytical results of storm water sampling at the Facility, indicate that the Eastgate Hauling Facility Owner and/or Operator has violated and continues to violate Discharge Prohibition III.D of the 2015 Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan. The table attached hereto as Exhibit 1 includes sample results of storm water discharges collected and analyzed by the Facility. As demonstrated by the data in Exhibit 1, the Eastgate Hauling Facility Owner and/or Operator has failed to discharge pollutants in storm water at or below Basin Plan water quality standards. For example, the San Diego Basin Plan sets forth a narrative standard for TSS mandating that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Yet, the Facility's own storm water monitoring data shows numerous instances of extremely high TSS concentrations, which have the potential to adversely affect the beneficial uses of Receiving Waters. Ex. 1.

The Storm Water Permit Discharge Prohibitions further prohibit storm water discharges and authorized NSWDs which cause or threaten to cause pollution, contamination, or nuisance as defined in Section 13050 of the California Water Code. 1997 Permit § A.2; 2015 Permit § III.C. The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease." "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

Information available to Coastkeeper and CERF indicates that the Eastgate Hauling Facility has discharged, and continues to discharge, numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters. For example, the Eastgate Hauling Facility's own monitoring data shows that on numerous occasions during the past five years, the Facility has discharged TSS in excess of the Basin Plan Water Quality Objective, and EPA Benchmark standard, which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. *See* Ex. 1. As such, the Eastgate Hauling Facility's discharges of polluted storm water have violated the Storm Water Permit's Discharge Prohibition III.C.

Furthermore, as discussed in Section 3.6.3, *infra*, information available to Coastkeeper and CERF indicates that the Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to analyze the Facility's storm water discharges for numerous pollutants required by the Storm Water Permit. This information further indicates that the Facility has discharged and continues to discharge numerous pollutants in concentrations exceeding water

Exhibit 1
Page 011

quality objectives in violation of Discharge Prohibition III.D, and which cause or threaten to cause pollution, contamination, or nuisance in violation of Discharge Prohibition III.C.

Coastkeeper and CERF put the Eastgate Hauling Facility Owner and/or Operator on notice that the Storm Water Permit Discharge Prohibition is violated each time storm water discharges from the Facility. *See* Ex. 2 (setting forth dates of all precipitation events during the past five years).[11] These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water in violation of Discharge Prohibitions III.C or III.D of the 2015 Permit. Each time the Facility Owner and/or Operator discharges polluted storm water in violation of Discharge Prohibitions III.C or III.D of the 2015 Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owner and/or Operator has been in violation since August 26, 2014, and Coastkeeper and CERF will update the dates of violations when additional information and data become available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

Further, Coastkeeper and CERF put the Eastgate Hauling Facility Owner and/or Operator on notice that Discharge Prohibitions III.C and III.D are independent Storm Water Permit requirements that must be complied with, and that carrying out the iterative process triggered by exceedances of the Numeric Action Levels ("NALs") listed at Table 2 of the 2015 Permit does not amount to compliance with the Discharge Prohibition provisions.

### 3.3. <u>Discharges of Polluted Storm Water from the Facility in Violation of Storm Water Permit Effluent Limitation.</u>

The Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve Best Available Technology Economically Achievable ("BAT") for toxic and non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 1997 Permit § B.3; 2015 Permit § V.A.

The EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards as required by Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit.[12] As

---

[11] Exhibit 2 includes the dates of all precipitation events recorded during the past five years, and the corresponding quantity of precipitation for each such event. The data in Exhibit 2 was recorded by the National Oceanic & Atmospheric Administration at the weather monitoring station geographically nearest to the Facility with complete precipitation records. Coastkeeper and CERF will include additional dates of rain events when that information becomes available.

[12] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) Authorization to Discharge Under the National Pollutant Discharge Elimination System*, as modified effective February 26, 2009, Fact Sheet at 106; *see also* 65 Federal Register 64839 (2000).

Exhibit 1
Page 012

such, discharges from an industrial Facility containing pollutant concentrations that exceed EPA Benchmarks indicate that the Facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants.[13]

Information available to Coastkeeper and CERF, including its review of publicly available information and observations, indicates that BMPs that achieve BAT/BCT have not been developed and/or implemented at the Eastgate Hauling Facility. Consistent with Coastkeeper and CERF's review of available information and direct observations, the Facility's storm water monitoring data demonstrates that Facility discharges have exceeded EPA Benchmarks for several pollutants, indicating that the Facility has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards. For example, storm water samples collected from the Facility on December 5, 2018, January 12, 2019, and January 14, 2019 reflected TSS concentrations above the EPA Benchmark for TSS of 100 mg/L. *See* Ex. 1.

As discussed in Section 3.6.3, *infra*, information available to Coastkeeper and CERF indicates that the Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to analyze storm water discharged from the Facility for numerous pollutants that result from the Facility's industrial operations. As such, in addition to TSS, the Eastgate Hauling Facility likely discharges numerous additional pollutants in concentrations exceeding EPA benchmarks, indicating that the Facility has failed to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards.

Coastkeeper and CERF put the Eastgate Hauling Facility Owner and/or Operator on notice that the Storm Water Permit Effluent Limitation is violated each time storm water discharges from the Facility. *See* Ex. 2. These discharge violations are ongoing and will continue every time the Facility Owner and/or Operator discharges polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. Each time the Facility Owner and/or Operator discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owner and/or Operator has been in violation since August 26, 2014, and Coastkeeper and CERF will update the dates of violations when additional information and data become available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

Further, Coastkeeper and CERF put the Eastgate Hauling Facility Owner and/or Operator on notice that the 2015 Permit Effluent Limitation V.A is an independent requirement that must be complied with, and that carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the 2015 Permit does not amount to compliance with Effluent Limitation V.A.

---

[13] *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F.Supp.2d 914 (C.D. Cal. 2009).

Exhibit 1
Page 013

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Eastgate Hauling Facility*
August 27, 2019
Page 14

___

### 3.4. <u>Discharges of Polluted Storm Water from the Facility in Violation of Storm Water Permit Receiving Water Limitations</u>.

Receiving Water Limitation C.2 of the 1997 Permit prohibits storm water discharges and authorized NSWDs that cause or contribute to an exceedance of an applicable Water Quality Standard ("WQS").[14] The 2015 Permit includes the same receiving water limitation. 2015 Permit § VI.A. Discharges that contain pollutants in excess of an applicable WQS violate the Storm Water Permit Receiving Water Limitations. 1997 Permit § C.2; 2015 Permit § VI.A.

Receiving Water Limitation C.1 of the 1997 Permit prohibits storm water discharges and authorized NSWDs to surface water that adversely impact human health or the environment. The 2015 Permit includes the same receiving water limitation. 2015 Permit § VI.B. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of the Storm Water Permit Receiving Water Limitation. 1997 Permit § C.1; 2015 Permit § VI.B.

Storm water sampling at the Facility demonstrates that its discharges contain concentrations of pollutants that cause or contribute to a violation of an applicable WQS in violation of the Storm Water Permit's Receiving Water Limitations. *See* 1997 Permit § C.2; 2015 Permit § VI.A. For example, the San Diego Basin Plan mandates that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Yet, the Facility's own storm water monitoring data shows numerous instances of extremely high TSS concentrations, which have the potential to adversely affect the beneficial uses of Receiving Waters.

As explained herein, the Receiving Waters are impaired, and thus unable to support the designated Beneficial Uses, for some of the same pollutants discharged by the Facility. Carroll Canyon is impaired for benthic community effects. The Basin Plan explains that "[s]uspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." Basin Plan at 3-31. As such, the Facility's storm water discharges containing elevated concentrations of TSS in excess of the Basin Plan Water Quality Objective, cause and/or contribute to the benthic community effects impairment of Carroll Canyon.

Furthermore, Los Peñasquitos Lagoon is impaired for sedimentation and siltation. The Basin Plans explains that "[s]uspended sediment in surface waters can cause harm to aquatic organisms by abrasion of surface membranes, interference with respiration, and sensory

___

[14] The Basin Plan designates Beneficial Uses for the Receiving Waters. Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. Discharges above water quality standards contribute to the impairment of Receiving Waters' Beneficial Uses. Applicable water quality standards include, among others, the Criteria for Priority Toxic Pollutants in the State of California, 40 C.F.R. § 131.38 ("CTR"), and water quality objectives in the Basin Plan. Industrial storm water discharges must strictly comply with water quality standards, including those criteria listed in the applicable basin plan. *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).

Exhibit 1
Page 014

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Eastgate Hauling Facility*
August 27, 2019
Page 15

perception in aquatic fauna. Suspended sediment can reduce photosynthesis in and survival of aquatic flora by limiting the transmittance of light." *Id*. As the 2017 SWPPP acknowledges the presence of sediment in the Facility's discharges, and the Facility's own monitoring data reflects numerous exceedances the Basin Plan Water Quality Objective for TSS, the Facility's storm water discharges cause and/or contribute to the sedimentation/siltation impairment of the Los Peñasquitos Lagoon.

As discussed in Section 3.6.3, *infra*, information available to Coastkeeper and CERF indicates that the Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to analyze storm water discharged from the Facility for numerous pollutants that result from the Facility's industrial operations. As such, in addition to TSS, the Eastgate Hauling Facility likely discharges numerous pollutants in concentrations in exceedance of Receiving Water Limitations. For example, storm water discharges from facilities engaging in industrial activities similar to those conducted at the Eastgate Hauling Facility, which perform maintenance on heavy machinery used to handle municipal waste, typically contain extremely high levels of toxic metals, such as zinc and copper, in excess of the Basin Plan Objectives. Carroll Canyon and Los Peñasquitos Lagoon are impaired for toxicity, and Soledad Canyon is impaired for sediment toxicity. As such, any discharges from the Eastgate Hauling Facility exceeding the CTR will cause and/or contribute to the toxicity and sediment toxicity impairments of Receiving Waters.

The CTR and Basin Plan are applicable WQSs under the Storm Water Permit. Thus, discharges from the Facility containing concentrations of pollutants in exceedance of WQSs, cause or contribute to the impairments of Receiving Waters in violation of Receiving Water Limitations of the Storm Water Permit. 1997 Permit § C.2; 2015 Permit § VI.A. Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the Storm Water Permit Receiving Water Limitations. *See* 1997 Permit § C.1; 2015 Permit § VI.B.

Coastkeeper and CERF put the Eastgate Hauling Facility Owner and/or Operator on notice that Storm Water Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facility. *See* Ex. 2. Each time discharges of storm water from the Facility cause and/or contribute to a violation of an applicable WQS, it is a separate and distinct violation of Receiving Water Limitation C.2 of the 1997 Permit, Receiving Water Limitation VI.A of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Each time discharges of storm water from the Facility adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation C.1 of the 1997 Permit, Receiving Water Limitation VI.B of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the Storm Water Permit Receiving Water Limitations. The Facility Owner and/or Operator has been in violation since August 26, 2014, and Coastkeeper and CERF will update the dates of violation when additional information and data becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

Exhibit 1
Page 015

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Eastgate Hauling Facility*
August 27, 2019
Page 16

Further, Coastkeeper and CERF put the Facility Owner and/or Operator on notice that Receiving Water Limitations are independent Storm Water Permit requirements that must be complied with, and that carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the 2015 Permit does not amount to compliance with the Receiving Water Limitations.

**3.5. Failure to Develop, Implement, and/or Revise an Adequate Storm Water Pollution Prevention Plan.**

The Storm Water Permit requires permittees to develop and implement a Storm Water Pollution Prevention Plan prior to conducting industrial activities. A permittee has an ongoing obligation to revise the SWPPP as necessary to ensure compliance with the Storm Water Permit. The specific SWPPP requirements of the 1997 Permit and the 2015 Permit are set out below.

3.5.1.   1997 Permit SWPPP Requirements.

Section A.1 and Provision E.2 of the 1997 Permit require dischargers to have developed and implemented a SWPPP prior to beginning industrial activities that meets all of the requirements of the 1997 Permit. The objectives of the 1997 Permit SWPPP requirements are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the Facility and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. 1997 Permit § A.2. These BMPs must achieve compliance with the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

To ensure compliance with the Storm Water Permit, the SWPPP must be evaluated on an annual basis pursuant to the requirements of Section A.9 of the 1997 Permit, and must be revised as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Sections A.9–10. Sections A.3–10 of the 1997 Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a site map showing the Facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, areas of industrial activity, and other features of the Facility and its industrial activities (§ A.4); a list of significant materials handled and stored at the site (§ A.5); a description of potential pollutant sources, including industrial processes, material handling and storage areas, dust and particulate generating activities, significant spills and leaks, NSWDs and their sources, and locations where soil erosion may occur (§ A.6).

Sections A.7–8 of the 1997 Permit require an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized NSWDs, including structural BMPs where non-structural BMPs are not effective.

3.5.2.   2015 Permit SWPPP Requirements.

Exhibit 1
Page 016

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Eastgate Hauling Facility*
August 27, 2019
Page 17

As with the SWPPP requirements of the 1997 Permit, Sections X.A–H of the 2015 Permit require dischargers to have developed and implemented a SWPPP that meets all of the requirements of the 2015 Permit. *See also* 2015 Permit, Appendix 1. The objective of the SWPPP requirements are still to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. 2015 Permit § X.C.

The SWPPP must include, among other things and consistent with the 1997 Permit, a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, points of discharge, direction of flow, areas of actual and potential pollutant contact, nearby water bodies, and pollutant control measures; a description of the BMPs developed and implemented to reduce or prevent pollutants in storm water discharges and authorized NSWDs necessary to comply with the Storm Water Permit; the identification of NSWDs and the elimination of unauthorized NSWDs; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and the identification of individuals and their current responsibilities for developing and implementing the SWPPP. 2015 Permit §§ X.A–H.

Further, the 2015 Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 2015 Permit §§ X.A–B. Like the 1997 Permit, the 2015 Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed; and a visual inspection of equipment needed to implement the SWPPP. 2015 Permit §§ X.B, XV.

### 3.5.3. The Eastgate Hauling Facility Owner and/or Operator Has Violated and Continues to Violate the Storm Water Permit SWPPP Requirements.

The Eastgate Hauling Facility Owner and/or Operator has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP. First, the Facility SWPPP and site map fail to accurately include all information required by the Storm Water Permit. For example, the SWPPP, in conjunction with the site map claim that all water from DA-1 is routed to DP-1, the concrete curbed channel in the southeast corner of the Facility. Information available to Coastkeeper and CERF indicates that not all surface flows from DA-1 are successfully routed to DP-1. Some storm water flows and/or is tracked outside of the Facility boundary, onto the access road shared by the Eastgate Hauling Facility and the neighboring Robertson's Ready Mix Facility, and onto Eastgate Drive. This constitutes a separate discharge point from the Facility. However, the SWPPP and site map fail to identify it as such, and further fail to collect storm water samples from this discharge point, all of which are

Exhibit 1
Page 017

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Eastgate Hauling Facility*
August 27, 2019
Page 18

violations of the Storm Water Permit. *See e.g.,* 2015 Permit § X.E.3.b. The Facility SWPPP and
site map also fail to identify the containment capacity of the oil trench in DA-2 in violation of the
Storm Water Permit. *See* 2015 Permit § X.G.1.a. Further, each of the Tayman SWPPPs and site
maps are woefully inadequate, and lack adequate information regarding storm water flow,
drainage areas and discharge points, and locations of all industrial materials and industrial
activities.

The Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to
develop and/or implement a SWPPP that includes an adequate description of potential pollutant
sources. Section X.G.1.a of the 2015 Permit requires dischargers to "ensure the SWPPP
*describes* each industrial process including: manufacturing, cleaning, maintenance, recycling,
disposal, and any other activities related to the process." The Facility SWPPP fails to adequately
describe any of the industrial activities at the Facility. The most detailed information provided by
the SWPPP regarding the Facility's industrial operations, processes, and activities states: "The
Facility primarily maintains hauling vehicles. Hauling vehicles also receive mechanical
maintenance and washing at the Facility. Vehicle washing activities are conducted by a 3rd party
vendor." 2017 SWPPP § 2.1.2 The SWPPP provides no additional information regarding how
these activities are conducted at the Facility. The 2017 SWPPP also incorporates Tables 2.1.a–c
which list industrial activities, associated industrial materials, and pollutants, but these tables are
even more cursory than the narrative description provided in section 2.1.2. Thus, the SWPPP
fails to provide information regarding *how* the Eastgate Hauling Facility Owner and/or Operator
conduct any of its industrial activities. The Tayman Facility SWPPPs contain even less
information regarding Tayman's industrial activities. As such, the SWPPPs have failed and
continue to fail to provide the required *description* of industrial activities in violation of the
Storm Water Permit.

The Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to
develop and/or implement a SWPPP that includes an adequate pollutant source assessment.
Section X.G.2 of the 2015 Permit requires dischargers to "ensure that the SWPPP includes a
*narrative* assessment of all areas of industrial activity with potential industrial pollutant sources."
(emphasis added). This assessment shall include "pollutants likely to be present in industrial
storm water discharges and authorized NSWDs," (§ X.G.2.a.ii), "[t]he degree to which the
pollutants associated with those materials may be exposed to, and mobilized by contact with,
storm water," (§ X.G.2.a.iv), "[t]he direct and indirect pathways by which pollutants may be
exposed to storm water or authorized NSWDs," (§ X.G.2.a.v), and "[t]he effectiveness of
existing BMPs to reduce or prevent pollutants in industrial storm water discharges and
authorized NSWDs," (§ X.G.2.a.vii), among other requirements.

The 2017 SWPPP fails to comply with any of the aforementioned requirements of X.G.2.
The only narrative assessment provided in the 2017 SWPPP cursorily notes that the Facility
conducts "vehicle maintenance," "mechanical maintenance," and "washing" at the Facility, and
summarily states "[p]ollutants that can potentially enter stormwater run-off and other discharges
draining from the Facility include: Sediment (including vehicle traffic from both Eastgate
Hauling and Neighboring Facilities), Oil & Grease (waste oil and leaks from equipment); and
pH." Given the activities, operations, and materials present at this Facility as described in

Exhibit 1
Page 018

Section 2, *supra*, the 2017 SWPPP pollutant source assessment's conclusion that only sediment, O&G, and pH could be discharged from the Facility is absurd. As the pollutants identified in the pollutant source assessment are used to determine the parameters for which a Facility samples and analyzes its storm water, the Eastgate Hauling Facility Owner and/or Operator's identification of only these minimum pollutants evidences an intent to circumvent requirements of the Storm Water Permit, and thus avoid analyzing its storm water for required additional parameters.

The only pollutants identified in Table 2.1.b of the 2017 SWPPP are oil and grease, hydrocarbons, gross pollutants, and trace metals, without any further description or analysis. Even this woefully inadequate assessment of pollutants acknowledges that multiple metals and "gross pollutants" are present at the Facility, thus undermining the SWPPP's claims, made mere paragraphs prior, that only sediment, O&G, and pH could be present in the Facility's storm water discharges. Additionally, Table 2.1.a states that one source of pollutants at the Facility is "decaying organic material," evidencing that indicator bacteria such as fecal coliform, E. coli, and enterococcus are likely present at the Facility. Further, Table 2.1.b includes "debris from vehicles" as a pathway for pollutants to enter storm water. The vehicles receiving maintenance and washing at the Facility are used to transport municipal solid waste, green waste, and/or recyclables, and as such, they frequently track all pollutants associated with waste hauling onto the Facility. Indeed, the reason such vehicles and equipment are brought to the Facility for washing is that they have accumulated waste residue, trash, and other filth on their exterior and underside. As such, these vehicles frequently track numerous pollutants onto the Facility. Therefore, the SWPPP's recognition that "debris from vehicles" is a likely pollutant source at the Facility is an acknowledgement that these numerous pollutants associated with waste hauling activities are present at the Facility.

The Tayman Facility SWPPPs also fail to adequately assess pollutant sources. The 2015, 2016, and 2017 Tayman SWPPPs state only that "[s]ources of possible pollutants are motor oil hydraulic oil and basic solvents." Thus, these SWPPPs also violate Storm Water Permit SWPPP requirements.

In addition, as discussed in Section 2.2, *supra*, information available to Coastkeeper and CERF indicates that there are numerous other pollutants present in the Facility's storm water discharges. The Facility SWPPPs fail to acknowledge or assess the vast majority of these pollutants, and thus egregiously violate Storm Water Permit SWPPP requirements.

The Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that contains BMPs to prevent the exposure of pollutants and pollutant sources to storm water and the subsequent discharge of polluted storm water from the Facility, as required by the Storm Water Permit. This is due in part to the 2017 SWPPP's failure to include adequate site-specific information regarding the BMPs developed and/or implemented at the Facility. For example, Section 3.1 of the 2017 SWPPP simply states "[a]ll minimum Best Management Practices (BMPs) that are required by the IGP and necessary to meet the Facility conditions will be implemented." Thereafter, sections 3.1.1 through 3.1.5 of the 2017 SWPPP largely parrot the 2015 Permit language setting forth minimum BMP requirements.

Exhibit 1
Page 019

Furthermore, rather than provide site-specific details regarding which BMPs will be implemented at specific Facility locations to address specific pollutants, the 2017 SWPPP's BMPs section cites to the generic CASQA Stormwater BMP Handbook Portal for additional BMPs details. 2017 SWPPP § 3.1. In addition, the 2017 SWPPP BMP summary table only recognizes one industrial activity, vehicle and equipment maintenance, without providing additional specifics. 2017 SWPPP, Table 3.5. Table 3.5 only addresses O&G, metals, and suspended sediment as potential pollutants, and thus fails to mention numerous pollutants. Therefore, the 2017 SWPPP fails to provide adequate site-specific information regarding how and where such BMPs are implemented, in violation of the Storm Water Permit. *See* 2015 Permit §§ X.A; X.H.

The SWPPP's inadequacies are further documented by the continuous and ongoing discharge of storm water containing pollutant levels that exceed EPA Benchmarks and applicable WQSs, which indicate that the Facility's BMPs are failing to meet BAT/BCT requirements. *See, e.g.,* Ex. 1.

The Eastgate Hauling Facility Owner and/or Operator has also failed to revise the Facility's SWPPP to ensure compliance with the Storm Water Permit. Despite the significant concentrations of pollutants in the Facility's storm water discharges, information available to Coastkeeper and CERF indicates that the Facility SWPPP has remained the same since November 2017, and has not been revised to include additional BMPs to eliminate or reduce these pollutants, as required by the Storm Water Permit.

Accordingly, the Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to adequately develop, implement, and/or revise the Facility SWPPP in violation of SWPPP requirements of the Storm Water Permit. Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. The Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit SWPPP requirements since at least August 26, 2014. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

### 3.6. Failure to Develop, Implement, and/or Revise an Adequate Monitoring and Reporting Program.

The Storm Water Permit requires permittees to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. A permittee has an ongoing obligation to revise the M&RP as necessary to ensure compliance with the Storm Water Permit. The specific M&RP requirements of the 1997 Permit and the 2015 Permit are set out below.

#### 3.6.1. 1997 Permit M&RP Requirements.

Exhibit 1
Page 020

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Eastgate Hauling Facility*
August 27, 2019
Page 21

Section B.1 and Provision E.3 of the 1997 Permit require Facility operators to develop and implement an adequate M&RP prior to the commencement of industrial activities at a Facility, that meets all of the requirements of the Storm Water Permit. The primary objective of the M&RP is to detect and measure the concentrations of pollutants in a Facility's discharge to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* 1997 Permit § B2.

The M&RP must therefore ensure that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and must be evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *Id*. §§ B.3–16. Dischargers must revise the SWPPP in response to their M&RP observations to ensure that BMPs are effectively reducing and/or eliminating pollutants at the Facility. *Id*. § B.4. Sections B.5 and B.7 of the 1997 Permit require dischargers to visually observe and collect samples of storm water from all locations where storm water is discharged.

Sections B.5 and B.7 of the 1997 Storm Water Permit require dischargers to visually observe and collect samples of storm water from all drainage areas and discharge locations where storm water is discharged. Under Section B.5 of the Storm Water Permit, a permittee is required to collect at least two (2) samples from each discharge location at the Facility during the Wet Season. Storm water samples must be analyzed for TSS, pH, SC, total organic carbon or O&G, and other pollutants that are likely to be present in the Facility's discharges in significant quantities. *Id.* § B.5.c. Finally, permittees must identify and use analytical method detection limits sufficient to determine compliance with the 1997 Permit's monitoring program objectives and specifically, the Effluent Limitations and Receiving Water Limitations. *Id.* § B.10.iii.

3.6.2.  <u>2015 Permit M&RP Requirements</u>.

As with the 1997 M&RP requirements, Sections X.I and XI.A–D of the 2015 Permit require Facility operators to develop and implement an adequate M&RP that meets all of the requirements of the 2015 Permit. The objective of the M&RP is still to detect and measure the concentrations of pollutants in a Facility's discharge, and to ensure compliance with the 2015 Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit § XI. An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *Id*.

As an *increase* in frequency of monitoring requirements, Sections XI.B.1–5 of the 2015 Permit requires permittees to collect storm water discharge samples from a qualifying storm event[15] as follows: 1) from each drainage area at all discharge locations, 2) from two (2) storm events within the first half of each Reporting Year[16](July 1 to December 31), 3) from two (2)

---

[15] The 2015 Permit defines a qualifying storm event as one that produces a discharge for at least one drainage area, and is preceded by 48-hours with no discharge from any drainage areas. 2015 Permit, Section XI(B)(1).

[16] A Reporting Year replaced the 1997 permit term Wet Season, and is defined as July 1 through June 30. 2015 Permit, Findings, ¶ 62(b).

Exhibit 1
Page 021

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Eastgate Hauling Facility*
August 27, 2019
Page 22

storm events within the second half of each Reporting Year (January 1 to June 30), and 4) within four hours of the start of a discharge, or the start of Facility operations if the qualifying storm event occurs within the previous 12-hour period. The 2015 Permit requires, among other things, that permittees must submit *all sampling* and analytical results for all samples via SMARTS within 30 days of obtaining all results for each sampling event. *Id*. § XI.B.11 (emphasis added).

The parameters to be analyzed are also consistent with the 1997 Permit, however, the 2015 Permit no longer requires SC to be analyzed. Sections XI.B.6.a–b of the 2015 Permit requires permittees to analyze samples for TSS, O&G, and pH. Section XI.B.6.c–d of the 2015 Permit requires permittees to analyze samples for all pollutants associated with the Discharger's industrial activities. Specifically, the 2015 Permit requires Facility Owners and/or Operators to sample and analyze parameters on a Facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. *Id*. § XI.B.6.c. Section XI.B.6.e of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with a Clean Water Act Section 303(d) listed impairment(s), or approved Total Maximum Daily Loads.

    3.6.3.   <u>The Facility Owner and/or Operator Has Violated and Continues to Violate the Storm Water Permit M&RP Requirements</u>.

The Eastgate Hauling Facility Owner and/or Operator has been and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised M&RP. For example, the Facility Owner and/or Operator has failed and continues to fail to sample and analyze storm water discharges for all parameters required by the Storm Water Permit, and fails to collect samples from all discharge locations.

Information available to Coastkeeper and CERF indicates that the Eastgate Hauling Facility Owner and/or Operator has failed to sample for numerous constituents likely to be present at the Facility in violation of Sections XI.B.6.c and XI.B.6.e of the 2015 Permit. As explained in Sections 2.2 and 3.5.3, *supra*, in light of the Facility's activities of storing, washing, and maintaining waste hauling trucks, dozens of pollutants are likely present at the Facility. However, the Facility Owner and/or Operator analyzes storm water samples for only TSS, O&G, and pH in violation of the Storm Water Permit.

In addition, the Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement an M&RP that requires the collection of storm water samples from all discharge locations at the Facility in violation of Section XI.B.4 of the 2015 Permit. For example, both Republic and Tayman have only collected storm water samples from DP-1, accounting for storm water in DA-1. However, the 2017 SWPPP and site map indicate that the Facility consists of two drainage areas, DA-1 and DA-2. DA-2 discharges storm water and non-storm water at DP-2. However, both Tayman and Republic have failed to collect samples from DP-2. Furthermore, information available to Coastkeeper and CERF indicates that the Facility also discharges storm water from the truck ingress/egress point of the Facility, which ultimately discharges to Eastgate Drive. The Facility Owner and/or Operator has failed to sample any storm water discharged from this ingress/egress point.

Exhibit 1
Page 022

Section XI.B.4 of the 2015 Permit specifically requires dischargers to collect samples "from *each drainage area* at *all* discharge locations." While Section B.7.d of the 1997 Permit and Section XI.C.4 of the 2015 Permit allow permittees to reduce the number of locations to be sampled, there is no indication that the Facility Owner and/or Operator has complied with the requirements of Section B.7.d of the 1997 Permit or Section XI.C.4 of the 2015 permit to justify sampling a reduced number of discharge locations at the Facility. Therefore, the Eastgate Hauling Facility is in violation of the Storm Water Permit for failing to collect any samples from DP-2 or the truck ingress/egress point to the Facility.

The Eastgate Hauling Facility Owner and/or Operator also failed to collect the required number of storm water samples for each reporting period. For example, the Facility only collected one sample during the entire 2017-2018 reporting period, and two samples from the 2016-17 reporting period. The Storm Water Permit requires permitees to collect samples from four QSEs during each reporting period.

Finally, the Storm Water Permit requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs. Based on information available to Coastkeeper and CERF, including Annual Reports, the Eastgate Hauling Facility Owner and/or Operator fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

Accordingly, the Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to adequately develop, implement, and/or revise a M&RP, in violation of the Storm Water Permit. Every day the Facility operates with an inadequately developed and/or implemented M&RP, or with an improperly revised M&RP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. The Eastgate Hauling Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit M&RP requirements since at least August 26, 2014. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

### 3.7. <u>Failure to Comply with the Storm Water Permit's Reporting Requirements</u>.

Section B.14 of the 1997 Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section B.14 requires that the Annual Report include a summary of visual observations and sampling results, an evaluation of the visual observation and sampling results, the laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required, and other information specified in Section B.13. The 2015 Permit includes the same reporting requirements with the Annual Report due July 15. *See* 2015 Permit § XVI.

The Eastgate Hauling Facility Owner and/or Operator has failed and continues to fail to submit Annual Reports that comply with the Storm Water Permit reporting requirements. For

Exhibit 1
Page 023

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Eastgate Hauling Facility*
August 27, 2019
Page 24

example, the Facility Owner and/or Operator simply failed to upload an Annual Report to the SMARTS database for the reporting period of 2017-2018. The Annual Report for the 2013-14 reporting period contains only the Facility and Operator information, and the rest of the report is blank or incomplete. The 2015-16 Annual Report inaccurately states that the Facility is not located within an impaired HUC 10 watershed, when Carroll Canyon, Soledad Canyon, and Los Peñasquitos Lagoon are impaired for various pollutants as discussed *supra*. The 2016-17 Annual Report inaccurately attests that all pollutants identified in the impaired watershed were included in the SWPPP pollutant source assessment. However, none of the pollutants identified in the 2016-17 Annual Report were acknowledged or assessed in Tayman's SWPPPs during that time period.

In each Annual Report since the filing of the 2013-14 Annual Report, the Eastgate Hauling Facility Owner and/or Operator certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the Storm Water Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the Storm Water Permit, or will otherwise be revised to achieve compliance. However, information available to Coastkeeper and CERF indicates that these certifications are erroneous. For example, storm water samples collected from the Facility contain concentrations of pollutants above EPA Benchmarks and WQSs, thus demonstrating that the Facility BMPs do not adequately address existing potential pollutant sources. Further, as discussed in Sections 3.5.3 and 3.6.3, *supra*, the Facility's SWPPP does not include many elements required by the Storm Water Permit, and thus it is erroneous to certify that the SWPPP complies with the Storm Water Permit.

In addition, Eastgate Hauling Facility Owner and/or Operator has not accurately reported non-compliance, as required by the Storm Water Permit. *See* 1997 Permit § C.11.d; 2015 Permit § XVI.B.2.

Given that the Eastgate Hauling Facility Owner and/or Operator has submitted incomplete and/or incorrect Annual Reports that fail to comply with the Storm Water Permit, the Facility Owner and/or Operator is in daily violation of the Storm Water Permit. Every day the Facility Owner and/or Operator conducts operations at the Facility without reporting as required by the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). The Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit's reporting requirements every day since at least August 26, 2014. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

## 4.  RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the

Exhibit 1
Page 024

period commencing five years prior to the date of the Notice Letter. These provisions of law authorize civil penalties of $37,500.00 per day per violation for all Clean Water Act violations after January 12, 2009 and $54,833.00 per day per violation for violations that occurred after November 2, 2015.

In addition to civil penalties, Coastkeeper and CERF will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law. Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), Coastkeeper and CERF will seek to recover their litigation costs, including attorneys' and experts' fees.

## 5. CONCLUSION

Coastkeeper and CERF are willing to discuss effective remedies for the violations described in this Notice Letter. However, upon expiration of the 60-day notice period, Coastkeeper and CERF will file a citizen suit under Section 505(a) of the Clean Water Act for the Eastgate Hauling Facility Owner and/or Operator's violations of the Storm Water Permit.

If you wish to pursue settlement discussions, please contact Coastkeeper and CERFs legal counsel:

Matt O'Malley
Patrick McDonough
matt@sdcoastkeeper.org
San Diego Coastkeeper
2825 Dewey Road, Suite 207
San Diego, California 92106
619-758-7743

Marco Gonzalez
Livia Borak Beaudin
livia@coastlawgroup.com
Coast Law Group, LLP
1140 South Coast Highway 101
Encinitas, California 92024
Tel: 760-942-8505

Sincerely,

Matt O'Malley
Patrick McDonough
Attorneys for San Diego Coastkeeper

Marco Gonzalez
Livia Borak Beaudin
Attorneys for Coastal Environmental Rights Foundation

Exhibit 1
Page 025

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Eastgate Hauling Facility*
August 27, 2019
Page 26

## SERVICE LIST

<u>VIA U.S. MAIL</u>

David Gibson
Executive Officer
San Diego Regional Water Quality Control Board
2375 Northside Drive, Suite 100
San Diego, California 92108

Andrew Wheeler, Administrator
Environmental Protection Agency
Office of the Administrator 1101A
1200 Pennsylvania Ave N.W
Washington, DC 20460

Mike Stoker
Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Eileen Sobeck
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812–0110

Exhibit 1
Page 026

 

August 27, 2019

<u>VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED</u>

Republic Services of Chula Vista
ATTN: Managing Agent
881 Energy Way
Chula Vista, CA 91911

CT Corporation System
Registered agent for:
Republic Services, Inc.,
818 West Seventh Street, Suite 930
Los Angeles, CA 90017

Republic Services, Inc.
ATTN: Managing Agent
881 Energy Way
Chula Vista, CA 91911

Republic Services of Chula Vista
ATTN: Managing Agent
18500 North Allied Way
Phoenix, AZ 85054

Republic Services, Inc.
ATTN: Managing Agent
18500 North Allied Way
Phoenix, AZ 85054

**Re:    Notice of Violation and Intent to File Suit Under the Clean Water Act**

To the Above-Listed Recipients:

Please accept this letter on behalf of San Diego Coastkeeper ("Coastkeeper") and Coastal Environmental Rights Foundation ("CERF") regarding violations of the Clean Water Act[1] and California's Storm Water Permit[2] occurring at the Chula Vista Hauling Facility, 881 Energy Way, Chula Vista, California 91911 ("Chula Vista Hauling Facility" or "Facility"). The purpose of this letter is to put Republic Services of Chula Vista and/or Republic Services, Inc. ("Republic"), as the owner(s) and/or operator(s) of the Facility, on notice of the violations of the Storm Water Permit occurring at the Facility, including, but not limited to, discharges of polluted storm water from the Chula Vista Hauling Facility into local surface waters. Violations of the Storm Water Permit are violations of the Clean Water Act. As explained below, Republic is liable for violations of the Storm Water Permit and the Clean Water Act.

Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen must give notice of his/her intention to file suit. Notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*
[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, Order No. 97-03-DWQ ("1997 Permit"), as amended by Order No. 2014-0057-DWQ ("2015 Permit").

Exhibit 1
Page 027

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 2

control agency in the State in which the violations occur, and, if the alleged violator is a
corporation, the registered agent of the corporation. *See* 40 C.F.R. § 135.2(a)(1). This notice
letter ("Notice Letter") is being sent to you as the responsible Owner and/or Operator of the
Chula Vista Hauling Facility, or as the registered agent for the owner or operator. This
Notice Letter is issued pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act to
inform Republic that Coastkeeper and CERF intend to file a federal enforcement action against
Republic for violations of the Storm Water Permit and the Clean Water Act sixty (60) days from
the date of this Notice Letter.

1.      **BACKGROUND**

   1.1. **San Diego Coastkeeper and Coastal Environmental Rights Foundation.**

        San Diego Coastkeeper is a non-profit public benefit corporation organized under the
laws of the State of California with its office at 2825 Dewey Road, Suite 207, San Diego,
California 92106. Founded in 1995, San Diego Coastkeeper is dedicated to the preservation,
protection, and defense of the environment, wildlife, and natural resources of San Diego County
watersheds. To further these goals, Coastkeeper actively seeks federal and state agency
implementation of the Clean Water Act, and, where necessary, directly initiates enforcement
actions on behalf of themselves and their members.

        CERF is a non-profit public benefit corporation organized under the laws of the State of
California with its main office in Encinitas, California. CERF is dedicated to the preservation,
protection, and defense of the environment, the wildlife, and the natural resources of the
California Coast. CERF's mailing address is 1140 S. Coast Highway 101, Encinitas, California
92024.

        Members of Coastkeeper and CERF live in and around, recreate in and around, and enjoy
the waters into which the Facility discharges, including the Otay River and San Diego Bay
(collectively "Receiving Waters"). Members of Coastkeeper and CERF use the Receiving
Waters to swim, boat, kayak, surf, bird watch, view wildlife, hike, bike, walk, run, and/or for
general aesthetic enjoyment. Additionally, members of Coastkeeper and CERF use the Receiving
Waters to engage in scientific study through pollution and habitat monitoring and restoration
activities. The discharges of pollutants from the Facility impair each of these uses. Discharges of
polluted storm water from the Facility are ongoing and continuous. Thus, the interests of
Coastkeeper's and CERF's members have been, are being, and will continue to be adversely
affected by the Facility Owner and/or Operator's failure to comply with the Clean Water Act and
the Storm Water Permit.

   1.2. **The Owner and/or Operator of the Facility.**

        Information available to Coastkeeper and CERF indicates that Republic Services, Inc. is
the Owner and/or Operator of the Facility and has been for at least the past five years. *See*
November 2016 Facility Storm Water Pollution Prevention Plan ("SWPPP"), § 1.1 ("The
property is owned by Republic Services and is being operated by Republic Services."). Republic

Exhibit 1
Page 028

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 3

Services, Inc. is herein referred to as "Republic" or "Facility Owner and/or Operator." Information available to Coastkeeper and CERF indicates that Republic Services, Inc. is an active Delaware corporation and its registered agent is CT Corporation System, 818 West Seventh Street, Suite 930, Los Angeles, California 90017.

The Chula Vista Hauling Facility Owner and/or Operator has violated and continues to violate the procedural and substantive terms of the Storm Water Permit including, but not limited to, the illegal discharge of pollutants from the Facility into local surface waters. As explained herein, the Facility Owner and/or Operator is liable for violations of the Storm Water Permit and the Clean Water Act.

### 1.3. The Facility's Storm Water Permit Coverage.

Certain classified facilities that discharge storm water associated with industrial activity are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent ("NOI") to the State Water Resources Control Board ("State Board") to obtain Storm Water Permit coverage. Information available to Coastkeeper and CERF indicates that the Chula Vista Hauling Facility first obtained Storm Water Permit coverage on July 6, 1998. The Facility submitted its most recent NOI on March 6, 2018 ("2018 NOI"). Coastkeeper and CERF obtained the 2018 NOI from California's online Storm Water Multiple Application & Reporting Tracking System ("SMARTs") database. The 2018 NOI lists the Facility Waste Discharge Identification ("WDID") number as 9 37I014355. The NOI identifies both the Facility site name and Facility operator as "Republic Services of Chula Vista." However, the Facility's SWPPPs dated June 2015 ("2015 SWPPP"), and November 2016 ("2016 SWPPP") both state that the property is owned and operated by "Republic Services." 2016 SWPPP § 1.1; 2015 SWPPP § 1.1. Furthermore, the Facility's Level 2 Exceedance Response Action ("ERA") Plan dated December 2017 ("2017 Level 2 ERA Action Plan"), and Level 2 ERA Technical Report dated December 31, 2018 ("2018 Level 2 ERA Report") were both "prepared for Republic Services, Inc." As such, information available to Coastkeeper and CERF indicates that Republic Services, Inc. is the Owner and/or Operator of the Facility. Thus, the Facility Owner and/or Operator has failed to file an accurate NOI regarding the Facility's proper Owner and/or Operator in violation of the Storm Water Permit. *See* 1997 Permit § III, Attachment 3; 2015 Permit § I.A.17, Attachment D.

The 2018 NOI states that the facility size is 202,204 square feet, all of which is industrial area exposed to storm water, but does not indicate what percent of the site is impervious. The 2016 SWPPP, states that the site comprises approximately 4.64 acres, which is approximately equivalent to 202,204 square feet, but also fails to state what percentage of the site if impervious. Thus, information available to Coastkeeper and CERF indicates that the Facility Owner and/or Operator has failed to provide the total percentage of site impervious surface are in violation of Attachment D of the 2015 Storm Water Permit, and Attachment 3 of the 1997 Permit.

The 2018 NOI, and the 2016 SWPPP, list the Standard Industrial Classification ("SIC") code for the Chula Vista Hauling Facility as 4212. The 2018 NOI describes this SIC code as "Local Trucking Without Storage" while the 2016 SWPPP describes it as "Motor Freight Transportation and Warehousing." The entire Facility requires Storm Water Permit coverage.

Exhibit 1
Page 029

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 4

Information available to Coastkeeper and CERF, including the Facility 2016 SWPPP describing vehicle and equipment maintenance and storage at the Facility, indicates that SIC code 4231 (terminal and joint terminal maintenance facilities for motor freight transportation) also applies to the Facility.

Coastkeeper and CERF put the Facility Owner and/or Operator on notice that industrial activities are conducted throughout the Facility, and thus the entire Facility requires Storm Water Permit coverage. In addition, even if the regulated industrial activities are not occurring throughout the entire Facility at all times, under the Storm Water Permit's definition of "storm water associated with industrial activities" and explanation of material handling activities, Coastkeeper and CERF puts the Facility Owner and/or Operator on notice that since insufficient best management practices ("BMPs") or other controls exist to separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities, storm water at the Facility commingles and thus all storm water discharges from the Facility are regulated under the Storm Water Permit.

### 1.4. <u>Storm Water Pollution and the Waters Receiving Facility's Discharges</u>.

With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations around San Diego County, such as the Chula Vista Hauling Facility, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

Polluted discharges from industrial facilities similarly situated to the Chula Vista Hauling Facility often contain the following pollutants: heavy metals such as copper, iron, lead, aluminum, selenium, and zinc; pathogens and bacteria such as E. coli, enterococcus, and fecal coliform; excessive nutrients such as nitrogen and phosphorus; oil and grease ("O&G"), hydraulic fluids, antifreeze, aromatic hydrocarbons, and chlorinated hydrocarbons; solvents and detergents; and paints. Many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and/or developmental or reproductive harm.[3] Discharges of polluted storm water pose carcinogenic and reproductive toxicity threats to the public and adversely affect the aquatic environment.

The Receiving Waters into which the Chula Vista Hauling Facility discharges polluted storm water are ecologically sensitive areas. The Otay River and portions of San Diego Bay provide critical migrating waterfowl habitat, nesting sites for sensitive bird species, and generally protect a tremendous diversity of plant and animal species. Although pollution and habitat destruction have drastically diminished once-abundant and varied fisheries, the Receiving Waters are still essential habitat for dozens of fish, bird, mammal, and reptile species. For

---

[3] Health & Saf. Code §§ 25249.5 - 25249.1.

Exhibit 1
Page 030

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 5

example, the Otay River Valley is home to coyotes, grey foxes, raccoons, desert cottontails, and American badgers.[4] According to the City of Chula Vista, over 200 bird species utilize the Otay River Valley including the great blue heron, snowy egret, white-tailed kite, northern harrier, red-tailed hawk, coots, ducks, and endangered birds such as Least Bell's Vireo and southwestern willow flycatcher.[5] Pollutants discharged from the Facility are deleterious to invertebrates, insects, larval fish, and local vegetation in the Otay River and Otay River Valley. As such these pollutant discharges strain the ecosystems on which numerous species, some of which are endangered, depend for survival.

Furthermore, the Otay River empties directly into the San Diego Bay National Wildlife Refuge, a 2,300-acre protected refuge managed by the U.S. National Fish and Wildlife Service at the southern end of San Diego Bay.[6] As over ninety percent of historic wetlands of San Diego Bay have been filled in, drained, or diked, this refuge provides critical habitat for hundreds of thousands of birds migrating along the Pacific Flyway, as well as for the bay's resident species. Storm water and non-storm water contaminated with pathogens, sediment, heavy metals, and other pollutants degrade San Diego Bay, and in particular the special biological significance of the National Wildlife Refuge.

The polluted discharges from the Facility harm the special aesthetic and recreational significance of the Receiving Waters, adversely impacting the public's ability, as well as that of Coastkeeper's and CERF's members, to use and enjoy these unique waterbodies. Otay Valley Regional Park extends from the mouth of the Otay River at San Diego Bay, along the Otay River to the Lower Otay Reservoir. The park includes several miles of hiking, biking, and equestrian riding along the Otay River, which offer recreational opportunities to observe not only wildlife, but also unique habitats which include maritime succulent scrub, southern cottonwood willow riparian forest, alkali marsh, Diegan coastal sage scrub, and the rare and local Orcutt's bird's beak.[7] The San Diego Bay National Wildlife Refuge is also easily accessible by the public for use and enjoyment. Pollutants discharged from the Chula Vista Hauling Facility affects the health of the Receiving Waters, and thus the plant and animal life of the surrounding habitats. Damage to these natural habitats, and thus the flora and fauna within them, harms the ability of the public, including Coastkeeper's and CERF's members' ability to use and enjoy the unique recreational opportunities offered by the Receiving Waters. Furthermore, Coastkeeper's and CERF's members are less likely to recreate in and around waters known to be polluted with pathogens such as E. coli and fecal coliform, as well as nutrients and toxic metals such as lead, copper, and zinc.

The California Regional Water Quality Control Board, San Diego Region, ("Regional Board") issued the *Water Quality Control Plan for the San Diego Basin* ("San Diego Basin Plan" or "Basin Plan"). The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the Otay River include: Non-Contact Water Recreation, Warm

---

[4] Otay Valley Regional Park Brochure, *available at* https://www.chulavistaca.gov/home/showdocument?id=8405.
[5] *Id.*
[6] U.S. Fish & Wildlife Service, San Diego Bay National Wildlife Refuge, *About the Refuge*, *available at* https://www.fws.gov/refuge/San_Diego_Bay/about.html.
[7] Otay Valley Regional Park Brochure.

Exhibit 1
Page 031

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 6

Freshwater Habitat, Wildlife Habitat, Rare, Threatened, or Endangered Species, and the potential Beneficial Use of Contact Recreation. Basin Plan, Table 2-2. The existing Beneficial Uses for the San Diego Bay include: Contact Recreation, Non-Contact Water Recreation, Preservation of Biological Habitats of Special Significance, Wildlife Habitat, Rare, Threatened, or Endangered Species, Migration of Aquatic Organisms, Marine Habitat, Estuarine Habitat, Spawning, Reproduction, and/or Early Development, Shellfish Harvesting, Commercial and Sport Fishing, Navigation, and Industrial Service Supply. *Id*. at Table 2-3.

According to the 2016 303(d) List of Impaired Water Bodies, San Diego Bay is impaired for mercury, polycyclic aromatic hydrocarbons ("PAHs"), and polychlorinated biphenyls ("PCBs").[8] Other parts of San Diego Bay are impaired for benthic community effects, sediment toxicity, copper, total coliform, enterococcus, fecal coliform, and chlordane. Information available to Coastkeeper and CERF, including Coastkeeper's monitoring data reported in the California Environmental Data Exchange Network ("CEDEN"), confirms that the Otay River is impaired for indicator bacteria such as E. Coli and enterococcus, as well as nutrients such as Nitrate + Nitrite ("N+N") and phosphorus.[9]

## 2.   THE CHULA VISTA HAULING FACILITY AND RELATED DISCHARGES OF POLLUTANTS

### 2.1.  The Facility Site Description and Industrial Activities.

The Owners and/or Operators of the Chula Vista Hauling Facility state that the Facility primarily maintains and stores waste hauling vehicles, waste containers, and trash bins. 2016 SWPPP §§ 2.1.1-2. The maintenance of this equipment includes washing, welding, fueling, and oil refills. *Id*. The 2016 SWPPP also acknowledges outdoor material storage and vehicle parking occur outdoors. *Id*. § 2.1.2. Information available to Coastkeeper and CERF indicates that the Facility also engages in the following industrial activities: handling and storage of hazardous materials; storage of mechanical parts; storage of fuel and other flammable materials; natural gas compression and storage; paint storage; and storage and use of various other chemicals.

According to the Facility SWPPPs and site map, the areas of industrial activity at the Facility include the maintenance shop, wash bay, welding bay, truck storage area, waste container and trash bins storage areas, the truck parking and CNG fueling area, battery storage, flammables cabinet, the hazardous waste material storage area, metals storage bin, tire storage area, CNG dryer, compressor, and compressed fuel tank area, and fueling island.  *Id*. at § 2.1.4.

According to the Facility SWPPPs, industrial materials associated with operations at the Chula Vista Hauling Facility include natural gas and CNG; other compressed gasses; diesel and other fuels; new and used oils and other lubricants; new and used antifreeze; welding metals;

---

[8] 2016 Integrated Report – All Assessed Waters, *available at*
*http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2012.shtml* (last accessed on August 14, 2019).
[9] This data and information is publicly available at https://ceden.waterboards.ca.gov/AdvancedQueryTool under the program titled "SDCK Monitoring Program."

Exhibit 1
Page 032

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 7

acetylene, oxygen, and carbon dioxide for welding; wash water; and refinishing debris. Information available to Coastkeeper and CERF indicates that the hauling vehicles maintained at the Facility have accumulated waste residue, trash, and other filth on their exterior and underside from handling municipal solid waste, green waste, and/or recyclables, which is tracked onto and throughout the Facility during the normal course of operations.

Information available to Coastkeeper and CERF indicates that these industrial activities occur at various locations throughout the Facility either outdoors, or without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility. Further, information available to Coastkeeper and CERF indicates that the pollutants associated with the Facility have been and continue to be tracked throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking trash, pathogens, nutrient pollutants, sediment, dirt, O&G, metal particles, and other pollutants off-site. The resulting illegal discharges of polluted storm water and non-storm water impact Coastkeeper's and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human wellbeing, aquatic life, and ecosystem health.

### 2.2. <u>Pollutants and Pollutant Sources Related to the Facility's Industrial Activities</u>.

According to the 2016 Facility SWPPP, pollutants which can potentially enter the Chula Vista Hauling Facility's storm water include "Sediment (including erodible soils and aggregates), Oil and Grease (waste oil and leaks from equipment), Hydrocarbons (petroleum products, hydraulic fluid, and fuel), Gross Pollutants (litter, debris, and floatables), Organics (cleaners, solvents, and herbicides), [and] Trace Metals." *See* 2016 SWPPP § 2.3.1.

Information available to Coastkeeper and CERF indicates that pollutants commonly present in storm water discharged from facilities similar to the Chula Vista Hauling Facility include: pathogens such as enterococcus, E. coli, and fecal coliform; excessive nutrients such as ammonia as nitrogen, nitrite, nitrate, total nitrogen and phosphorus; metals such as aluminum, lead, zinc, manganese, selenium, copper, and iron; dissolved oxygen; as well as a host of other pollutants acknowledged in the Facility SWPPPs such as gasoline and diesel fuels; fuel additives; coolants; antifreeze; transmission fluid; hydraulic fluid; waste oil; compressed natural gas; oil and grease; total suspended solids ("TSS"); and pH affecting substances.

As further discussed Sections 3.5.3 and 3.6.3, *infra*, the Chula Vista Hauling Facility SWPPPs have failed and continue to fail to adequately assess potential pollutant and pollutant sources, and the Facility has failed and continues to fail to monitor for all pollutants required by the Permit.

### 2.3. <u>The Facility Storm Water Flow and Discharge Locations</u>.

Although Section 5.5.5 of the 2016 SWPPP erroneously states that the Facility consists of five drainage areas, other sections of the SWPPP and the Facility site map indicate that there are

Exhibit 1
Page 033

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 8

two. According to the Facility Owner and/or Operator, Drainage Area 1 ("DA-1") "includes the vehicle entry roadway, the truck parking and CNG fueling area, portions of the covered vehicle maintenance shop and work area." 2016 SWPPP § 2.1.4. Information available to Coastkeeper and CERF indicates that DA-1 also includes a large hauling vehicle storage area, ingress/egress points to the vehicle maintenance shop and wash rack, underground storage tanks for oil and hydraulic fluids, a natural gas compressor, a CNG storage area, and a fuel island. The Facility site map and 2016 SWPPP indicates that water on the impervious surfaces of DA-1 is directed southwest via sheet flow and curb flow towards the storm drain inlet and vault identified as PL-1. The north side of this drainage area consists of a pervious slope that abuts the Otay Landfill directly to the north. "Surface flows from this slope are directed to the west with a masonry wall." *Id*. The curb inlet at PL-1 contains a Filtrexx and Metaloxx filtration system, and the vault is fitted with a custom fabricated outlet screen to remove additional pollutants before discharge.

According to the Facility SWPPPs, Drainage Area 2 ("DA-2") includes the trash bin and lift storage area, covered battery storage, flammables cabinet, the hazardous waste material storage area, employee parking area, and the office and shop area. *Id*. "Surface flows are directed southwest towards the berm, curb, and drains towards the flow through planter and discharges at RD-1." *Id*. Information available to Coastkeeper and CERF indicates that DA-2 also includes the welding shop, tire storage area, outdoor waste bins, and ingress/egress points to the vehicle maintenance shop and wash rack. Furthermore, there is an entry/exit point from a dirt road into DA-2, through which waste hauling vehicles, bins, and containers can enter the Chula Vista Hauling Facility directly from the adjacent Otay Landfill Facility.

The Facility SWPPPs also fail to acknowledge various sloped areas which are outside of DA1, but located within the Facility boundary, and which border the western and southern boundaries of the Facility. According to the Facility Site Map, this unlabeled drainage area includes a natural gas compressor, compressed CNG storage tanks, a generator, and curotto waste can storage.

## 3.   VIOLATIONS OF THE CLEAN WATER ACT AND THE STORM WATER PERMIT

In California, any person who discharges storm water associated with certain industrial activity must comply with the terms of the Storm Water Permit in order to lawfully discharge pollutants. *See* 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1).

Between 1997 and June 30, 2015, the Storm Water Permit in effect was Order No. 97-03-DWQ, which Coastkeeper and CERF refer to as the "1997 Permit." On July 1, 2015, pursuant to Order No. 2014-0057-DWQ the Storm Water Permit was reissued, which Coastkeeper and CERF refer to as the "2015 Permit." As explained below, the 2015 Permit includes terms that are as stringent or more stringent than the 1997 Permit. Accordingly, the Chula Vista Hauling Facility Owner and/or Operator is liable for violations of the 1997 Permit and ongoing violations of the 2015 Permit, and civil penalties and injunctive relief are available remedies. *See Illinois v. Outboard Marine, Inc.*, 680 F.2d 473, 480-81 (7th Cir. 1982) (relief granted for violations of an expired permit); *Sierra Club v. Aluminum Co. of Am.*, 585 F. Supp. 842, 853-54 (N.D.N.Y. 1984)

Exhibit 1
Page 034

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 9

(holding that the Clean Water Act's legislative intent and public policy favor allowing penalties for violations of an expired permit); *Pub. Interest Research Group of N.J. v. Carter-Wallace, Inc.*, 684 F. Supp. 115,121-22 (D.N.J. 1988) ("[l]imitations of an expired permit, when those limitations have been transferred unchanged to the newly issued permit, may be viewed as currently in effect").

**3.1.** **Unauthorized Non-Storm Water Discharges from the Facility in Violation of Storm Water Permit Discharge Prohibition.**

Except as authorized by certain special conditions, the Storm Water Permit prohibits permittees from discharging materials other than storm water ("non-storm water discharges" or "NSWDs") either directly or indirectly to waters of the United States. 1997 Permit §§ A.1, D.1; 2015 Permit § III.B. Prohibited NSWDs must be either eliminated or permitted by a separate NPDES permit. 1997 Permit § A.1; 2015 Permit § III.B.

Information available to Coastkeeper and CERF indicates that unauthorized NSWDs occur at the Facility, and the Facility has failed to develop and/or implement adequate BMPs necessary to prevent these discharges. For example, unauthorized NSWDs occur at the Facility from the Facility's waste hauling truck, bin, and container washing activities. However, the Facility SWPPPs fail to identify any BMPs would prevent wash water from being tracked out of wash bays, commingling, and discharging from the Facility. NSWDs resulting from washing and cleaning are not from sources that are listed among the authorized NSWDs in the special conditions section of the Storm Water Permit, and are thus always prohibited. Furthermore, the 2016 SWPPP concedes that no non-storm water discharges are authorized at facility. 2016 SWPPP § 2.4. Therefore, the Facility Owner and/or Operator's assertion that "[t]here are no activities at this site that may result in unauthorized non-stormwater discharges" is erroneous, and in violation of the Storm Water Permit. *Id.*; *see also* 1997 Permit § A.1; 2015 Permit § III.B.

Coastkeeper and CERF put the Chula Vista Hauling Facility Owner and/or Operator on notice that the Storm Water Discharge Prohibition is violated each time unauthorized non-storm water is discharged from the Facility. *See* 1997 Permit § D.1; *see also* 2015 Permit § III.B. These Discharge Prohibition violations are ongoing and will continue until the Facility Owner and/or Operator develops and implements BMPs that prevent prohibited unauthorized NSWDs, or obtains separate NPDES permit coverage. Each time the Facility Owner and/or Operator discharges prohibited non-storm water in violation of the Storm Water Permit's Discharge Prohibitions is a separate and distinct violation of the Storm Water Permit and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owner and/or Operator has been in violation since August 26, 2014, and Coastkeeper and CERF will update the number and dates of violations when additional information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

**3.2.** **Discharges of Polluted Storm Water from the Facility in Violation of Storm Water Permit Discharge Prohibitions.**

Exhibit 1
Page 035

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 10

Section III of the 2015 Permit enumerates several Discharge Prohibitions. Section III.D of the 2015 Permit states that "[d]ischarges that violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans (Basin Plans), or statewide water quality control plans and policies are prohibited." The San Diego Basin Plan designates beneficial uses for water bodies in the San Diego region and establishes water quality objectives and implementation plans to protect those beneficial uses.[10] The San Diego Basin Plan further establishes certain Waste Discharge Prohibitions.[11] Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited. Allowances for dilution may be made at the discretion of the Regional Board."[12] "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water.[13] Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the San Diego Regional Board is prohibited by Discharge Prohibition III.D of the 2015 Permit.

Information available to Coastkeeper and CERF, including its review of publicly available information and observations, indicates that no express allowance for dilution has been granted by the Regional Board applicable to the Chula Vista Hauling Facility's discharges, or to the downstream Receiving Waters. As such, and consistent with Coastkeeper and CERF's review of available information and direct observations, the analytical results of storm water sampling at the Facility demonstrate that the Chula Vista Hauling Facility Owner and/or Operator has violated and continues to violate Discharge Prohibition III.D of the 2015 Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan. The table attached hereto as Exhibit 1 includes sample results of storm water discharges collected and analyzed by the Facility. As demonstrated by the data in Exhibit 1, the Chula Vista Hauling Facility Owner and/or Operator has failed to discharge pollutants in storm water at or below Basin Plan Water Quality Objectives. For example, the Basin Plan Objective for hydrogen ion concentration ("pH") for inland surface waters states that "the pH shall not be depressed below 6.5 nor raised above 8.5 S.U." However, storm water samples collect from the Facility on December 16, 2016 at PL-1 and RD-1, December 5, 2016 at RD-1, December 12, 2014 at RD-1, and December 2, 2014 at PL-1 reflected a pH below 6.5. Ex. 1.

The Storm Water Permit Discharge Prohibitions further prohibit storm water discharges and authorized NSWDs which cause or threaten to cause pollution, contamination, or nuisance as defined in Section 13050 of the California Water Code. 1997 Permit § A.2; 2015 Permit § III.C. The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease." "Pollution" is defined as "an alteration of the quality

---

[10] *See* https://www.waterboards.ca.gov/sandiego/water_issues/programs/basin_plan/ for updated Basin Plan.
[11] San Diego Basin Plan, Chapter 4, page 4-19.
[12] *Id*. at page 4-20 (Waste Discharge Prohibition 5).
[13] California Water Code, § 13050(d) (emphasis added).

Exhibit 1
Page 036

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 11

of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

Information available to Coastkeeper and CERF, including the Facility's own storm water monitoring data and other publicly available information, indicates that the Chula Vista Hauling Facility has discharged, and continues to discharge, numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters. For example, the Chula Vista Hauling Facility's own monitoring data shows that on numerous occasions during the past five years, the Facility has discharged TSS, pH, and zinc in excess of various water quality objectives, benchmarks and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. *See* Ex. 1. As such, the Chula Vista Hauling Facility's discharges of polluted storm water have violated the Storm Water Permit's Discharge Prohibition III.C.

Furthermore, as discussed in Section 3.6.3, *infra*, information available to Coastkeeper and CERF indicates that the Chula Vista Hauling Facility Owner and/or Operator has failed and continues to fail to analyze the Facility's storm water discharges for numerous pollutants required by the Storm Water Permit. This information further indicates that the Facility has discharged and continues to discharge numerous pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D, and which cause or threaten to cause pollution, contamination, or nuisance in violation of Discharge Prohibition III.C.

Coastkeeper and CERF put the Chula Vista Hauling Facility Owner and/or Operator on notice that the Storm Water Permit Discharge Prohibition is violated each time storm water discharges from the Facility. *See* Exhibit 2 (setting forth dates of all precipitation events during the past five years).[14] These Discharge Prohibition violations are ongoing and will continue every time the Facility Owner and/or Operator discharges polluted storm water in violation of Discharge Prohibitions III.C or III.D of the 2015 Permit. Each time the Facility Owner and/or Operator discharges polluted storm water in violation of Discharge Prohibitions III.C or III.D of the 2015 Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owner and/or Operator has been in violation since August 26, 2014, and Coastkeeper and CERF will update the dates of violations when additional information and data become available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

Further, Coastkeeper and CERF put the Chula Vista Hauling Facility Owner and/or Operator on notice that Discharge Prohibitions III.C and III.D are independent Storm Water Permit requirements that must be complied with, and that carrying out the iterative process

---

[14] Exhibit 2 includes the dates of all precipitation events recorded during the past five years, and the corresponding quantity of precipitation for each such event. The data in Exhibit 2 was recorded by the National Oceanic & Atmospheric Administration at the weather monitoring station geographically nearest to the Facility with complete precipitation records. Coastkeeper and CERF will include additional dates of rain events when that information becomes available.

Exhibit 1
Page 037

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 12

triggered by exceedances of the Numeric Action Levels ("NALs") listed at Table 2 of the 2015 Permit does not amount to compliance with the Discharge Prohibition provisions.

### 3.3. <u>Discharges of Polluted Storm Water from the Facility in Violation of Storm Water Permit Effluent Limitation</u>.

The Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve Best Available Technology Economically Achievable ("BAT") for toxic and non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 1997 Permit § B.3; 2015 Permit § V.A.

The EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards as required by Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit.[15] As such, discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants.[16]

Information available to Coastkeeper and CERF, including its review of publicly available information and observations, indicates that BMPs that achieve BAT/BCT have not been developed and/or implemented at the Chula Vista Hauling Facility. Consistent with Coastkeeper and CERF's review of available information and direct observations, the Facility's storm water monitoring data demonstrates that Facility discharges have exceeded EPA Benchmarks for several pollutants, indicating that the Facility has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards. For example, the Facility's monitoring data reflects that multiple storm water samples have exceeded the EPA Benchmark for TSS of 100 mg/L. *See* Ex. 1. Furthermore, the Facility Owner and/or Operator analyzed its storm water discharges for zinc on December 2, 2014 and December 12, 2014, and each sample collected exceeded the EPA Benchmark for zinc of 0.12 mg/L.

As further discussed in Section 3.6.3, *infra*, information available to Coastkeeper and CERF indicates that the Chula Vista Hauling Facility Owner and/or Operator has failed and continues to fail to analyze storm water discharged from the Facility for numerous pollutants associated with the Facility's industrial operations. As such, in addition to TSS, the Chula Vista Hauling Facility likely discharges numerous pollutants in concentrations exceeding EPA

---

[15] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) Authorization to Discharge Under the National Pollutant Discharge Elimination System*, as modified effective February 26, 2009, Fact Sheet at 106; *see also* 65 Federal Register 64839 (2000).
[16] *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F.Supp.2d 914 (C.D. Cal. 2009).

Exhibit 1
Page 038

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 13

benchmarks, indicating that the Facility has failed to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards.

Coastkeeper and CERF put the Chula Vista Hauling Facility Owner and/or Operator on notice that the Storm Water Permit Effluent Limitation is violated each time storm water discharges from the Facility. *See* Ex. 2. These discharge violations are ongoing and will continue every time the Facility Owner and/or Operator discharges polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. Each time the Facility Owner and/or Operator discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owner and/or Operator has been in violation since August 26, 2014, and Coastkeeper and CERF will update the dates of violations when additional information and data become available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

Further, Coastkeeper and CERF put the Chula Vista Hauling Facility Owner and/or Operator on notice that the 2015 Permit Effluent Limitation V.A is an independent requirement that must be complied with, and that carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the 2015 Permit does not amount to compliance with Effluent Limitation V.A.

### 3.4. <u>Discharges of Polluted Storm Water from the Facility in Violation of Storm Water Permit Receiving Water Limitations</u>.

Receiving Water Limitation C.2 of the 1997 Permit prohibits storm water discharges and authorized NSWDs that cause or contribute to an exceedance of an applicable Water Quality Standard ("WQS").[17] The 2015 Permit includes the same receiving water limitation. 2015 Permit § VI.A. Discharges that contain pollutants in excess of an applicable WQS violate the Storm Water Permit Receiving Water Limitations. 1997 Permit § C.2; 2015 Permit § VI.A.

Receiving Water Limitation C.1 of the 1997 Permit prohibits storm water discharges and authorized NSWDs to surface water that adversely impact human health or the environment. The 2015 Permit includes the same receiving water limitation. 2015 Permit § VI.B. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of the Storm Water Permit Receiving Water Limitation. 1997 Permit § C.1; 2015 Permit § VI.B.

---

[17] The Basin Plan designates Beneficial Uses for the Receiving Waters. Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. Discharges above water quality standards contribute to the impairment of Receiving Waters' Beneficial Uses. Applicable water quality standards include, among others, the Criteria for Priority Toxic Pollutants in the State of California, 40 C.F.R. § 131.38 ("CTR"), and water quality objectives in the Basin Plan. Industrial storm water discharges must strictly comply with water quality standards, including those criteria listed in the applicable basin plan. *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).

Exhibit 1
Page 039

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 14

Information available to Coastkeeper and CERF indicates that storm water and NSWDs from the Facility contain concentrations of pollutants that cause or contribute to a violation of an applicable WQS in violation of the Storm Water Permit's Receiving Water Limitations. As discussed in Section 3.6.3, *infra*, the Facility Owner and/or Operator has failed and continues to fail to sample and analyze storm water discharges for all parameters required by the Storm Water Permit. For example, as discussed in Section 2.2, *supra*, pollutants commonly present in storm water discharged from facilities similar to the Chula Vista Hauling Facility include pathogens such as enterococcus, E. coli, and fecal coliform, and excessive nutrients such as nitrogen and other nitrogen-based compounds like nitrite and nitrate. As such, the Facility likely discharges pollutants such as indicator bacteria and N+N in exceedance of applicable WQSs.

As explained herein, the Receiving Waters are impaired, and thus unable to support the designated Beneficial Uses, for some of the same pollutants discharged by the Facility. Coastkeeper's Ambient Monitoring Program data, publicly available via the CEDEN database, evidences that the Otay River is impaired for total coliform, E. coli, enterococcus, N+N, and phosphorus. As such, information available to Coastkeeper and CERF indicates that the Hauling Facility's discharges of elevated levels of indicator bacteria and N+N cause and/or contribute to the bacteria and nutrient impairments of the Otay River.

The CTR and Basin Plan are applicable WQSs under the Storm Water Permit. Thus, discharges from the Facility containing concentrations of pollutants in exceedance of WQSs, cause or contribute to the impairments of Receiving Waters in violation of Receiving Water Limitations of the Storm Water Permit. 1997 Permit § C.2; 2015 Permit § VI.A. Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the Storm Water Permit Receiving Water Limitations. *See* 1997 Permit § C.1; 2015 Permit § VI.B.

Coastkeeper and CERF put the Chula Vista Hauling Facility Owner and/or Operator on notice that Storm Water Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facility. *See* Ex. 2. Each time discharges of storm water from the Facility cause and/or contribute to a violation of an applicable WQS, it is a separate and distinct violation of Receiving Water Limitation C.2 of the 1997 Permit, Receiving Water Limitation VI.A of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Each time discharges of storm water from the Facility adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation C.1 of the 1997 Permit, Receiving Water Limitation VI.B of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the Storm Water Permit Receiving Water Limitations. The Facility Owner and/or Operator has been in violation since August 26, 2014, and Coastkeeper and CERF will update the dates of violation when additional information and data becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

Further, Coastkeeper and CERF put the Facility Owner and/or Operator on notice that Receiving Water Limitations are independent Storm Water Permit requirements that must be

Exhibit 1
Page 040

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 15

complied with, and that carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the 2015 Permit does not amount to compliance with the Receiving Water Limitations.

### 3.5. <u>Failure to Develop, Implement, and/or Revise an Adequate Storm Water Pollution Prevention Plan</u>.

The Storm Water Permit requires permittees to develop and implement a Storm Water Pollution Prevention Plan prior to conducting industrial activities. A permittee has an ongoing obligation to revise the SWPPP as necessary to ensure compliance with the Storm Water Permit. The specific SWPPP requirements of the 1997 Permit and the 2015 Permit are set out below.

#### 3.5.1. <u>1997 Permit SWPPP Requirements</u>.

Section A.1 and Provision E.2 of the 1997 Permit require dischargers to have developed and implemented a SWPPP prior to beginning industrial activities that meets all of the requirements of the 1997 Permit. The objectives of the 1997 Permit SWPPP requirements are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the Facility and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. 1997 Permit § A.2. These BMPs must achieve compliance with the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

To ensure compliance with the Storm Water Permit, the SWPPP must be evaluated on an annual basis pursuant to the requirements of Section A.9 of the 1997 Permit, and must be revised as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Sections A.9–10. Sections A.3–10 of the 1997 Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a site map showing the facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, areas of industrial activity, and other features of the facility and its industrial activities (§ A.4); a list of significant materials handled and stored at the site (§ A.5); a description of potential pollutant sources, including industrial processes, material handling and storage areas, dust and particulate generating activities, significant spills and leaks, NSWDs and their sources, and locations where soil erosion may occur (§ A.6).

Sections A.7–8 of the 1997 Permit require an assessment of potential pollutant sources at the facility and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized NSWDs, including structural BMPs where non-structural BMPs are not effective.

#### 3.5.2. <u>2015 Permit SWPPP Requirements</u>.

As with the SWPPP requirements of the 1997 Permit, Sections X.A–H of the 2015 Permit require dischargers to have developed and implemented a SWPPP that meets all of the

Exhibit 1
Page 041

requirements of the 2015 Permit. *See also* 2015 Permit, Appendix 1. The objective of the SWPPP requirements are still to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. 2015 Permit § X.C.

The SWPPP must include, among other things and consistent with the 1997 Permit, a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, points of discharge, direction of flow, areas of actual and potential pollutant contact, nearby water bodies, and pollutant control measures; a description of the BMPs developed and implemented to reduce or prevent pollutants in storm water discharges and authorized NSWDs necessary to comply with the Storm Water Permit; the identification of NSWDs and the elimination of unauthorized NSWDs; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and the identification of individuals and their current responsibilities for developing and implementing the SWPPP. 2015 Permit §§ X.A–H.

Further, the 2015 Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 2015 Permit §§ X.A–B. Like the 1997 Permit, the 2015 Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed; and a visual inspection of equipment needed to implement the SWPPP. 2015 Permit §§ X.B, XV.

   3.5.3.   <u>The Chula Vista Hauling Facility Owner and/or Operator Has Violated and Continues to Violate the Storm Water Permit SWPPP Requirements</u>.

The Chula Vista Hauling Facility Owner and/or Operator has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP. First, information available to Coastkeeper and CERF indicates that the Facility site map has failed and continues to fail to accurately include all information required by the Storm Water Permit. The most recent site map publicly available via the SMARTS database is dated May 14, 2015, and was uploaded to the database June 26, 2015. This site map, as well as the Facility SWPPPs, fail to accurately label all areas of industrial activity. For example, the site map and SWPPPs fail to acknowledge that waste hauling trucks, bins, and containers, all of which have been recently exposed to a variety of trash and waste, frequently enter and exit the Facility via the driveway located within DA-2, as well as frequently traverse DA-1. Furthermore, the site map and SWPPP fail to acknowledge the ingress/egress point through which waste hauling vehicles, bins, and containers enter the Facility directly from the Otay Landfill via a dirt road on the eastern side of the Facility. Waste hauling vehicles, bins and containers entering the Facility

Exhibit 1
Page 042

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 17

directly from the Otay Landfill are likely to track significant quantities of pollutants onto the impervious surfaces of the Chula Vista Hauling Facility. Additionally, as noted in Section 2.2, *supra*, the Facility SWPPPs also fail to acknowledge storm water runoff from various sloped areas which are outside of DA1, but located within the Facility boundary, and which border the western and southern boundaries of the Facility. According to the Facility Site Map, this unlabeled drainage area includes a natural gas compressor, compressed CNG storage tanks, a generator, and waste can storage. As such, several industrial activities are conducted within these areas, yet the Facility SWPPPs fail to assess storm water flow or pollutant sources.

The Chula Vista Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate description of potential pollutant sources. Section X.G.1.a of the 2015 Permit requires dischargers to "ensure the SWPPP *describes* each industrial process including: manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to the process." (emphasis added). Both the 2015 and 2016 Facility SWPPPs fail to provide adequate descriptions of any industrial activities conducted at the Facility. Sections 2.1.2 provides only cursory summaries of which industrial activities take place at the Facility, but fail to adequately "*describe* each industrial process," and all activities related each process as required by the Storm Water Permit. For example, the 2016 SWPPP's list of "specific industrial activities" lacks any sort of specificity and consists of only "vehicle and equipment maintenance," "vehicle and equipment fueling," and "container maintenance." The SWPPP fails to describe how vehicles and equipment are washed, whether and how any wash water is contained, how welding operations are conducted, what other maintenance is performed on vehicles and bins, how the Facility compresses natural gas and provides this fuel to its vehicles, etc. While the 2016 SWPPP incorporates Table 2.1.a, "Industrial Activities and Associated Materials," and Table 2.1.b, "List of Significant Industrial Materials," these tables are even more cursory than the narrative descriptions provided in Section 2.1 of the 2016 SWPPP. As such, the SWPPPs fail to provide the required *description* of industrial activities in violation of the Storm Water Permit. *See* 2015 Permit § X.G.1.

The Chula Vista Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate pollutant source assessment. Section X.G.2 of the 2015 Permit requires dischargers to "ensure that the SWPPP includes a *narrative* assessment of all areas of industrial activity with potential industrial pollutant sources." (emphasis added). This assessment shall include "pollutants likely to be present in industrial storm water discharges and authorized NSWDs," (§ X.G.2.a.ii), "[t]he degree to which the pollutants associated with those materials may be exposed to, and mobilized by contact with, storm water," (§ X.G.2.a.iv), "[t]he direct and indirect pathways by which pollutants may be exposed to storm water or authorized NSWDs," (§ X.G.2.a.v), and "[t]he effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs," (§ X.G.2.a.vii), among other requirements.

The 2015 and 2016 Facility SWPPPs fail to comply with any of the aforementioned requirements of X.G.2. The only narrative assessment provided in the 2016 SWPPP cursorily lists out the industrial activities conducted at the Facility, and summarily states "[p]ollutants that can potentially enter storm water run-off and other discharges draining from the facility include:

Exhibit 1
Page 043

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 18

Sediment (including erodibles and aggregates), Oil and Grease (waste oil and leaks from equipment), Hydrocarbons (petroleum products, hydraulic fluid, and fuel), Gross Pollutants (litter, debris, and floatables), Organics (cleaners, solvents, and herbicides), [and] Trace Metals." 2016 SWPPP § 2.3.1. Furthermore, the only pollutants identified in the 2016 SWPPP's table of "industrial activities and associated pollutants" are oil and grease, hydrocarbons, diesel fuel, gross pollutants, and trace metals. 2016 SWPPP, Table 2.1.a. Given the activities, operations, and materials present at this Facility as described in Section 2, *supra*, the 2016 SWPPP pollutant source assessment of only sediment, O&G, hydrocarbons, gross pollutants, organics, and trace metals is woefully inadequate. As the pollutants identified in the pollutant source assessment are used to determine the parameters for which a Facility samples and analyzes its storm water, the Chula Vista Hauling Facility Owner and/or Operator's identification of only these minimum pollutants evidences an intent to circumvent requirements of the Storm Water Permit, and thus avoid analyzing its storm water for required additional parameters.

Moreover, as discussed in Section 2.2, *supra*, information available to Coastkeeper and CERF indicates that there are numerous other pollutants present in the Facility's storm water discharges. However, the Facility SWPPPs fail to assess the vast majority of these pollutants, and thus egregiously violate the Storm Water Permit SWPPP requirements.

The Chula Vista Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that contains BMPs to prevent the exposure of pollutants and pollutant sources to storm water and the subsequent discharge of polluted storm water from the Facility, as required by the Storm Water Permit. This is due in part to the SWPPPs' failure to include adequate site-specific information regarding the BMPs developed and/or implemented at the Facility. For example, Section 3.1 of the 2016 SWPPP simply states "[a]ll minimum Best Management Practices (BMPs) that are required by the IGP and necessary to meet the facility conditions will be implemented." Thereafter, sections 3.1.1 through 3.1.7 of the 2016 SWPPP largely parrot the 2015 Permit language setting forth minimum BMP requirements. Furthermore, rather than provide site-specific details regarding which BMPs will be implemented at specific facility locations to address specific pollutants, the 2016 SWPPP's BMPs section cites to the generic CASQA Stormwater BMP Handbook Portal for additional BMPs details. 2016 SWPPP § 3.1. Moreover, Table 3.1 of the 2016 SWPPP contradicts the SWPPP's statement that all minimum BMPs required by the Permit will be implemented. For example, Table 3.1 indicates that vehicle and equipment cleaning BMPs, as well as outdoor equipment operations BMPs, are "not applicable" to the Facility. As one the Facility's primary industrial activities is washing and cleaning vehicles and equipment, and wash hauling vehicles are regularly operating outdoors at the Facility, stating BMPs pertaining to these activities is clearly erroneous.

The Facility SWPPPs also fail to adequately analyze the pollutants that each BMP is designed to reduce or prevent from discharging in violation of section X.H.4.a.i of the 2015 Permit. Additionally, Tables 3.1, 3.3, and 3.4 of the 2016 SWPPP, which identify minimum BMPs, stormwater containment and discharge reduction BMPs, and treatment control BMPs respectively, each fail to indicate which pollutants will be addressed by each BMP. Finally, Table 3.5, the BMP summary table, also fails to adequately identify the potential pollutants addressed by each BMP. The only potential "pollutants" identified by Table 3.5 are oil and

Exhibit 1
Page 044

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 19

grease, suspended sediment, and metals and thus fails to mention numerous pollutants present at the Facility. Therefore, the 2016 SWPPP fails to provide adequate site-specific information regarding how and where such BMPs are implemented, in violation of the Storm Water Permit. *See* 2015 Permit §§ X.A; X.H.

The SWPPP's inadequacies are further documented by the continuous and ongoing discharge of storm water containing pollutant levels that exceed EPA Benchmarks and applicable WQSs, which indicate that the Facility's BMPs are failing to meet BAT/BCT requirements.

The objectives of the Permit's SWPPP requirements are to identify and evaluate sources of pollutants associated with industrial activities, and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. However, the current Facility SWPPP fails to adequately assess pollutant sources, describe industrial activities, or implement adequate BMPs. These failures completely undermine the intent of the Storm Water Permit's SWPPP provisions. *See* 2015 Permit § X.C.

The Chula Vista Hauling Facility Owner and/or Operator has also failed to revise the Facility's SWPPP to ensure compliance with the Storm Water Permit. Despite the significant concentrations of pollutants in the Facility's storm water discharges each year, information available to Coastkeeper and CERF indicates that the Facility SWPPP has remained the same since November 2016, and has not been revised to include additional BMPs to eliminate or reduce these pollutants, as required by the Storm Water Permit.

Accordingly, the Chula Vista Hauling Facility Owner and/or Operator has failed and continues to fail to adequately develop, implement, and/or revise the Facility SWPPP in violation of SWPPP requirements of the Storm Water Permit. Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. The Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit SWPPP requirements since at least August 26, 2014. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

### 3.6. Failure to Develop, Implement, and/or Revise an Adequate Monitoring and Reporting Program.

The Storm Water Permit requires permittees to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. A permittee has an ongoing obligation to revise the M&RP as necessary to ensure compliance with the Storm Water Permit. The specific M&RP requirements of the 1997 Permit and the 2015 Permit are set out below.

### 3.6.1. 1997 Permit M&RP Requirements.

Exhibit 1
Page 045

Section B.1 and Provision E.3 of the 1997 Permit require facility operators to develop and implement an adequate M&RP prior to the commencement of industrial activities at a facility, that meets all of the requirements of the Storm Water Permit. The primary objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* 1997 Permit § B2.

The M&RP must therefore ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility, and must be evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *Id*. §§ B.3–16. Dischargers must revise the SWPPP in response to their M&RP observations to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. *Id*. § B.4. Sections B.5 and B.7 of the 1997 Permit require dischargers to visually observe and collect samples of storm water from all locations where storm water is discharged.

Sections B.5 and B.7 of the 1997 Storm Water Permit require dischargers to visually observe and collect samples of storm water from all drainage areas and discharge locations where storm water is discharged. Under Section B.5 of the Storm Water Permit, a permittee is required to collect at least two (2) samples from each discharge location at the facility during the Wet Season. Storm water samples must be analyzed for TSS, pH, SC, total organic carbon or O&G, and other pollutants that are likely to be present in the facility's discharges in significant quantities. *Id*. § B.5.c. Finally, permittees must identify and use analytical method detection limits sufficient to determine compliance with the 1997 Permit's monitoring program objectives and specifically, the Effluent Limitations and Receiving Water Limitations. *Id*. § B.10.iii.

3.6.2.   <u>2015 Permit M&RP Requirements</u>.

As with the 1997 M&RP requirements, Sections X.I and XI.A–D of the 2015 Permit require facility operators to develop and implement an adequate M&RP that meets all of the requirements of the 2015 Permit. The objective of the M&RP is still to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the 2015 Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit § XI. An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility, and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *Id*.

As an *increase* in frequency of monitoring requirements, Sections XI.B.1–5 of the 2015 Permit requires permittees to collect storm water discharge samples from a qualifying storm event[18] as follows: 1) from each drainage area at all discharge locations, 2) from two (2) storm events within the first half of each Reporting Year[19](July 1 to December 31), 3) from two (2)

---

[18] The 2015 Permit defines a qualifying storm event as one that produces a discharge for at least one drainage area, and is preceded by 48-hours with no discharge from any drainage areas. 2015 Permit, Section XI(B)(1).
[19] A Reporting Year replaced the 1997 permit term Wet Season, and is defined as July 1 through June 30. 2015 Permit, Findings, ¶ 62(b).

Exhibit 1
Page 046

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 21

storm events within the second half of each Reporting Year (January 1 to June 30), and 4) within four hours of the start of a discharge, or the start of facility operations if the qualifying storm event occurs within the previous 12-hour period. The 2015 Permit requires, among other things, that permittees must submit *all sampling* and analytical results for all samples via SMARTS within 30 days of obtaining all results for each sampling event. *Id*. § XI.B.11 (emphasis added).

The parameters to be analyzed are also consistent with the 1997 Permit, however, the 2015 Permit no longer requires SC to be analyzed. Sections XI.B.6.a–b of the 2015 Permit requires permittees to analyze samples for TSS, O&G, and pH. Section XI.B.6.c–d of the 2015 Permit requires permittees to analyze samples for all pollutants associated with the Discharger's industrial activities. Specifically, the 2015 Permit requires Facility Owners and/or Operators to sample and analyze parameters on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. *Id*. § XI.B.6.c. Section XI.B.6.e of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with a Clean Water Act Section 303(d) listed impairment(s), or approved Total Maximum Daily Loads.

     3.6.3.  <u>The Facility Owner and/or Operator Has Violated and Continues to Violate the Storm Water Permit M&RP Requirements</u>.

     The Chula Vista Hauling Facility Owner and/or Operator has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised M&RP. For example, the Chula Vista Hauling Facility Owner and/or Operator has failed and continues to fail to sample and analyze storm water discharges for all parameters as required by the Storm Water Permit, and fails to collect samples from all discharge locations.

     Information available to Coastkeeper and CERF indicates that the Chula Vista Hauling Facility Owner and/or Operator has failed to sample for numerous constituents likely to be present at the Facility in violation of section XI.B.6.c of the 2015 Permit. In light of the Facility's activities of storing, washing, welding, painting, and otherwise maintaining waste hauling trucks and containers, dozens of pollutants are likely present at the Facility, as previously explained in Section 2.2, *supra*. Furthermore, as noted in multiple sections *supra*, the Facility Owner and/or Operator analyzed its storm water discharges for zinc on December 2, 2014 and December 12, 2014, and each sample collected exceeded the EPA Benchmark for zinc of 0.12 mg/L. Yet, the Facility Owner and/or Operator ceased sampling for zinc after December 12, 2014 without providing explanation or implementing any BMPs to reduce and/or prevent discharges of zinc in the Facility's storm water, indicating that the Facility continues to discharge high levels of zinc. The Facility has therefore failed and continues to fail to sample for numerous "additional" parameters in violation of Section B.5.c of the 1997 Permit, and Section XI.B.6.c of the 2015 Permit.

     In addition, the Chula Vista Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement an M&RP that requires the collection of storm water samples from all discharge locations at the Facility in violation of Section XI.B.4 of the 2015 Permit. For example, the Facility Owner and/or Operator only collects samples from DA-1

Exhibit 1
Page 047

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 22

sampling location PL-1, and from DA-2 at sampling location RD-1. However, the Facility Owner and/or Operator has failed to collect samples from the unnamed drainage area between DA-1 and the Facility boundary along the western and southern edges of the property. The Facility site map indicates that storm water flows down a slope on the western side of the property, and likely onto a neighboring facility. The site map further indicates that storm water on the southernmost edge of the Facility is routed westward along the property boundary, and discharges from the southwestern corner of the Facility. As discussed in Section 3.5.3, *supra*, the Facility conducts various industrial activities within this drainage area.

Section XI.B.4 of the 2015 Permit specifically requires dischargers to collect samples "from *each drainage area* at *all* discharge locations." While Section B.7.d of the 1997 Permit and Section XI.C.4 of the 2015 Permit allow permittees to reduce the number of locations to be sampled, there is no indication that the Facility Owner and/or Operator has complied with the requirements of Section B.7.d of the 1997 Permit or Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility. In addition to failing to collect samples from the unnamed drainage area between DA-1 and the Facility boundary along the western and southern edges of the property, the Facility also failed to collect a sample from PL-1, sampling only RD-1 during the most recent sampling conducted on May 22, 2019. The Facility's 2018-2019 Annual Report indicates that PL-1 was clogged. However, information available to Coastkeeper and CERF indicates that this clog did not prevent storm water from discharging from the Facility. Therefore, the Chula Vista Hauling Facility is in violation of the Storm Water Permit for failing to collect samples from each drainage area at all discharge points.

The Chula Vista Hauling Facility Owner and/or Operator also failed to collect the required number of storm water samples for each reporting period. For example, the Facility only collected one sample during the entire 2017-2018 reporting period.

Finally, the Storm Water Permit requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs. Based on information available to Coastkeeper and CERF, including Annual Reports, the Chula Vista Hauling Facility Owner and/or Operator fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

Accordingly, the Chula Vista Hauling Facility Owner and/or Operator has failed and continues to fail to adequately develop, implement, and/or revise a M&RP, in violation of the Storm Water Permit. Every day the Facility operates with an inadequately developed and/or implemented M&RP, or with an improperly revised M&RP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. The Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit M&RP requirements since at least August 26, 2014. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

### 3.7. <u>Failure to Comply with the Storm Water Permit's Reporting Requirements</u>.

Exhibit 1
Page 048

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 23

Section B.14 of the 1997 Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section B.14 requires that the Annual Report include a summary of visual observations and sampling results, an evaluation of the visual observation and sampling results, the laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required, and other information specified in Section B.13. The 2015 Permit includes the same reporting requirements with the Annual Report due July 15. *See* 2015 Permit § XVI.

The Chula Vista Hauling Facility Owner and/or Operator has failed and continues to fail to submit Annual Reports that comply with the Storm Water Permit reporting requirements. For example, the Facility Owner and/or Operator simply failed to upload an Annual Report to the SMARTS database for the reporting period of 2017-2018. Additionally, the Annual Reports for the 2015-16 and 2016-17 reporting periods state that ammonia, iron, manganese, and nitrogen are not present at the Facility, and certify that the Facility included these pollutants in the SWPPPs' pollutant source assessment. However, the Facility SWPPPs fail to assess any of these pollutants, and, as discussed in Section 2.2, *supra*, information available to Coastkeeper and CERF indicates that all of these pollutants are present at the Chula Vista Hauling Facility.

In each Annual Report since the filing of the 2013-14 Annual Report, the Chula Vista Hauling Facility Owner and/or Operator certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the Storm Water Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the Storm Water Permit, or will otherwise be revised to achieve compliance. However, information available to Coastkeeper and CERF indicates that these certifications are erroneous. For example, storm water samples collected from the Facility contain concentrations of pollutants above EPA Benchmarks and WQSs, thus demonstrating that the Facility BMPs do not adequately address existing potential pollutant sources. Further, as discussed in Sections 3.5.3 and 3.6.3, the Facility's SWPPPs do not include many elements required by the Storm Water Permit, and thus it is erroneous to certify that the SWPPP complies with the Storm Water Permit.

In addition, Chula Vista Hauling Facility Owner and/or Operator has not accurately reported non-compliance, as required by the Storm Water Permit. *See* 1997 Permit § C.11.d; 2015 Permit § XVI.B.2.

Given that the Chula Vista Hauling Facility Owner and/or Operator has submitted incomplete and/or incorrect Annual Reports that fail to comply with the Storm Water Permit, the Facility Owner and/or Operator is in daily violation of the Storm Water Permit. Every day the Facility Owner and/or Operator conducts operations at the Facility without reporting as required by the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). The Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit's reporting requirements every day since at least August 26, 2014. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility

Exhibit 1
Page 049

Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

### 3.8. <u>Failure to Comply with Level 1 Exceedance Response Action Requirements</u>.

When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status" for all parameters listed in Table 2 of the 2015 Permit. 2015 Permit § XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *Id.* § XII.C. Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the discharger enters the Exceedance Response Action ("ERA") process. *Id.* The ERA process requires the discharger to conduct an evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s) by October 1 following commencement of Level 1 status. *Id.* § XII.C.1.a-b. The evaluation must include the identification of the "corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit." *Id.* § XII.C.1.c. "Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated." *Id.*

Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, prepare a Level 1 ERA Report. *Id.* § XII.C.2. The Level 1 Report must be prepared by a QISP and include a summary of the Level 1 ERA evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL. *Id.* § XII.C.2.a.i-ii. The SWPPP revisions and additional BMP development and implementation must also be completed by January 1, and the Level 1 status discharger is required to submit via SMARTS the Level 1 ERA Report certifying the evaluation has been conducted, and SWPPP revisions and BMP implementation have been completed. *Id.* The certification also requires the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *Id.* § XII.C.2.a.iii. A permittee's Level 1 status for a parameter will return to Baseline status if a Level 1 ERA report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *Id.* § XII.C.2.b. A permittee will enter a Level 2 status if there is a NAL exceedance of the same parameter when the discharger is in Level 1 status. *Id.* § D.

The Chula Vista Hauling Facility entered Level 1 status for TSS following the 2015-16 reporting period with an average annual concentration of TSS of 273 mg/L, exceeding the annual NAL of 100 mg/L. Following the 2016-17 reporting period, the Facility entered Level 2 status for TSS with an average annual concentration of TSS of 152.75 mg/L. Following the 2017-18 reporting period, during which the Facility Owner and/or Operator collected only one sample, the Facility remained Level 2 for TSS. The Facility's sampling data from the 2018-19 reporting

Exhibit 1
Page 050

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 25

currently reflects an average of 264 mg/L TSS, indicating that the Facility will again exceed NAL standards for the current reporting period.

Coastkeeper and CERF note that, due to the Facility's failure to collect samples from all drainage areas and all discharge points, as well as the failure to analyze storm water samples for all parameters required by the Storm Water Permit, the Facility's monitoring data fails to accurately portray the Chula Vista Hauling Facility's actual NALs exceedances and proper ERA levels.

In September 2016, the Facility Owner and/or Operator submitted a consolidated ERA Level 1 Evaluation and Report for TSS ("2016 Level 1 ERA Report"). The 2016 Level 1 ERA Report failed to conduct an adequate Level 1 status evaluation to identify additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances at the Facility. The 2016 Level 1 ERA Report's "evaluation" identified the likely source of TSS at the Facility as "[i]ndustrial activity, truck movement around the site, [and] wind blown" sediment, and simply recommended hand sweeping around PL-1 and exploring the option of a better sweeper truck. This alleged evaluation of the sources of TSS at the Facility is woefully inadequate. The Report's statement that a likely source of TSS is "industrial activity" is entirely void of specificity, thus violating Section XII.C.1.b of the 2015 Permit and undermining the intent of the ERA provisions of the Storm Water Permit. As the Facility has continued to discharge TSS in excess of NALs, the 2016 Level 1 ERA Report failed to adequately evaluate sources of TSS, or recommend BMPs that would successfully reduce TSS below the NAL standard. *See* 2015 Permit § XII.C.1.c.

In December 2017, the Chula Vista Facility Owner and/or Operator published the Level 2 ERA Action Plan, which is publicly available on the SMARTS online database. The 2015 Permit requires that a Level 2 ERA Action Plan shall at a minimum address the drainage areas with corresponding Level 2 NAL exceedances. 2015 Permit § XII.D.1.c. As previously discussed, the Facility Owner and/or Operator has failed to collect samples from each drainage area, and discharge point. As such, the 2017 ERA Level 2 Action Plan failed to adequately evaluate any other drainage areas, undermining the accuracy of the ERA action plan, as well as the effectiveness of the NAL iterative process.

In December 2018, the Chula Vista Facility Owner and/or Operator published the Level 2 ERA Technical Report, which identifies several BMPs implemented at the Facility. However, as the 2018 Level 2 Technical Report admits, the Facility's monitoring data from the current reporting period indicates "that future NAL exceedances have not been eliminated." In fact, the average annual TSS concentration for the Facility is higher than it has been at any point during the past three years. Therefore, the Facility's ERA reports and action plans have failed to adequately evaluate sources of TSS, or recommend BMPs that would successfully reduce TSS below the NAL standard. *See* 2015 Permit § XII.C.1.c.

The Chula Vista Hauling Facility Owner and/or Operator has failed and continues to fail to conduct adequate Level 1 status evaluation and report that complies with the Storm Water Permit. Additionally, the Facility Owner and/or Operator has failed and continues to fail to comply with ERA Level 2 requirements. As such, the Facility Owner and/or Operator is in daily

Exhibit 1
Page 051

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 26

violation of the Storm Water Permit. Every day the Facility Owner and/or Operator conducts operations at the Facility without an adequate Level 1 status evaluation, and/or without submitting adequate Level 1 and/or Level 2 ERA Reports, Plans, and Studies is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). The Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit's Level 1 status ERA evaluation requirement every day since October 1, 2016. The Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit for failing to submit adequate ERA Reports every day since January 1, 2017. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act and Storm Water Permit's Level 1 status ERA evaluation requirements every day since October 1, 2016. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act and Storm Water Permit's Level 1 ERA Report requirements every day since January 1, 2017.

**4.   RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT**

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter. These provisions of law authorize civil penalties of $37,500.00 per day per violation for all Clean Water Act violations after January 12, 2009 and $54,833.00 per day per violation for violations that occurred after November 2, 2015.

In addition to civil penalties, Coastkeeper and CERF will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law. Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), Coastkeeper and CERF will seek to recover their litigation costs, including attorneys' and experts' fees.

**5.   CONCLUSION**

Coastkeeper and CERF are willing to discuss effective remedies for the violations described in this Notice Letter. However, upon expiration of the 60-day notice period, Coastkeeper and CERF will file a citizen suit under Section 505(a) of the Clean Water Act for the Chula Vista Hauling Facility Owner and/or Operator's violations of the Storm Water Permit.

If you wish to pursue settlement discussions, please contact Coastkeeper and CERFs legal counsel:

> Matt O'Malley
> Patrick McDonough
> matt@sdcoastkeeper.org
> San Diego Coastkeeper

Exhibit 1
Page 052

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., Chula Vista Hauling Facility*
August 27, 2019
Page 27

       2825 Dewey Road, Suite 207
       San Diego, California 92106
       Tel: 619-758-7743

       Marco Gonzalez
       Livia Borak Beaudin
       livia@coastlawgroup.com
       Coast Law Group, LLP
       1140 South Coast Highway 101
       Encinitas, California 92024
       Tel: 760-942-8505

Sincerely,

Matt O'Malley
Patrick McDonough
Attorneys for San Diego Coastkeeper

Marco Gonzalez
Livia Borak Beaudin
Attorneys for Coastal Environmental
Rights Foundation

## SERVICE LIST

VIA U.S. MAIL

David Gibson
Executive Officer
San Diego Regional Water Quality Control Board
2375 Northside Drive, Suite 100
San Diego, California 92108

Andrew Wheeler, Administrator
Environmental Protection Agency
Office of the Administrator 1101A
1200 Pennsylvania Ave N.W
Washington, DC 20460

Mike Stoker
Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Eileen Sobeck
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812–0110

Exhibit 1
Page 053

 

August 27, 2019

<u>VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED</u>

Republic Services, Inc.                    CT Corporation System
ATTN: Managing Agent                       Registered agent for:
8364 Clairemont Mesa Blvd.                 Republic Services, Inc.,
San Diego, CA 92111                        818 West Seventh Street, Suite 930
                                           Los Angeles, CA 90017
Republic Services of San Diego
ATTN: Managing Agent                       Republic Services, Inc.
8364 Clairemont Mesa Blvd.                 ATTN: Managing Agent
San Diego, CA 92111                        18500 North Allied Way
                                           Phoenix, AZ 85054
Republic Services of San Diego
ATTN: Managing Agent
18500 North Allied Way
Phoenix, AZ 85054


**Re:    Notice of Violation and Intent to File Suit Under the Clean Water Act**

To the Above-Listed Recipients:

  Please accept this letter on behalf of San Diego Coastkeeper ("Coastkeeper") and Coastal Environmental Rights Foundation ("CERF") regarding violations of the Clean Water Act[1] and California's Storm Water Permit[2] occurring at the San Diego Hauling Facility, 8364 Clairemont Mesa Blvd., San Diego, California 92111 ("San Diego Hauling Facility" or "Facility"). The purpose of this letter is to put Republic Services of San Diego and/or Republic Services, Inc. ("Republic"), as the owner(s) and/or operator(s) of the Facility, on notice of the violations of the Storm Water Permit occurring at the Facility, including, but not limited to, discharges of polluted storm water from the San Diego Hauling Facility into local surface waters. Violations of the Storm Water Permit are violations of the Clean Water Act. As explained below, Republic is liable for violations of the Storm Water Permit and the Clean Water Act.

  Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen must give notice of his/her intention to file suit. Notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.
[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, Order No. 97-03-DWQ ("1997 Permit"), as amended by Order No. 2014-0057-DWQ ("2015 Permit").

Exhibit 1
Page 054

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 2

("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation. *See* 40 C.F.R. § 135.2(a)(1). This notice letter ("Notice Letter") is being sent to you as the responsible owner and/or operator of the San Diego Hauling Facility, or as the registered agent for the owner and/or operator. This Notice Letter is issued pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act to inform Republic that Coastkeeper and CERF intend to file a federal enforcement action against Republic for violations of the Storm Water Permit and the Clean Water Act sixty (60) days from the date of this Notice Letter.

## 1.    BACKGROUND

### 1.1. <u>San Diego Coastkeeper and Coastal Environmental Rights Foundation</u>.

San Diego Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 2825 Dewey Road, Suite 207, San Diego, California 92106. Founded in 1995, San Diego Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of San Diego County watersheds. To further these goals, Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of themselves and their members.

CERF is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Encinitas, California. CERF is dedicated to the preservation, protection, and defense of the environment, the wildlife, and the natural resources of the California Coast. CERF's mailing address is 1140 S. Coast Highway 101, Encinitas, California 92024.

Members of Coastkeeper and CERF live in and around, recreate in and around, and enjoy the waters into which the Facility discharges, including San Clemente Canyon Creek, Rose Creek, Mission Bay at the Mouth of Rose Creek, the greater Mission Bay, and the Pacific Ocean (collectively "Receiving Waters"). Members of Coastkeeper and CERF use the Receiving Waters to swim, boat, kayak, surf, bird watch, view wildlife, hike, bike, walk, run, and/or for general aesthetic enjoyment. Additionally, members of Coastkeeper and CERF use the Receiving Waters to engage in scientific study through pollution and habitat monitoring and restoration activities. The discharges of pollutants from the Facility impair each of these uses. Discharges of polluted storm water from the Facility are ongoing and continuous. Thus, the interests of Coastkeeper's and CERF's members have been, are being, and will continue to be adversely affected by the Facility Owner and/or Operator's failure to comply with the Clean Water Act and the Storm Water Permit.

### 1.2. <u>The Owner and/or Operator of the Facility</u>.

Information available to Coastkeeper and CERF indicates that Republic Services, Inc. is the owner(s) and/or operator(s) of the Facility and have been for at least the past five years. *See*

Exhibit 1
Page 055

2016 Facility Storm Water Pollution Prevention Plan ("SWPPP") ("The property is owned by Republic Services and is being operated by Republic Services. San Diego Hauling was sold to Republic Services (formerly known as Allied Waste Industries) in 1997 by Laidlaw Waste Systems, Inc."). Republic Services, Inc. is herein referred to as "Republic" or "Facility Owner and/or Operator." Information available to Coastkeeper and CERF indicates that Republic Services, Inc. is an active Delaware corporation and its registered agent is CT Corporation System, 818 West Seventh Street, Suite 930, Los Angeles, California 90017.

The San Diego Hauling Facility Owner and/or Operator has violated and continues to violate the procedural and substantive terms of the Storm Water Permit including, but not limited to, the illegal discharge of pollutants from the Facility into local surface waters. As explained herein, the Facility Owner and/or Operator is liable for violations of the Storm Water Permit and the Clean Water Act.

**1.3. <u>The Facility's Storm Water Permit Coverage</u>.**

Certain classified facilities that discharge storm water associated with industrial activity are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent ("NOI") to the State Water Resources Control Board ("State Board") to obtain Storm Water Permit coverage. Information available to Coastkeeper and CERF indicates that the San Diego Hauling Facility first obtained Storm Water Permit coverage on December 22, 1998. The Facility submitted its most recent NOI on March 16, 2018 ("2018 NOI"). Coastkeeper and CERF obtained the 2018 NOI from California's online Storm Water Multiple Application & Reporting Tracking System ("SMARTs") database. The 2018 NOI lists the Facility Waste Discharge Identification ("WDID") number as 9 37I014866, and identifies both the Facility site name and Facility operator as "Republic Services of San Diego." The Facility's SWPPPs dated June 2015 ("2015 SWPPP") and November 2016 ("2016 SWPPP") both state that the "property is owned by Republic Services and is being operated by Republic Services." Additionally, the Level 2 Exceedance Response Action ("ERA") Plan dated December 2017 ("2017 Level 2 ERA Action Plan"), and the Level 2 ERA Technical Report dated December 2018 ("2018 Level 2 ERA Technical Report") were both "prepared for Republic Services, Inc.," and both state that the "property is owned and operated by Republic Services, Inc." As such, information available to Coastkeeper and CERF indicates that Republic Services, Inc. is the owner and/or operator of the Facility.

The 2018 NOI states that the Facility is four acres, all of which are exposed to storm water, but does not indicate what percent of the site is impervious. The 2016 SWPPP, the latest SWPPP which currently covers the Facility, states that the operating portion of Facility is approximately 3.6 acres, and lists the site as greater than 90 percent impervious.

The 2018 NOI and the 2016 SWPPP list the Standard Industrial Classification ("SIC") code for the San Diego Hauling Facility as 4212. The 2018 NOI describes this SIC code as local trucking without storage, while the 2016 SWPPP states it is "Motor Freight Transportation and Warehousing." Information available to Coastkeeper and CERF, including the Facility 2016 SWPPP describing vehicle and equipment maintenance and storage at the Facility, indicates that

Exhibit 1
Page 056

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 4

SIC code 4231 (terminal and joint terminal maintenance facilities for motor freight transportation), and SIC code 4953 (refuse systems) also apply to the Facility.

Coastkeeper and CERF put the Facility Owner and/or Operator on notice that industrial activities are conducted throughout the Facility, and thus the entire Facility requires Storm Water Permit coverage. In addition, even if the regulated industrial activities are not occurring throughout the entire Facility at all times, under the Storm Water Permit's definition of "storm water associated with industrial activities" and explanation of material handling activities, Coastkeeper and CERF puts the Facility Owner and/or Operator on notice that since insufficient best management practices ("BMPs") or other controls exist to separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities, storm water at the Facility commingles and thus all storm water discharges from the Facility are regulated under the Storm Water Permit.

## 1.4. <u>Storm Water Pollution and the Waters Receiving Facility's Discharges</u>.

With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations around San Diego County, such as the San Diego Hauling Facility, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

Polluted discharges from industrial facilities similarly situated to the San Diego Hauling Facility often contain the following pollutants: heavy metals such as copper, iron, lead, aluminum, selenium, and zinc; pathogens and bacteria such as E. coli, enterococcus, and fecal coliform; excessive nutrients such as nitrogen and phosphorus; oil and grease ("O&G"), hydraulic fluids, antifreeze, aromatic hydrocarbons, and chlorinated hydrocarbons; solvents and detergents; and paints. Many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and/or developmental or reproductive harm.[3] Discharges of polluted storm water pose carcinogenic and reproductive toxicity threats to the public and adversely affect the aquatic environment.

Polluted discharges from the Facility harm the special aesthetic and recreational significance of the Receiving Waters, adversely impacting the public's ability, as well as that of Coastkeeper's and CERF's members, to use and enjoy these unique waterbodies. Mission Bay is the marquee recreational aquatic playground for the entire San Diego region, serving both local residents and tourists from around the globe. It is the largest aquatic recreation park in the world, and is visited by an estimated 15 million people annually.[4] Every day, people use and enjoy Mission Bay for numerous recreational activities including swimming, sailing, jet skiing,

---

[3] Health & Saf. Code §§ 25249.5 - 25249.1.
[4] David Garrick, *Mission Bay Park slated for $40M makeover, biggest in decades*, S.D. Union Tribune, Oct. 31, 2018, *available at* https://www.sandiegouniontribune.com/news/politics/sd-me-mission-bay-20181030-story.html.

Exhibit 1
Page 057

wakeboarding, kite surfing, paddle boarding, kayaking, and numerous other aquatic activities. Furthermore, the Mission Bay is surround by beaches, biking and walking paths, playgrounds for children, and other park spaces. As such, people are recreating in, on, and around Mission Bay every day. Polluted storm water and non-storm discharged from the San Diego Hauling Facility exposes people and the environment to pathogens, toxic metals, and other contaminants that pose bacterial, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment. As such, Coastkeeper's and CERF's members are less likely to recreate in and around the Receiving Waters.

The Receiving Waters into which the San Diego Hauling Facility discharges polluted storm water are ecologically sensitive areas. The Receiving Waters provide critical migrating waterfowl habitat and nesting sites for sensitive bird species, and generally protects a tremendous diversity of plant and animal species. For example, in Mission Bay, the Kendall-Frost Reserve & Northern Wildlife Preserve, a sixteen-acre marshland owned by the City of San Diego, provides a unique and critical habitat to numerous bird species. According to the City of San Diego, "[t]wo endangered species depend entirely on this marsh: the light-footed clapper rail and the Belding's savannah sparrow."[5] This wildlife preserve is located adjacent to the mouth of Rose Creek, where pollutants traveling down Rose Creek are discharged into Mission Bay.

Storm water and non-storm water contaminated with pathogens, sediment, heavy metals, and other pollutants harm the special biological significance of the Receiving Waters, which, in turn, impairs non-contact recreational opportunities of Coastkeeper's and CERF's members, such as aesthetic enjoyment and wildlife observation. The endangered light-footed clapper rail feeds on invertebrates, larval fish, and local vegetation. The Belding's savannah sparrow depends on dense pickleweed for nesting habitat, and feeds on seeds and insects.[6] Pollutants discharged from the San Diego Hauling Facility are deleterious to invertebrates, insects, larval fish, and local vegetation in the Kendall-Frost Reserve & Northern Wildlife Preserve. Thus, these pollutant discharges strain the already endangered species which depend on these ecosystems to survive.

In addition to the Kendall-Frost Reserve & Northern Wildlife Preserve, multiple areas around Mission Bay provide unique opportunities for bird watching. Mariner's Point and protected areas of Fiesta Island serve as habitat to the federally endangered California least tern. Fiesta Island also serves provides critical habitat for the ruddy turnstone, willet, and black-billed plover. Mission Bay near the mouth of Tecolote Creek is home to coots, ruddy ducks, buffleheads, cinnamon teals, northern pintails, green-winged teals, scaup, redheads, and loons.[7] Perez Cove is one of the three known nesting sites in San Diego County for the great blue heron, one of the largest and most majestic shorebirds in the Americas. Damage to these natural habitats, and thus the flora and fauna within them, harms the ability of the public, including

---

[5] San Diego Parks & Recreation Website, Kendall-Frost Reserve & Northern Wildlife Preserve, *available at* https://www.sandiego.gov/park-and-recreation/parks/regional/missionbay/mbtour.
[6] *Id.*
[7] San Diego Parks & Recreation Website, Tecolote Creek and Fiesta Island, *available at* https://www.sandiego.gov/park-and-recreation/parks/regional/missionbay/mbtour1#Fiesta.

Exhibit 1
Page 058

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 6

Coastkeeper's and CERF's members' ability, to use and enjoy the unique recreational opportunities offered by the Receiving Waters.

Furthermore, polluted storm water discharged from the Facility travels only a short distance before reaching Receiving Waters which travel through, and indeed serve as the lifeblood for, several parks and open spaces which have been specifically preserved for the public's recreational and aesthetic enjoyment. For example, Marion Bear Memorial Park includes 467 acres of dedicated natural parkland and several miles of hiking trails which surround San Clemente Canyon Creek, and ultimately join up with hiking trails in Rose Canyon along Rose Creek. San Clemente Canyon also serves as an important habitat for raccoons, skunks, rabbits, amphibians, reptiles and birds, and serve as a critical wildlife corridor for coyote, fox and other mammals.[8] Polluted discharges from the Facility impede Coastkeeper's and CERF's members' use and enjoyment of the parks, trails and open spaces surrounding Rose Creek and San Clemente Canyon Creek.

The California Regional Water Quality Control Board, San Diego Region, ("Regional Board") issued the *Water Quality Control Plan for the San Diego Basin* ("San Diego Basin Plan" or "Basin Plan"). The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for San Clemente Canyon Creek downstream of the point at which it receives storm water discharges from the Palomar Facility include: Contact Water Recreation, Non-Contact Water Recreation, Warm Freshwater Habitat, Wildlife Habitat, Rare, Threatened, or Endangered Species, and Spawning, Reproduction, and/or Early Development. Basin Plan, Table 2-2. The Beneficial Uses of Rose Creek downstream of the point at which it receives storm water discharges from the Facility include: Contact Water Recreation, Non-Contact Water Recreation, Warm Freshwater Habitat, Wildlife Habitat, and Industrial Service Supply. *Id.* The existing and potential Beneficial Uses for Mission Bay include: Contact Recreation, Non-Contact Water Recreation, Wildlife Habitat, Rare, Threatened, or Endangered Species, Migration of Aquatic Organisms, Marine Habitat, Estuarine Habitat, Spawning, Reproduction, and/or Early Development, Shellfish Harvesting, Commercial and Sport Fishing, and Industrial Service Supply. *Id.* at Table 2-3.

According to the 2016 303(d) List of Impaired Water Bodies, Rose Creek is impaired for benthic community effects, selenium, and toxicity.[9] Coastkeeper monitoring data, publicly reported in the California Environmental Data Exchange Network ("CEDEN"), indicates that Rose Creek is also impaired for E. coli, enterococcus, total coliform, nitrate and nitrite (N+N), and phosphorus.[10] Coastkeeper monitoring data reported in CEDEN also indicates that San Clemente Creek is impaired for E. coli, enterococcus, and total coliform. According to the 2016 303(d) List of Impaired Water Bodies, Mission Bay at the mouth of Rose Creek is impaired for

---

[8] San Diego Parks & Recreation Website, Marian Bear Memorial Park History, *available at* https://www.sandiego.gov/park-and-recreation/parks/osp/marianbear/marbear#history.
[9] 2016 Integrated Report – All Assessed Waters, *available at http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2012.shtml* (last accessed on August 14, 2019).
[10] This data and information is publicly available at https://ceden.waterboards.ca.gov/AdvancedQueryTool under the program titled "SDCK Monitoring Program."

Exhibit 1
Page 059

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 7

lead and for eutrophic conditions. According to the 2016 303(d) List of Impaired Water Bodies, Mission Bay Shoreline at Campland by the Bay, which is immediately adjacent to mouth Rose Creek, is impaired for indicator bacteria such as enterococcus, fecal coliform, and total coliform. According to the 2016 303(d) List of Impaired Water Bodies, Mission Bay at large is impaired for mercury and polychlorinated biphenyls ("PCBs"). Other areas of Mission Bay are impaired for copper, and toxicity. Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

## 2.   THE SAN DIEGO HAULING FACILITY AND RELATED DISCHARGES OF POLLUTANTS

### 2.1. <u>The Facility Site Description and Industrial Activities</u>.

The Owners and/or Operators of the San Diego Hauling Facility describe the Facility as "a hauling, storage, and maintenance Facility for waste bins, equipment, and vehicles." 2016 SWPPP § 2.1.2. The 2016 SWPPP explains that "[t]he Facility primarily maintains waste containers and hauling vehicles. Waste containers and trash bins are brought on-site for maintenance, including painting, welding, and washing. Hauling vehicles also receive mechanical maintenance and washing at the Facility. A wash bay, paint booth, and a welding bay are also on-site." *Id*. Section 2.3.1 of the 2016 SWPPP notes that the Facility conducts vehicle [compressed natural gas ("CNG")] fueling, as well as "waste transfer operations." The 2017 Level 2 ERA Action Plan and 2018 Level 2 ERA Technical Report further indicate that the San Diego Hauling Facility engages in waste transfer operations. Both documents state that a potential source of total suspended solids ("TSS") at the Facility is "industrial activity around the transfer bays." Furthermore, the 2017 Level 2 ERA Action Plan refers to the San Diego Hauling Facility as a "transfer station." 2017 Level 2 ERA Action Plan at 1-1.

Information available to Coastkeeper and CERF indicates that industrial activities at the Facility include but are not limited to: waste hauling vehicle and container washing, repair, fueling, and other maintenance; receiving, unloading, and handling of solid waste, green waste, and recyclables materials; depositing and/or loading municipal solid waste into trucks or containers;  disposal of residue from solid waste, green waste, and recyclables materials from hauling trucks and containers; hazardous materials handling and storage; mechanical parts handling and storage; welding; painting; outdoor storage of waste hauling vehicles and containers; outdoor storage of various materials and chemicals; storage of fuel and other flammable materials; natural gas compression and storage; paint storage; and parking.

According to the Facility SWPPPs, industrial materials associated with operations at the San Diego Hauling Facility include natural gas and CNG; other compressed gasses; diesel and other fuels; new and used oils and other lubricants; new and used antifreeze; welding metals; acetylene, oxygen, and carbon dioxide for welding; wash water; and refinishing debris. Information available to Coastkeeper and CERF indicates that the Facility also handles significant quantities of municipal solid waste, green waste, and recyclables.

Exhibit 1
Page 060

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 8

According to the Facility SWPPPs and site map, the areas of industrial activity at the Facility include the paint booth; wash rack; welding bay; CNG dryer, compressor, and compressed fuel tank area; trash can and bin storage area; two oil/water separator areas; the storage area for bin parts, scrap metal, and bin parts to be repaired; the vehicle and bin maintenance shop; additional parts storage areas; tire storage area; and fueling stations. *Id*. at § 2.1.4; site map. Information available to Coastkeeper and CERF indicates that the Facility also includes a transfer bay. *See* 2017 Level 2 ERA Action Plan at 1-1, 3-1; 2018 Level 2 ERA Technical Report at 3-1, 4-4.

Information available to Coastkeeper and CERF indicates that these industrial activities occur at various locations throughout the Facility either outdoors, or without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility. Further, information available to Coastkeeper and CERF indicates that the pollutants associated with the Facility have been and continue to be tracked throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking trash, pathogens, nutrient pollutants, sediment, dirt, O&G, metal particles, and other pollutants off-site. The resulting illegal discharges of polluted storm water and non-storm water impact Coastkeeper's and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human wellbeing, aquatic life, and ecosystem health.

## 2.2.  Pollutants and Pollutant Sources Related to the Facility's Industrial Activities.

Despite the activities and pollutant sources listed above, the 2016 Facility SWPPP states that the only pollutants "that can potentially enter stormwater run-off and other discharges draining from the Facility include: Sediment (including vehicle traffic), Oil and Grease (waste oil and leaks from equipment), and pH." However, this claim is contradicted by Tables 2.1.a and 2.1.b of very same SWPPP. Table 2.1.b indicates that pollutants associated with industrial activities at the Facility include: oil and grease, hydrocarbons, CNG, diesel fuel, "gross pollutants," and "trace metals." Table 2.1.a states that indicator bacteria, enterococcus, fecal coliform, total coliform, copper and zinc are present at the Facility, yet declines to indicate whether these pollutants potentially discharge from the Facility, stating only that the site does not discharge to a waterbody impaired for such pollutants. Information available to Coastkeeper and CERF indicates that the Facility discharges all of the pollutants identified in Tables 2.1.a-b of the 2016 SWPPP, in addition to many others.

Information available to Coastkeeper and CERF indicates that pollutants commonly present in storm water discharged from facilities similar to the San Diego Hauling Facility include: pathogens such as enterococcus, E. coli, and fecal coliform; excessive nutrients such as ammonia as nitrogen, N+N, total nitrogen and phosphorus; metals such as aluminum, lead, zinc, manganese, selenium, copper, and iron; dissolved oxygen; as well as a host of other pollutants acknowledged in the Facility SWPPPs such as gasoline and diesel fuels; fuel additives; coolants; antifreeze; transmission fluid; hydraulic fluid; waste oil; compressed natural gas; oil and grease; TSS; and pH affecting substances.

Exhibit 1
Page 061

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 9

As further discussed Sections 3.5.3 and 3.6.3, *infra*, the San Diego Hauling Facility SWPPPs have failed and continue to fail to adequately assess potential pollutant and pollutant sources, and the Facility has failed and continues to fail to monitor for all pollutants required by the Permit.

### 2.3.   San Diego Hauling Facility Storm Water Flow and Discharge Locations.

The San Diego Hauling Facility Owner and/or Operator reports that the Facility consists of five drainage areas which ultimately discharge storm water from the Facility into the City of San Diego Municipal Separate Storm Sewer System ("MS4"), "which directs the flows north towards San Clemente Canyon and into Rose Canyon Creek, which discharges into Mission Bay." 2016 SWPPP § 2.1.1.

According to the Facility SWPPPs, Drainage Area 1 ("DA1") includes the employee parking area; a portion under the sloped roof of a building which houses a paint booth, wash rack, offices, and welding bay; and the CNG dryer, compressor, and compressed fuel tank. 2016 SWPPP § 2.1.4. The Facility site map indicates that storm water within DA1 discharges via three driveways to the surface street bordering the Facility to the West. The Facility Owner and/or Operator classifies DA1 as non-industrial reasoning that "[a]ll of the industrial activities are conducted under weatherproof covers, or are stored in sealed, well maintained tanks." *Id.*

Information available to Coastkeeper and CERF indicates the San Diego Hauling Facility Owner and/or Operator's self-classification of DA1 as non-industrial is erroneous. First, the Facility Owner and/or Operator's reason for classifying DA1 as non-industrial acknowledges that industrial activities do occur within DA1. Conducting industrial activities under weatherproof covers and storing materials in sealed containers does not render a drainage area "non-industrial." Such practices may qualify for Non-Exposure Certification ("NEC"), but the Facility Owner and/or Operator erroneously equates NEC with non-industrial. Furthermore, Table 3.5 of the 2016 SWPPP indicates that various pollutants and pollutant sources associated with container maintenance affect DA1. Moreover, DA1 includes the driveway through which waste hauling trucks and containers regularly enter and exit the Facility. These trucks and containers are used to transport and store municipal solid waste, green waste, and recyclables, and as such, they frequently track all pollutants associated with waste hauling through DA1. Indeed, the reason such vehicles and equipment are brought to the Facility for washing is that they have accumulated waste residue, trash, and other filth on their exterior and underside. As such, pollutants associated with the Facility's industrial operations have been and continue to be tracked throughout the entire site, including this ingress/egress driveway. During rainfall events, storm water carrying these pollutants commingles with other storm water from DA1.

The 2016 SWPPP acknowledges that Drainage Area 2 ("DA2") contains scrap metal bins and trash can and bin storage, and that surface flows in this drainage area are directed towards the storm drain inlet at SD-1. The Facility's 2018 Level 2 ERA Technical Report states that a Kraken grate media filter was installed at SD-1. Flows in this subsurface drainage pipe are directed to the City of San Diego MS4. 2016 SWPPP § 2.1.4.

Exhibit 1
Page 062

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 10

Information available to Coastkeeper and CERF indicates that the paint booths, welding bays, and wash racks, and transfer bays are located within DA2 or bordering DA2. Moreover, all entrances and exits to the Facility buildings which house paint booths, welding bays, wash racks, and transfer bays are located within DA2, and thus any escape or track-out of pollutants associated with any of these industrial activities will end up in DA2.

The 2016 SWPPP claims that Drainage Area 3 ("DA3") "contains some of the CNG fueling area, the Diesel [sic] fueling island, truck parking area, and the office supply storage bin." Information available to Coastkeeper and CERF indicate that DA3 has also been used for trash can, bin, and waste hauling vehicle storage, and such equipment is stored outdoors, exposed to precipitation. The 2016 SWPPP states that storm water from DA3 flows to an unnamed drain inlet fitted with a filter, and thereafter runs West, connecting to the drainage system beneath SD-1, and ultimately to the City of San Diego MS4. 2016 SWPPP § 2.1.4.

According to the 2016 SWPPP, Drainage Area 4 ("DA4") includes parts storage for the vehicle maintenance shop, the used oil AST, tire storage, and the diesel exhaust fluid tanks. 2016 SWPPP § 2.1.4. The 2016 SWPPP also explains that the maintenance building located within DA4 includes a wash bay and welding bay. *Id*. § 2.3.1. Information available to Coastkeeper and CERF, indicates that DA4 has also been used for trash can, bin, and waste hauling vehicle storage, and such equipment is stored outdoors, exposed to precipitation. Surface flows are directed towards the drain inlet located on the south side of this drainage area, which is fitted with a Filtrexx with Metaloxx storm drain filter insert. Flows in this subsurface drainage pipe are directed northwest, joined by flows from DA3, connect to the drainage system beneath SD-1, and are thus ultimately routed to the City of San Diego MS4. 2016 SWPPP § 2.1.4.

The current Facility SWPPP states that Drainage Area 5 ("DA5") includes the visitor and employee parking area; the offices and parts storage; and the vehicle maintenance shop. The Facility Owners and/or Operators erroneously identify DA5 as non-industrial, reasoning that the "industrial activities are conducted under weatherproof covers, or are stored in sealed, well maintained tanks." DA5 is immediately adjacent to the Facility's primary ingress/egress driveway, through which waste hauling vehicles and containers frequently travel. Information available to Coastkeeper and CERF indicates that there are no BMPs to prevent pollutants from these vehicles and containers from settling on DA5. Further, during rainfall events, storm water from this ingress/egress driveway in DA1 comingles with storm water from DA5, as there are insufficient BMPs in place to prevent such comingling. Surface flows in DA5 are directed towards the Industrial Park Driveway.

## 3.   VIOLATIONS OF THE CLEAN WATER ACT AND THE STORM WATER PERMIT

In California, any person who discharges storm water associated with certain industrial activity must comply with the terms of the Storm Water Permit in order to lawfully discharge pollutants. *See* 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1).

Exhibit 1
Page 063

Between 1997 and June 30, 2015, the Storm Water Permit in effect was Order No. 97-03-DWQ, which Coastkeeper and CERF refer to as the "1997 Permit." On July 1, 2015, pursuant to Order No. 2014-0057-DWQ the Storm Water Permit was reissued, which Coastkeeper and CERF refer to as the "2015 Permit." As explained below, the 2015 Permit includes terms that are as stringent or more stringent than the 1997 Permit. Accordingly, the San Diego Hauling Facility Owner and/or Operator is liable for violations of the 1997 Permit and ongoing violations of the 2015 Permit, and civil penalties and injunctive relief are available remedies. *See Illinois v. Outboard Marine, Inc.*, 680 F.2d 473, 480-81 (7th Cir. 1982) (relief granted for violations of an expired permit); *Sierra Club v. Aluminum Co. of Am.*, 585 F. Supp. 842, 853-54 (N.D.N.Y. 1984) (holding that the Clean Water Act's legislative intent and public policy favor allowing penalties for violations of an expired permit); *Pub. Interest Research Group of N.J. v. Carter-Wallace, Inc.*, 684 F. Supp. 115,121-22 (D.N.J. 1988) ("[l]imitations of an expired permit, when those limitations have been transferred unchanged to the newly issued permit, may be viewed as currently in effect").

### 3.1. Unauthorized NSWDs from the Facility in Violation of Storm Water Permit Discharge Prohibition.

Except as authorized by certain special conditions, the Storm Water Permit prohibits permittees from discharging materials other than storm water ("non-storm water discharges" or "NSWDs") either directly or indirectly to waters of the United States. 1997 Permit §§ A.1, D.1; 2015 Permit § III.B. Prohibited NSWDs must be either eliminated or permitted by a separate NPDES permit. 1997 Permit § A.1; 2015 Permit § III.B.

Information available to Coastkeeper and CERF indicates that unauthorized NSWDs occur at the Facility, and the Facility has failed to develop and/or implement adequate BMPs necessary to prevent these discharges. For example, one of the Facility's primary industrial activities is vehicle and container washing, and Table 3.5 of the 2016 SWPPP indicates that "wash water" associated with container maintenance is common in DA1 and DA2. *See also* 2016 SWPPP § 2.1.2. However, the Facility SWPPPs fail to identify any BMPs would prevent wash water from being tracked out of wash bays, commingling, and discharging from the Facility. NSWDs resulting from washing and cleaning are not from sources that are listed among the authorized NSWDs in the special conditions section of the Storm Water Permit, and are thus always prohibited. Furthermore, the 2016 SWPPP concedes that no non-storm water discharges are authorized at the Facility. 2016 SWPPP § 2.4. Therefore, the Facility Owner and/or Operator's assertion that "[t]here are no activities at this site that may result in unauthorized non-stormwater discharges" is erroneous, and in violation of the Storm Water Permit. *Id.*; *see also* 1997 Permit § A.1; 2015 Permit § III.B.

Coastkeeper and CERF put the San Diego Hauling Facility Owner and/or Operator on notice that the Storm Water Discharge Prohibition is violated each time unauthorized non-storm water is discharged from the Facility. *See* 1997 Permit § D.1; *see also* 2015 Permit § III.B. These Discharge Prohibition violations are ongoing and will continue until the Facility Owner and/or Operator develops and implements BMPs that prevent prohibited unauthorized NSWDs, or obtains separate NPDES permit coverage. Each time the Facility discharges prohibited non-

Exhibit 1
Page 064

storm water in violation of the Storm Water Permit's Discharge Prohibitions is a separate and distinct violation of the Storm Water Permit and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owner and/or Operator has been in violation since August 26, 2014, and Coastkeeper and CERF will update the number and dates of violations when additional information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

### 3.2. <u>Discharges of Polluted Storm Water from the Facility in Violation of Storm Water Permit Discharge Prohibitions.</u>

Section III of the 2015 Permit enumerates several Discharge Prohibitions. Section III.D of the 2015 Permit states that "[d]ischarges that violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans (Basin Plans), or statewide water quality control plans and policies are prohibited." The San Diego Basin Plan designates beneficial uses for water bodies in the San Diego region and establishes water quality objectives and implementation plans to protect those beneficial uses.[11] The San Diego Basin Plan further establishes certain Waste Discharge Prohibitions.[12] Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited. Allowances for dilution may be made at the discretion of the Regional Board."[13] "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water.[14] Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the San Diego Regional Board is prohibited by Discharge Prohibition III.D of the 2015 Permit.

Information available to Coastkeeper and CERF, including its review of publicly available information and observations, indicates that no express allowance for dilution has been granted by the Regional Board applicable to the San Diego Hauling Facility's discharges, or to the downstream Receiving Waters. As such, and consistent with Coastkeeper and CERF's review of available information and direct observations, the analytical results of storm water sampling at the Facility demonstrate that the San Diego Hauling Facility Owner and/or Operator has violated and continues to violate Discharge Prohibition III.D of the 2015 Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan. The table attached hereto as Exhibit 1 includes sample results of storm water discharges collected and analyzed by the Facility. As demonstrated by the data in Exhibit 1, the San Diego Hauling Facility Owner and/or Operator has failed to discharge pollutants in storm water at or below Basin Plan water quality standards. For example, the Basin Plan Objective for hydrogen ion concentration ("pH") for inland surface waters states that "the pH shall not be depressed below 6.5 nor raised above

---

[11] *See* https://www.waterboards.ca.gov/sandiego/water_issues/programs/basin_plan/ for updated Basin Plan.
[12] San Diego Basin Plan, Chapter 4, page 4-19.
[13] *Id.* at page 4-20 (Waste Discharge Prohibition 5).
[14] California Water Code, § 13050(d) (emphasis added).

Exhibit 1
Page 065

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 13

8.5 S.U.," and multiple storm water samples collected from the Facility on December 12, 2014 reflected a pH of 6, which is outside the acceptable level of the Basin Plan water quality objective. Ex. 1.

The Storm Water Permit Discharge Prohibitions further prohibit storm water discharges and authorized NSWDs which cause or threaten to cause pollution, contamination, or nuisance as defined in Section 13050 of the California Water Code. 1997 Permit § A.2; 2015 Permit § III.C. The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease." "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

Information available to Coastkeeper and CERF, including the Facility's own storm water monitoring data and other publicly available information, indicates that the San Diego Hauling Facility has discharged, and continues to discharge, numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters. For example, the San Diego Hauling Facility's own monitoring data shows that on numerous occasions during the past five years, the Facility has discharged zinc, pH affecting substances, TSS, and oil and grease ("O&G") in excess of various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. *See* Ex. 1. As such, the San Diego Hauling Facility's discharges of polluted storm water have violated the Storm Water Permit's Discharge Prohibition III.C.

Furthermore, as discussed in Section 3.6.3, *infra*, information available to Coastkeeper and CERF indicates that the San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to analyze the Facility's storm water discharges for numerous pollutants required by the Storm Water Permit. This information further indicates that the Facility has discharged and continues to discharge numerous pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D, and which cause or threaten to cause pollution, contamination, or nuisance in violation of Discharge Prohibition III.C.

Coastkeeper and CERF put the San Diego Hauling Facility Owner and/or Operator on notice that the Storm Water Permit Discharge Prohibition is violated each time storm water discharges from the Facility. *See* Exhibit 2 (setting forth dates of all precipitation events during the past five years).[15] These Discharge Prohibition violations are ongoing and will continue every time the Facility Owner and/or Operator discharges polluted storm water in violation of Discharge Prohibitions III.C or III.D of the 2015 Permit. Each time the Facility discharges

---

[15] Exhibit 2 includes the dates of all precipitation events recorded during the past five years, and the corresponding quantity of precipitation for each such event. The data in Exhibit 2 was recorded by the National Oceanic & Atmospheric Administration at the weather monitoring station geographically nearest to the Facility with complete precipitation records. Coastkeeper and CERF will include additional dates of rain events when that information becomes available.

Exhibit 1
Page 066

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 14

polluted storm water in violation of Discharge Prohibitions III.C or III.D of the 2015 Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owner and/or Operator has been in violation since August 26, 2014, and Coastkeeper and CERF will update the dates of violations when additional information and data become available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

Further, Coastkeeper and CERF put the San Diego Hauling Facility Owner and/or Operator on notice that Discharge Prohibitions III.C and III.D are independent Storm Water Permit requirements that must be complied with, and that carrying out the iterative process triggered by exceedances of the Numeric Action Levels ("NALs") listed at Table 2 of the 2015 Permit does not amount to compliance with the Discharge Prohibition provisions.

### 3.3. <u>Discharges of Polluted Storm Water from the Facility in Violation of Storm Water Permit Effluent Limitation.</u>

The Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve Best Available Technology Economically Achievable ("BAT") for toxic and non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 1997 Permit § B.3; 2015 Permit § V.A.

The EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards as required by Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit.[16] As such, discharges from an industrial Facility containing pollutant concentrations that exceed EPA Benchmarks indicate that the Facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants.[17]

Information available to Coastkeeper and CERF, including its review of publicly available information and observations, indicates that BMPs that achieve BAT/BCT have not been developed and/or implemented at the San Diego Hauling Facility. Consistent with Coastkeeper and CERF's review of available information and direct observations, the Facility's storm water monitoring data demonstrates that Facility discharges have exceeded EPA Benchmarks for several pollutants, indicating that the Facility has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards. For example, the EPA Benchmark for TSS is 100 mg/L, and a storm water sample

---

[16] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) Authorization to Discharge Under the National Pollutant Discharge Elimination System*, as modified effective February 26, 2009, Fact Sheet at 106; *see also* 65 Federal Register 64839 (2000).

[17] *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F.Supp.2d 914 (C.D. Cal. 2009).

Exhibit 1
Page 067

collected from the Facility on January 9, 2018 reflected a TSS concentration of 175 mg/L. *See* Ex. 1. The Facility's monitoring data also indicates that on storm water samples collected on December 2, 2014 and December 12, 2014 exceeded the EPA Benchmark for zinc of 0.12 mg/L.

As discussed in Section 3.6.3, *infra*, information available to Coastkeeper and CERF indicates that the San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to analyze storm water discharged from the Facility for numerous pollutants that result from the Facility's industrial operations. As such, in addition to TSS and zinc, the San Diego Hauling Facility likely discharges numerous pollutants in concentrations exceeding EPA benchmarks, indicating that the Facility has failed to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards.

Coastkeeper and CERF put the San Diego Hauling Facility Owner and/or Operator on notice that the Storm Water Permit Effluent Limitation is violated each time storm water discharges from the Facility. *See* Exhibit 2 (setting forth dates of all precipitation events during the past five years).[18] These discharge violations are ongoing and will continue every time the Facility Owner and/or Operator discharges polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. Each time the Facility Owner and/or Operator discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owner and/or Operator has been in violation since August 26, 2014, and Coastkeeper and CERF will update the dates of violations when additional information and data become available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

Further, Coastkeeper and CERF put the San Diego Hauling Facility Owner and/or Operator on notice that the 2015 Permit Effluent Limitation V.A is an independent requirement that must be complied with, and that carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the 2015 Permit does not amount to compliance with Effluent Limitation V.A.

### 3.4. <u>Discharges of Polluted Storm Water from the Facility in Violation of Storm Water Permit Receiving Water Limitations</u>.

Receiving Water Limitation C.2 of the 1997 Permit prohibits storm water discharges and authorized NSWDs that cause or contribute to an exceedance of an applicable Water Quality Standard ("WQS").[19] The 2015 Permit includes the same receiving water limitation. 2015 Permit

---

[18] Exhibit 2 includes the dates of all precipitation events recorded during the past five years, and the corresponding quantity of precipitation for each such event. The data in Exhibit 2 was recorded by the National Oceanic & Atmospheric Administration at the weather monitoring station geographically nearest to the Facility with complete precipitation records. Coastkeeper and CERF will include additional dates of rain events when that information becomes available.

[19] The Basin Plan designates Beneficial Uses for the Receiving Waters. Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses.

Exhibit 1
Page 068

§ VI.A. Discharges that contain pollutants in excess of an applicable WQS violate the Storm Water Permit Receiving Water Limitations. 1997 Permit § C.2; 2015 Permit § VI.A.

Receiving Water Limitation C.1 of the 1997 Permit prohibits storm water discharges and authorized NSWDs to surface water that adversely impact human health or the environment. The 2015 Permit includes the same receiving water limitation. 2015 Permit § VI.B. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of the Storm Water Permit Receiving Water Limitation. 1997 Permit § C.1; 2015 Permit § VI.B.

Storm water sampling at the Facility demonstrates that its discharges contain concentrations of pollutants that cause or contribute to a violation of an applicable WQS in violation of the Storm Water Permit's Receiving Water Limitations. *See* 1997 Permit § C.2; 2015 Permit § VI.A. For example, the San Diego Basin Plan sets forth a narrative standard for TSS mandating that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Yet, the Facility's own storm water monitoring data shows numerous instances of extremely high TSS concentrations, which have the potential to adversely affect the beneficial uses of Receiving Waters. In addition, the CTR maximum freshwater concentration for zinc is 0.12 mg/L. Each of the six storm water samples analyzed for zinc on December 2, 2014 and December 12, 2014 exceeded the CTR standard, and one sample registered zinc at a concentration of 3.1 mg/L, over twenty-five (25) times the applicable standards.

As explained herein, the Receiving Waters are impaired, and thus unable to support the designated Beneficial Uses, for some of the same pollutants discharged by the Facility. Rose Creek is impaired for benthic community effects. The Basin Plan explains that "[s]uspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." Basin Plan at 3-31. The Facility's storm water discharges containing elevated concentrations of TSS in excess of the Basin Plan Water Quality Objective, cause and/or contribute to the benthic community effects impairment of Rose Creek.

Rose Creek is also impaired for toxicity. Discharges of elevated concentrations of zinc can contribute to the toxicity of Receiving Waters. *See* Basin Plan at 3-26. The Facility's storm water discharges containing elevated concentrations of zinc in excess of the CTR limits, cause and/or contribute to the toxicity impairment of Rose Creek.

---

Discharges above water quality standards contribute to the impairment of Receiving Waters' Beneficial Uses. Applicable water quality standards include, among others, the Criteria for Priority Toxic Pollutants in the State of California, 40 C.F.R. § 131.38 ("CTR"), and water quality objectives in the Basin Plan. Industrial storm water discharges must strictly comply with water quality standards, including those criteria listed in the applicable basin plan. *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).

Exhibit 1
Page 069

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 17

Information available to Coastkeeper and CERF indicates that the Facility discharges elevated concentrations of indicator bacteria such as fecal coliform, E. coil, and enterococcus in excess of the Basin Plan Objectives. For example, Table 2.1.a of the 2016 Facility SWPPP acknowledges that E. coli, enterococcus, fecal coliform, and total coliform are present at the Facility as a result of the Facility's industrial activities. Furthermore, storm water discharges from facilities similarly situated, which handle municipal waste and/or waste handling equipment, typically contain extremely high levels of these indicator bacteria.

Coastkeeper monitoring data, publicly reported in CEDEN indicates that both San Clemente Creek and Rose Creek are impaired for E. coli, enterococcus, and total coliform. According to the 2016 303(d) List of Impaired Water Bodies, Mission Bay Shoreline at Campland by the Bay, which is immediately adjacent to mouth Rose Creek, is impaired for indicator bacteria such as enterococcus, fecal coliform, and total coliform. As such, information available to Coastkeeper and CERF indicates that the San Diego Hauling Facility's discharges of elevated levels of indicator bacteria cause and/or contribute to the E. coli, enterococcus, and total coliform impairments of San Clemente Creek and Rose Creek, and to the enterococcus, fecal coliform, and total coliform impairments of Mission Bay Shoreline at Campland by the Bay.

The CTR and Basin Plan are applicable WQSs under the Storm Water Permit. Thus, discharges from the Facility containing concentrations of pollutants in exceedance of WQSs, cause or contribute to the impairments of Receiving Waters in violation of Receiving Water Limitations of the Storm Water Permit. 1997 Permit § C.2; 2015 Permit § VI.A. Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the Storm Water Permit Receiving Water Limitations. *See* 1997 Permit § C.1; 2015 Permit § VI.B.

Coastkeeper and CERF put the San Diego Hauling Facility Owner and/or Operator on notice that Storm Water Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facility. *See* Ex. 2. Each time discharges of storm water from the Facility cause and/or contribute to a violation of an applicable WQS, it is a separate and distinct violation of Receiving Water Limitation C.2 of the 1997 Permit, Receiving Water Limitation VI.A of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Each time discharges of storm water from the Facility adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation C.1 of the 1997 Permit, Receiving Water Limitation VI.B of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the Storm Water Permit Receiving Water Limitations. The Facility Owner and/or Operator has been in violation since August 26, 2014, and Coastkeeper and CERF will update the dates of violation when additional information and data becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

Further, Coastkeeper and CERF put the Facility Owner and/or Operator on notice that Receiving Water Limitations are independent Storm Water Permit requirements that must be complied with, and that carrying out the iterative process triggered by exceedances of the NALs

Exhibit 1
Page 070

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 18

listed at Table 2 of the 2015 Permit does not amount to compliance with the Receiving Water Limitations.

**3.5.** **Failure to Develop, Implement, and/or Revise an Adequate Storm Water Pollution Prevention Plan.**

The Storm Water Permit requires permittees to develop and implement a Storm Water Pollution Prevention Plan prior to conducting industrial activities. A permittee has an ongoing obligation to revise the SWPPP as necessary to ensure compliance with the Storm Water Permit. The specific SWPPP requirements of the 1997 Permit and the 2015 Permit are set out below.

3.5.1.   1997 Permit SWPPP Requirements.

Section A.1 and Provision E.2 of the 1997 Permit require dischargers to have developed and implemented a SWPPP prior to beginning industrial activities that meets all of the requirements of the 1997 Permit. The objectives of the 1997 Permit SWPPP requirements are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the Facility and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. 1997 Permit § A.2. These BMPs must achieve compliance with the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

To ensure compliance with the Storm Water Permit, the SWPPP must be evaluated on an annual basis pursuant to the requirements of Section A.9 of the 1997 Permit, and must be revised as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Sections A.9–10. Sections A.3–10 of the 1997 Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a site map showing the Facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, areas of industrial activity, and other features of the Facility and its industrial activities (§ A.4); a list of significant materials handled and stored at the site (§ A.5); a description of potential pollutant sources, including industrial processes, material handling and storage areas, dust and particulate generating activities, significant spills and leaks, NSWDs and their sources, and locations where soil erosion may occur (§ A.6).

Sections A.7–8 of the 1997 Permit require an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized NSWDs, including structural BMPs where non-structural BMPs are not effective.

3.5.2.   2015 Permit SWPPP Requirements.

As with the SWPPP requirements of the 1997 Permit, Sections X.A–H of the 2015 Permit require dischargers to have developed and implemented a SWPPP that meets all of the requirements of the 2015 Permit. *See also* 2015 Permit, Appendix 1. The objective of the

Exhibit 1
Page 071

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 19

SWPPP requirements are still to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. 2015 Permit § X.C.

The SWPPP must include, among other things and consistent with the 1997 Permit, a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, points of discharge, direction of flow, areas of actual and potential pollutant contact, nearby water bodies, and pollutant control measures; a description of the BMPs developed and implemented to reduce or prevent pollutants in storm water discharges and authorized NSWDs necessary to comply with the Storm Water Permit; the identification of NSWDs and the elimination of unauthorized NSWDs; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and the identification of individuals and their current responsibilities for developing and implementing the SWPPP. 2015 Permit §§ X.A–H.

Further, the 2015 Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 2015 Permit §§ X.A–B. Like the 1997 Permit, the 2015 Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed; and a visual inspection of equipment needed to implement the SWPPP. 2015 Permit §§ X.B, XV.

3.5.3.   The San Diego Hauling Facility Owner and/or Operator Has Violated and Continues to Violate the Storm Water Permit SWPPP Requirements.

The San Diego Hauling Facility Owner and/or Operator has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP. First, information available to Coastkeeper and CERF indicates that the Facility SWPPPs, as well as the Facility site map, dated June 2015 and uploaded to the SMARTS database June 29, 2015, fail to accurately label all areas of industrial activity. For example, as discussed in Section 2.3, *supra*, the Facility Owner and/or Operator's self-classification of DA1 as non-industrial is erroneous. Table 3.5 of the 2016 SWPPP indicates that various pollutants and pollutant sources associated with container maintenance are located within DA1. Furthermore, the site map and SWPPPs fail to acknowledge that waste hauling trucks, bins, and containers frequently enter and exit the Facility via the driveway located within DA1. As such, there are numerous industrial activities occurring within DA1, and the Facility's attempt to classify DA1 as non-industrial is erroneous, inaccurate, and violates the Storm Water Permit's SWPPP requirements.

Exhibit 1
Page 072

The site map and SWPPPs also fail to acknowledge that the paint booths, welding bays, and wash racks are located either within DA2 or bordering DA2. Moreover, while the 2016 SWPPP, 2017 Level 2 ERA Action Plan, and 2018 Level 2 ERA Technical Report acknowledge that the Facility engages in transfer operations, the site map and SWPPPs fail to provide any information about the Facility's transfer operations or where such activities take place on the Facility. The site map and SWPPPs fail to acknowledge that DA3 and DA4 are both used extensively for trash can, bin, and waste hauling vehicle storage, and such equipment is stored outdoors, exposed to precipitation. The site map also fails to label all pollutant control measures implemented at the Facility. *See* 2015 Permit § X.E.3.a. As such, the Facility SWPPPs and site maps have failed to accurately label and describe the location of all industrial activities, industrial materials, and potential pollutant sources in each drainage area in violation of the Storm Water Permit. *See* 2015 Permit, §§ X.E.3.f, X.G.

The San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate description of potential pollutant sources. Section X.G.1.a of the 2015 Permit requires dischargers to "ensure the SWPPP *describes* each industrial process including: manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to the process." Both the 2015 and 2016 Facility SWPPPs fail to adequately describe any of the industrial activities at the Facility. The entirety of the 2016 SWPPP's description of industrial activities is as follows:

> "The Facility conducts vehicle CNG fueling and waste transfer operations, maintains waste containers and stores hauling vehicles. Waste containers and trash bins are brought on-site for maintenance, which includes welding and washing. Hauling vehicles also receive mechanical maintenance and washing at the Facility. The maintenance building also includes a wash bay and a welding bay." 2016 SWPPP § 2.3.1.

The 2016 SWPPP also incorporates Tables 2.1.a–c which list industrial activities, associated industrial materials, and pollutants, but these tables are even more cursory than the narrative description provided in section 2.3.1. Thus, the SWPPPs fail to provide information regarding *how* the San Diego Hauling Facility Owner and/or Operator conduct any of these industrial activities. As such, the SWPPPs fail to provide the required *description* of industrial activities in violation of the Storm Water Permit. *See* 2015 Permit § X.G.1.

The San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate pollutant source assessment. Section X.G.2 of the 2015 Permit requires dischargers to "ensure that the SWPPP includes a *narrative* assessment of all areas of industrial activity with potential industrial pollutant sources." (emphasis added). This assessment shall include "pollutants likely to be present in industrial storm water discharges and authorized NSWDs," (§ X.G.2.a.ii), "[t]he degree to which the pollutants associated with those materials may be exposed to, and mobilized by contact with, storm water," (§ X.G.2.a.iv), "[t]he direct and indirect pathways by which pollutants may be exposed to storm water or authorized NSWDs," (§ X.G.2.a.v), and "[t]he effectiveness of

Exhibit 1
Page 073

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 21

existing BMPs to reduce or prevent pollutants in industrial storm water discharges and
authorized NSWDs," (§ X.G.2.a.vii), among other requirements.

The 2015 and 2016 Facility SWPPPs fail to comply with any of the aforementioned
requirements of X.G.2. The only narrative assessment provided in the 2016 SWPPP cursorily
lists out the industrial activities conducted at the Facility, and summarily states "[p]ollutants that
can potentially enter stormwater run-off and other discharges draining from the Facility include:
Sediment (including vehicle traffic), Oil & Grease (waste oil and leaks from equipment); and
pH." Given the activities, operations, and materials present at this Facility as described in
Section 2, *supra*, the 2016 SWPPP pollutant source assessment's conclusion that only sediment,
O&G, and pH could be discharged from the Facility is absurd. As the pollutants identified in the
pollutant source assessment are used to determine the parameters for which a Facility samples
and analyzes its storm water, the San Diego Hauling Facility Owner and/or Operator's
identification of only these minimum pollutants evidences an intent to circumvent requirements
of the Storm Water Permit, and thus avoid analyzing its storm water for required additional
parameters.

The only pollutants identified in Table 2.1.b of the 2016 SWPPP are oil and grease,
hydrocarbons, gross pollutants, trace metals, CNG, and diesel fuel, without any further
description or analysis. Even this woefully inadequate assessment of pollutants acknowledges
that multiple metals and "gross pollutants" are present at the Facility, thus undermining the
SWPPPs claims, made mere paragraphs prior, that only sediment, O&G, and pH could be present
in the Facility's storm water discharges. Moreover, Table 2.1.a of the 2016 SWPPP specifically
acknowledges that indicator bacteria, enterococcus, fecal coliform, total coliform, copper and
zinc are present at the Facility, yet the SWPPP fails to identify or describe any BMPs that would
eliminate such pollutants from its storm water and non-storm water discharges. Thus, Table 2.1.a
further undermines the SWPPP's claim that only sediment, O&G, and pH could be present in the
Facility's storm water discharges. In addition, as discussed in Section 2.2, *supra*, information
available to Coastkeeper and CERF indicates that there are numerous other pollutants present in
the Facility's storm water discharges. Thus, the Facility SWPPPs fail to adequately and
accurately assess the vast majority of these pollutants in violation of the Storm Water Permit's
SWPPP requirements.

The San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to
develop and/or implement a SWPPP that contains BMPs to prevent the exposure of pollutants
and pollutant sources to storm water and the subsequent discharge of polluted storm water from
the Facility, as required by the Storm Water Permit. This is due in part to the SWPPPs' failure to
include adequate site-specific information regarding the BMPs developed and/or implemented at
the Facility. For example, Section 3.1 of the 2016 SWPPP simply states "[a]ll minimum Best
Management Practices (BMPs) that are required by the IGP and necessary to meet the Facility
conditions will be implemented." Thereafter, sections 3.1.1 through 3.1.7 of the 2016 SWPPP
largely parrot the 2015 Permit language setting forth minimum BMP requirements. Furthermore,
rather than provide site-specific details regarding which BMPs will be implemented at specific
Facility locations to address specific pollutants, the 2016 SWPPP's BMPs section cites to the
generic CASQA Stormwater BMP Handbook Portal for additional BMPs details. 2016 SWPPP §

Exhibit 1
Page 074

3.1. In addition, the 2016 SWPPP BMP summary table only recognizes three industrial activities without additional specifics: vehicle and equipment maintenance, vehicle and equipment fueling, and container maintenance. 2016 SWPPP, Table 3.5. Table 3.5 only addresses O&G, metals, and suspended sediment as potential pollutants, and thus fails to mention numerous pollutants. Therefore, the 2016 SWPPP fails to provide adequate site-specific information regarding how and where such BMPs are implemented, in violation of the Storm Water Permit. *See* 2015 Permit §§ X.A; X.H.

The SWPPP's inadequacies are further documented by the continuous and ongoing discharge of storm water containing pollutant levels that exceed EPA Benchmarks and applicable WQSs, which indicate that the Facility's BMPs are failing to meet BAT/BCT requirements. *See, e.g.,* Ex. 1.

The San Diego Hauling Facility Owner and/or Operator has also failed to revise the Facility's SWPPP to ensure compliance with the Storm Water Permit. Despite the significant concentrations of pollutants in the Facility's storm water discharges each year, information available to Coastkeeper and CERF indicates that the Facility SWPPP has remained the same since November 2016, and has not been revised to include additional BMPs to eliminate or reduce these pollutants, as required by the Storm Water Permit.

Accordingly, the San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to adequately develop, implement, and/or revise the Facility SWPPP in violation of SWPPP requirements of the Storm Water Permit. Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. The Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit SWPPP requirements since at least August 26, 2014. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

### 3.6. <u>Failure to Develop, Implement, and/or Revise an Adequate Monitoring and Reporting Program.</u>

The Storm Water Permit requires permittees to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. A permittee has an ongoing obligation to revise the M&RP as necessary to ensure compliance with the Storm Water Permit. The specific M&RP requirements of the 1997 Permit and the 2015 Permit are set out below.

#### 3.6.1. <u>1997 Permit M&RP Requirements</u>.

Section B.1 and Provision E.3 of the 1997 Permit require Facility operators to develop and implement an adequate M&RP prior to the commencement of industrial activities at a Facility, that meets all of the requirements of the Storm Water Permit. The primary objective of

Exhibit 1
Page 075

the M&RP is to detect and measure the concentrations of pollutants in a Facility's discharge to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* 1997 Permit § B2.

The M&RP must therefore ensure that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and must be evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *Id*. §§ B.3–16. Dischargers must revise the SWPPP in response to their M&RP observations to ensure that BMPs are effectively reducing and/or eliminating pollutants at the Facility. *Id*. § B.4. Sections B.5 and B.7 of the 1997 Permit require dischargers to visually observe and collect samples of storm water from all locations where storm water is discharged.

Sections B.5 and B.7 of the 1997 Storm Water Permit require dischargers to visually observe and collect samples of storm water from all drainage areas and discharge locations where storm water is discharged. Under Section B.5 of the Storm Water Permit, a permittee is required to collect at least two (2) samples from each discharge location at the Facility during the Wet Season. Storm water samples must be analyzed for TSS, pH, SC, total organic carbon or O&G, and other pollutants that are likely to be present in the Facility's discharges in significant quantities. *Id.* § B.5.c. Finally, permittees must identify and use analytical method detection limits sufficient to determine compliance with the 1997 Permit's monitoring program objectives and specifically, the Effluent Limitations and Receiving Water Limitations. *Id.* § B.10.iii.

### 3.6.2.   2015 Permit M&RP Requirements.

As with the 1997 M&RP requirements, Sections X.I and XI.A–D of the 2015 Permit require Facility operators to develop and implement an adequate M&RP that meets all of the requirements of the 2015 Permit. The objective of the M&RP is still to detect and measure the concentrations of pollutants in a Facility's discharge, and to ensure compliance with the 2015 Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit § XI. An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *Id*.

As an *increase* in frequency of monitoring requirements, Sections XI.B.1–5 of the 2015 Permit requires permittees to collect storm water discharge samples from a qualifying storm event[20] as follows: 1) from each drainage area at all discharge locations, 2) from two (2) storm events within the first half of each Reporting Year[21](July 1 to December 31), 3) from two (2) storm events within the second half of each Reporting Year (January 1 to June 30), and 4) within four hours of the start of a discharge, or the start of Facility operations if the qualifying storm event occurs within the previous 12-hour period. The 2015 Permit requires, among other things,

---

[20] The 2015 Permit defines a qualifying storm event as one that produces a discharge for at least one drainage area, and is preceded by 48-hours with no discharge from any drainage areas. 2015 Permit, Section XI(B)(1).

[21] A Reporting Year replaced the 1997 permit term Wet Season, and is defined as July 1 through June 30. 2015 Permit, Findings, ¶ 62(b).

Exhibit 1
Page 076

that permittees must submit *all sampling* and analytical results for all samples via SMARTS within 30 days of obtaining all results for each sampling event. *Id*. § XI.B.11 (emphasis added).

The parameters to be analyzed are also consistent with the 1997 Permit, however, the 2015 Permit no longer requires SC to be analyzed. Sections XI.B.6.a–b of the 2015 Permit requires permittees to analyze samples for TSS, O&G, and pH. Section XI.B.6.c–d of the 2015 Permit requires permittees to analyze samples for all pollutants associated with the Discharger's industrial activities. Specifically, the 2015 Permit requires Facility Owners and/or Operators to sample and analyze parameters on a Facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. *Id*. § XI.B.6.c. Section XI.B.6.e of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with a Clean Water Act Section 303(d) listed impairment(s), or approved Total Maximum Daily Loads.

### 3.6.3. The Facility Owner and/or Operator Has Violated and Continues to Violate the Storm Water Permit M&RP Requirements.

The San Diego Hauling Facility Owner and/or Operator has been and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised M&RP. For example, the Facility Owner and/or Operator has failed and continues to fail to sample and analyze storm water discharges for all parameters required by the Storm Water Permit, and fails to collect samples from all discharge locations.

Information available to Coastkeeper and CERF indicates that the San Diego Hauling Facility Owner and/or Operator has failed to sample for numerous constituents likely to be present at the Facility in violation of section XI.B.6.c of the 2015 Permit. In light of the Facility's activities of storing, washing, welding, painting, and otherwise maintaining waste hauling trucks and containers, as well as its waste transfer operations, dozens of pollutants are likely present at the Facility, as previously explained in Section 2.2, *supra*. Moreover, the 2016 SWPPP acknowledges that zinc, copper, E. coli, enterococcus, fecal coliform, total coliform, and "trace metals" are present at the Facility as a result of the Facility's industrial activities. 2016 SWPPP, Tables 2.1.a-b. Furthermore, as noted in multiple sections *supra*, the Facility Owner and/or Operator analyzed its storm water discharges for zinc on December 2, 2014 and December 12, 2014, and all six samples collected exceeded the EPA Benchmark for zinc of 0.12 mg/L. Yet, the Facility Owner and/or Operator ceased sampling for zinc after December 12, 2014 without providing explanation or implementing any BMPs to reduce and/or prevent discharges of zinc in the Facility's storm water. However, the Facility Owner and/or Operator analyzes samples for only TSS, O&G, and pH. The Facility has therefore failed and continues to fail to sample for numerous "additional" parameters in violation of Section B.5.c of the 1997 Permit, and Section XI.B.6.c of the 2015 Permit.

In addition, the San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to develop and/or implement an M&RP that requires the collection of storm water samples from all discharge locations at the Facility in violation of Section XI.B.4 of the 2015 Permit. For example, the Facility Owner and/or Operator only collects samples from DA2

Exhibit 1
Page 077

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 25

(at SD-1), and has failed and continues to fail collect samples from DA1, DA3, DA4, and DA5. Information available to Coastkeeper and CERF indicates that the Facility's storm water samples collected at SD-1 fail to account for post-BMP pollutants from DA3 and DA4. For example, Table 5.4 of the 2016 SWPPP, notes that SD-1 has "no additional inputs." Furthermore, the San Diego Hauling Facility Owner and/or Operator used to collect samples from DA2, DA3, and DA4 separately, but ceased that practice after December 12, 2014 without explanation. Thus, the Facility fails to sample storm water and non-storm water from DA3 and DA4 in violation of the Storm Water Permit.

Furthermore, the Facility Owner and/or Operator's self-classification of DA1 as non-industrial is erroneous. Table 3.5 of the 2016 SWPPP indicates that various pollutants and pollutant sources associated with container maintenance are located within DA1. Furthermore, the site map and SWPPPs fail to acknowledge that waste hauling trucks, bins, and containers frequently enter and exit the Facility via the driveway located within DA1. The Facility has also failed to obtain a No Exposure Certification ("NEC") to exclude any individual drainage areas from the SWPPP and monitoring requirements of the Storm Water Permit.[22] As such, there are numerous industrial activities occurring within DA1, and the Facility's attempt to classify DA1 as non-industrial is erroneous, inaccurate, and violates the Storm Water Permit's SWPPP requirements.

The Facility Owners and/or Operators also identify DA5 as non-industrial, using the same erroneous reasoning used to classify DA1 as non-industrial. Furthermore, DA5 is immediately adjacent to the Facility's primary ingress/egress driveway, through which waste hauling vehicles and containers frequently travel. Information available to Coastkeeper and CERF indicates that there are no BMPs to prevent pollutants from these vehicles and containers from settling on DA5. Further, during rainfall events, storm water from this ingress/egress driveway in DA1 comingles with storm water from DA5, as there are insufficient BMPs in place to prevent such comingling.

Section XI.B.4 of the 2015 Permit specifically requires dischargers to collect samples "from *each drainage area* at *all* discharge locations." While Section B.7.d of the 1997 Permit and Section XI.C.4 of the 2015 Permit allow permittees to reduce the number of locations to be sampled, there is no indication that the Facility Owner and/or Operator has complied with the requirements of Section B.7.d of the 1997 Permit or Section XI.C.4 to justify sampling a reduced

---

[22] For a Facility covered by the Storm Water Permit to obtain a NEC, "Dischargers shall identify any drainage areas with no exposure to industrial activities and materials in accordance with the definitions in <u>Section XVII</u>." 2015 Permit, § X.G.2.c. "Any drainage areas on that Facility that would otherwise qualify for NEC coverage may be specially addressed in the Facility SWPPP by including an NEC Checklist and a certification statement demonstrating that those drainage areas of the Facility have been evaluated; and that none of the Industrial Materials or Activities . . . are, or will be in the foreseeable future, exposed to precipitation." *Id.*, § XVII.E.1. The NEC Checklist requires the Facility Owner and/or Operator to certify that certain industrial materials or activities are not exposed to precipitation including: using, storing or cleaning industrial machinery or equipment, and areas where residuals from using, storing or cleaning industrial machinery or equipment remain and are exposed; material handling equipment (except adequately maintained vehicles); and waste material (except waste in covered, non-leaking containers, e.g., dumpsters). *Id.*, § XVII.F.

Exhibit 1
Page 078

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 26

number of discharge locations at the Facility. Therefore, the San Diego Hauling Facility is in violation of the Storm Water Permit for failing to collect samples from DA1, DA3, DA4, and DA5.

The San Diego Hauling Facility Owner and/or Operator also failed to collect the required number of storm water samples for each reporting period. For example, the Facility only collected one sample during the entire 2017-2018 reporting period.

Finally, the Storm Water Permit requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs. Based on information available to Coastkeeper and CERF, including Annual Reports, the San Diego Hauling Facility Owner and/or Operator fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

Accordingly, the San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to adequately develop, implement, and/or revise a M&RP, in violation of the Storm Water Permit. Every day the Facility operates with an inadequately developed and/or implemented M&RP, or with an improperly revised M&RP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. The San Diego Hauling Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit M&RP requirements since at least August 26, 2014. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

**3.7.  Failure to Comply with the Storm Water Permit's Reporting Requirements.**

Section B.14 of the 1997 Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section B.14 requires that the Annual Report include a summary of visual observations and sampling results, an evaluation of the visual observation and sampling results, the laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required, and other information specified in Section B.13. The 2015 Permit includes the same reporting requirements with the Annual Report due July 15. *See* 2015 Permit § XVI.

The San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to submit Annual Reports that comply with the Storm Water Permit reporting requirements. For example, the Facility Owner and/or Operator simply failed to upload an Annual Report to the SMARTS database for the reporting period of 2017-2018. Additionally, the Annual Reports for the 2015-16 and 2016-17 reporting periods state that zinc, copper, E. coli, enterococcus, fecal coliform, and total coliform are not present at the Facility. However, as noted *supra*, the 2016 SWPPP acknowledges that all of these pollutants are present at the Facility as a result of the Facility's industrial activities.

Exhibit 1
Page 079

In each Annual Report since the filing of the 2013-14 Annual Report, the San Diego Hauling Facility Owner and/or Operator certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the Storm Water Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the Storm Water Permit, or will otherwise be revised to achieve compliance. However, information available to Coastkeeper and CERF indicates that these certifications are erroneous. For example, storm water samples collected from the Facility contain concentrations of pollutants above EPA Benchmarks and WQSs, thus demonstrating that the Facility BMPs do not adequately address existing pollutant sources. Further, as discussed in Sections 3.5.3 and 3.6.3, the Facility's SWPPPs do not include many elements required by the Storm Water Permit, and thus it is erroneous to certify that the SWPPP complies with the Storm Water Permit.

In addition, San Diego Hauling Facility Owner and/or Operator has not accurately reported non-compliance, as required by the Storm Water Permit. *See* 1997 Permit § C.11.d; 2015 Permit § XVI.B.2.

Given that the San Diego Hauling Facility Owner and/or Operator has submitted incomplete and/or incorrect Annual Reports that fail to comply with the Storm Water Permit, the Facility Owner and/or Operator is in daily violation of the Storm Water Permit. Every day the Facility Owner and/or Operator conducts operations at the Facility without reporting as required by the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). The Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit's reporting requirements every day since at least August 26, 2014. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 26, 2014.

### 3.8. Failure to Comply with Level 1 Exceedance Response Action Requirements.

When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status" for all parameters listed in Table 2 of the 2015 Permit. 2015 Permit § XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *Id.* § XII.C. Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the discharger enters the Exceedance Response Action ("ERA") process. *Id.* The ERA process requires the discharger to conduct an evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the Facility that are or may be related to the NAL exceedance(s) by October 1 following commencement of Level 1 status. *Id.* § XII.C.1.a-b. The evaluation must include the identification of the "corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit." *Id.* § XII.C.1.c. "Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated." *Id.*

Exhibit 1
Page 080

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 28

Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, prepare a Level 1 ERA Report. *Id*. § XII.C.2. The Level 1 Report must be prepared by a QISP and include a summary of the Level 1 ERA evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL. *Id.* § XII.C.2.a.i-ii. The SWPPP revisions and additional BMP development and implementation must also be completed by January 1, and the Level 1 status discharger is required to submit via SMARTS the Level 1 ERA Report certifying the evaluation has been conducted, and SWPPP revisions and BMP implementation have been completed. *Id.* The certification also requires the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *Id.* § XII.C.2.a.iii. A permittee's Level 1 status for a parameter will return to Baseline status if a Level 1 ERA report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *Id.* § XII.C.2.b. A permittee will enter a Level 2 status if there is a NAL exceedance of the same parameter when the discharger is in Level 1 status. *Id.* § D.

The San Diego Hauling Facility entered Level 1 status for TSS following the 2015-16 reporting period with an average annual concentration of TSS of 160 mg/L, exceeding the annual NAL of 100 mg/L. Following the 2016-17 reporting period, the Facility entered Level 2 status for TSS with an average annual concentration of TSS of 181.75 mg/L. The Facility also entered Level 1 status for O&G following the 2016-17 reporting period with an average annual amount of 16.925 mg/L, exceeding the annual NAL of 15.0 mg/L. Following the 2017-18 reporting period, during which the Facility Owner and/or Operator collected only one sample, the Facility remained in Level 1 status for O&G and Level 2 for TSS. Coastkeeper and CERF note that, due to the Facility's failure to collect samples from all drainage areas and all discharge points, as well as the failure to analyze storm water samples for all parameters required by the Storm Water Permit, the Facility's monitoring data fails to accurately portray the San Diego Hauling Facility's actual NAL exceedances and proper ERA levels.

In September 2016, the Facility Owner and/or Operator submitted a consolidated ERA Level 1 Evaluation and Report for TSS ("2016 Level 1 ERA Report"). The 2016 Level 1 ERA Report failed to conduct an adequate Level 1 status evaluation to identify additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances at the Facility. The 2016 Level 1 ERA Report's "evaluation" identified the likely source of TSS at the Facility as "[i]ndustrial activity, truck movement around the site, [and] minor wind blown" sediment, and simply recommended that the Facility's FloGard drain inlets be cleaned more frequently. This alleged evaluation of the sources of TSS at the Facility is woefully inadequate. The Report's statement that one likely source of TSS is "industrial activity" is entirely void of specificity, thus violating Section XII.C.1.b of the 2015 Permit and undermining the intent of the ERA provisions of the Storm Water Permit. As the Facility has continued to discharge TSS in excess of NALs, the 2016 Level 1 ERA Report failed to adequately evaluate sources of TSS, or recommend BMPs that would successfully reduce TSS below the NAL standard. *See* 2015 Permit § XII.C.1.c.

Exhibit 1
Page 081

In September 2017, the Facility Owner and/or Operator submitted a consolidated ERA Level 1 Evaluation and Report for O&G ("2017 Level 1 ERA Report"). Like the Level 1 ERA Report for TSS, the 2017 Level 1 ERA Report failed to conduct an adequate Level 1 status evaluation to identify additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances at the Facility. The 2017 Level 1 ERA Report for O&G closely mirrors that 2016 report for TSS in that it claims the SWPPP was sufficient, identified the likely source of O&G as "[i]ndustrial activity, [and] truck movement around the site," and simply recommended that the Facility's FloGard drain inlets be cleaned more frequently. As such, the 2017 Level 1 ERA Report violates the Storm Water Permit for the same reasons as the 2016 Level 1 ERA Report.

In December 2017, the San Diego Facility Owner and/or Operator published a Level 2 ERA Action Plan, which is publicly available on the SMARTS online database. The 2015 Permit requires that a Level 2 ERA Action Plan shall at a minimum address the drainage areas with corresponding Level 2 NAL exceedances. 2015 Permit § XII.D.1.c. As previously discussed, the Facility Owner and/or Operator has failed to collect samples from each drainage area, and discharge point. For example, the Facility Owner and/or Operator only collects storm water from DA2 at SD-1 in violation of the Storm Water Permit. As such, the 2017 ERA Level 2 Action Plan failed to adequately evaluate any other drainage areas, undermining the accuracy of the ERA action plan, as well as the and effectiveness of the NAL iterative process.

In December 2018, the San Diego Facility Owner and/or Operator published a Level 2 ERA Technical Report. Similar to the 2017 ERA Level 2 Action Plan, the 2018 Technical Report is inaccurate and ineffective due to the Facility Owner and/or Operator's failure to collect samples from each drainage area. For example, for both DA3 and DA4, the 2018 Technical Report's exceedance and BMP implementation analysis stats that "there were no exceedances in this DA." However, there were no recorded exceedances in these drainage areas because the Facility Owner and/or Operator ceased collecting samples from DA3 and DA4 after December 12, 2014 without providing any explanation.

The San Diego Hauling Facility Owner and/or Operator has failed and continues to fail to conduct adequate Level 1 status evaluation and report that complies with the Storm Water Permit. Additionally, the Facility Owner and/or Operator has failed and continues to fail to comply with ERA Level 2 requirements. As such, the Facility Owner and/or Operator is in daily violation of the Storm Water Permit. Every day the Facility Owner and/or Operator conducts operations at the Facility without an adequate Level 1 status evaluation, and/or without submitting adequate Level 1 and/or Level 2 ERA Reports, Plans, and Studies is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). The Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit's Level 1 status ERA evaluation requirement every day since October 1, 2016. The Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit for failing to submit adequate ERA Reports every day since January 1, 2017. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act and Storm Water Permit's Level 1 status ERA evaluation requirements every day since October 1, 2016. The Facility Owner and/or

Exhibit 1
Page 082

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 30

Operator is subject to civil penalties for all violations of the Clean Water Act and Storm Water Permit's Level 1 ERA Report requirements every day since January 1, 2017.

## 4.   RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter. These provisions of law authorize civil penalties of $37,500.00 per day per violation for all Clean Water Act violations after January 12, 2009 and $54,833.00 per day per violation for violations that occurred after November 2, 2015.

In addition to civil penalties, Coastkeeper and CERF will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law. Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), Coastkeeper and CERF will seek to recover their litigation costs, including attorneys' and experts' fees.

## 5.   CONCLUSION

Coastkeeper and CERF are willing to discuss effective remedies for the violations described in this Notice Letter. However, upon expiration of the 60-day notice period, Coastkeeper and CERF will file a citizen suit under Section 505(a) of the Clean Water Act for the San Diego Hauling Facility Owner and/or Operator's violations of the Storm Water Permit.

If you wish to pursue settlement discussions, please contact Coastkeeper and CERFs legal counsel:

Matt O'Malley
Patrick McDonough
matt@sdcoastkeeper.org
San Diego Coastkeeper
2825 Dewey Road, Suite 207
San Diego, California 92106
619-758-7743

Marco Gonzalez
Livia Borak Beaudin
livia@coastlawgroup.com
Coast Law Group, LLP
1140 South Coast Highway 101
Encinitas, California 92024
Tel: 760-942-8505

Exhibit 1
Page 083

Notice of Intent to Sue: Clean Water Act
*Republic Services, Inc., San Diego Hauling Facility*
August 27, 2019
Page 31

Sincerely,

Matt O'Malley
Patrick McDonough
Attorneys for San Diego Coastkeeper

Marco Gonzalez
Livia Borak Beaudin
Attorneys for Coastal Environmental
Rights Foundation

## SERVICE LIST

<u>VIA U.S. MAIL</u>

David Gibson
Executive Officer
San Diego Regional Water Quality Control Board
2375 Northside Drive, Suite 100
San Diego, California 92108

Mike Stoker
Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Andrew Wheeler, Administrator
Environmental Protection Agency
Office of the Administrator 1101A
1200 Pennsylvania Ave N.W
Washington, DC 20460

Eileen Sobeck
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812–0110

Exhibit 1
Page 084